1          UNITED STATES DISTRICT COURT

2             DISTRICT OF CONNECTICUT

3    _____

     AGNES KOLE                    )
4                    Plaintiff.    ) NO: 3:07cv1711(JCH)
                                   )
5    vs.                           ) April 7, 2008
                                   ) 10:07 a.m.
6    HARRY LAPPIN, ET Al           )
                     Defendants.   )
7    _____
                                        915 Lafayette Boulevard
8                                       Bridgeport, Connecticut

9                    HEARING
                     DAY 1
10

11   B E F O R E:
                     THE HONORABLE JANET C. HALL, U.S.D.J.

12   A P P E A R A N C E S:

13

     For the Plaintiff   :        BRUCE D. KOFFSKY, ESQ.
14                                Koffsky & Felsen, LLC
                                  1200 Summer Street
15                                Stamford, CT 06905

16

     For the Defendants  :        ALAN M. SOLOWAY
17                                U.S. Attorney's Office
                                  157 Church St., 23rd floor
18                                New Haven , CT 06510

19

     Court Reporter      :        Terri Fidanza, RPR
20

21

22

     Proceedings recorded by mechanical stenography,
23   transcript produced by computer.

24

25

1          THE COURT:  Good morning.  We're here this

2   morning in the matter of the Kole versus Lappin.  If I

3   can have appearance please.

4          MR. KOFFSKY:  Good morning, your Honor.

5   Attorney Bruce Koffsky for the petitioner Agnes Kole who

6   is with me at counsel table.

7          THE COURT:  Good morning, Attorney Koffsky.

8          MR. SOLOWAY:  For the government, your Honor,

9   Assistant United States Attorney Alan Soloway.

10          THE COURT:  Good morning, Attorney Soloway.

11          MR. SOLOWAY:  Your Honor, if I can looking at

12   the cover page of the original petition, names and number

13   of parties, the only proper party is Warden Zickefoose

14   and not the other originals.

15          THE COURT:  Attorney Koffsky, would you agree we

16   are working from the pro se petition?

17          MR. KOFFSKY:  I don't take a position.  It was

18   filed by her.  One of the parties is the correct party.

19          THE COURT:  I don't think Attorney Soloway is

20   disagreeing with that.  Just pointing out there are a lot

21   of others.

22          MR. KOFFSKY:  This is the first time I'm

23   handling a matter such as this so I'm not sure who the

24   proper party is.  I'm taking the position the proper

25   party has been served.

1          THE COURT:  That's fine.  That's the petition

2     for the habeas corpus so presumably the person who has

3     custody over Ms. Kole's body is the proper person.  You

4     can name the Attorney General.  It wouldn't be fruitful

5     and others go up the line to the head of the Bureau of

6     Prisons but I think the warden is currently Donna

7     Zickefoose.

8          MR. SOLOWAY:  Yes.

9          THE COURT:  By way of background, this petition

10    was filed toward the end of last year bringing --

11    complaining of the fact that the petitioner was not

12    receiving appropriate access to Kosher food in light of

13    the upcoming Passover season, and Attorney Koffsky who is

14    appointed after the pro se petition was filed, he

15    reminded my chambers of the fact that the holiday season

16    of which the petition was particularly focused was fast

17    approaching.  As a result of that, we had a telephone

18    conference, and I think effectively in my mind there

19    needed to be a decision because of the upcoming holiday,

20    and I suggested I thought I needed to have a hearing to

21    take some evidence before deciding.  I didn't wish to

22    decide on the papers.  That's what brings us here this

23    morning.  Attorney Koffsky, I understand that you wish to

24    put your client on the stand.

25          MR. KOFFSKY:  That's right.

```
 1                   THE COURT:  Why don't we start the evidence.
 2                   MR. KOFFSKY:  The petitioner calls Agnes Kole.
 3                   THE COURT:  If you come up to the witness stand.
 4       When you arrive, if you would remain standing so the
 5       clerk will administer an oath.
 6                   A G N E S   K O L E .
 7                    having been called as a witness, was first duly
 8                sworn and testified on his oath as follows:
 9
10                   THE CLERK:  State your full name for the record
11       and spell it.
12                   THE DEFENDANT:  Agnes Kole, K-o-l-e.  Agnes,
13       A-g-n-e-s.
14                   THE COURT:  You may be seated.  Thank you.
15       DIRECT EXAMINATION BY MR. KOFFSKY:
16            Q.  Good morning, Ms. Kole.
17            A.  Good morning.
18            Q.  Ms. Kole, where are you -- are you incarcerated?
19            A.  Yes.
20            Q.  Where are you incarcerated?
21            A.  Danbury.
22            Q.  Danbury Correctional?
23            A.  Yes.
24            Q.  That's the Federal Correctional Institute at
25       Danbury?
```

1          A.  Yes.

2          Q.  How long have you been there?

3          A.  I have been in Danbury from 1996, 12 years now.

4          Q.  And do you practice any particular religion?

5          A.  Yeah.

6          Q.  What is that religion?

7          A.  Jewish.

8          Q.  You have been Jewish since you went to Danbury?

9          A.  Yeah.

10         Q.  And since you have gone to Danbury, that's the

11    only religion that you have practiced?

12         A.  Yes.

13         Q.  The facility keeps track of what religions

14    people practice, am I correct?

15         A.  Yes.

16         Q.  Does the facility know that you practice the

17    Jewish religion?

18         A.  Yes.

19         Q.  In practicing the Jewish religion, being a

20    member of the Jewish religion, do you keep certain

21    dietary observances?

22         A.  Yes.

23         Q.  What are those dietary observes?

24         A.  Kosher food.

25         Q.  You eat Kosher foods at the Danbury prison?

1       A.  Diet food.  Kosher food.

2       Q.  So it is true that you eat Kosher food during

3   the entire year, am I correct?

4       A.  Um-hum.

5       Q.  Now, the food that you are served, is provided

6   by Danbury prison, correct?

7       A.  Yes.

8       Q.  Now, before we talk about the food that you are

9   served, would you tell the court how you live?  You are

10   in a room?

11       A.  Yes.

12       Q.  Would you describe to the judge how your room is

13   set up and how you live in the room?

14       A.  The room is set up with two inmates.  With two

15   inmates, I'm on the bottom bunk.  The other lady is on

16   the top bunk.  We have a sink.  We have toilet inside.

17   There's a door you can open.  It is not locked but you

18   can just close it.  If you want to use the bathroom,

19   there's something we call wick (ph.) you put up.  It is

20   in the bathroom.  You take it up.  It is a little that

21   opens that can see through.

22       Q.  You are in that room with another inmate?

23       A.  Yes.

24       Q.  Now, are there a group of inmates together in

25   what is called a pod?

1        A.  There's other units.

2        Q.  Withdrawn.  I didn't mean a pod.  I meant a

3   unit.  Is your section of the prison broken down into

4   units?

5        A.  Yes.

6        Q.  How many people in your unit?

7        A.  In my unit it is about 60.  When they do count,

8   there's 65, it is about 64.

9        Q.  There's approximately 60 people in your unit?

10        A.  Yes.

11        Q.  How many units are there in your area of the

12   prison?

13        A.  13 units.

14        Q.  So there's 13 units and in your unit there's

15   approximately 60 inmates, am I correct?

16        A.  A little bit more than 60.

17        Q.  You said that since you came to the prison, you

18   have been a practitioner of the Jewish religion and you

19   have been keeping kosher, am I correct?

20        A.  Yes.

21        Q.  Approximately how many other inmates in the area

22   where you live also keep kosher?

23        A.  In my unit, we're two.  In other unit there are

24   about 10 or 12.

25        Q.  There two kosher inmates in your unit but

1    approximately how many in the 13 units?

2          A.   About 10 of us.

3          Q.   Now, am I correct that the prison serves three

4    meals a day?

5          A.   Yes.

6          Q.   Now, would you tell the court what time

7    breakfast is served?

8          A.   The door opens by 6:15, sometimes 6:20, and we

9    go for breakfast.  That's when the doors opened.  Popped

10   up.  The breakfast is from that 6:15 to 7:00.  All back

11   at 7:30.

12         Q.   At about 6:15, your doors open; am I correct?

13         A.   Yes.

14         Q.   That's the first opportunity you have to leave

15   your room to go get breakfast?

16         A.   Yes.

17         Q.   Breakfast is served at 6:15?

18         A.   Yes.

19         Q.   Breakfast ends at about what time?

20         A.   7:00.

21         Q.   And when breakfast ends, there is no breakfast

22   food service after 7:00; am I correct?

23         A.   No, sir.

24         Q.   About what time is lunch served?

25         A.   Lunchtime I work.  We go to lunch around 11:00.

1          Q.   Let's go back.  You work for Unico; am I
2     correct?
3          A.   Yes.
4          Q.   Unico is a --
5               MR. SOLOWAY:  Unicor, U-n-i-c-o-r for the
6     record.
7          Q.   You work for Unicor?
8               THE COURT:  I'm familiar with it.
9          Q.   You work with Unicor, correct?
10         A.   Yes, sir.
11         Q.   You make cables, am I correct?
12         A.   Yes.  That's what we make cable.
13         Q.   After breakfast is served at 7:00, you go to
14    work?
15         A.   Yes, sir.
16         Q.   After breakfast ending and lunch being served,
17    does the prison give you any food?
18         A.   No, sir.
19         Q.   Now, you indicated that lunch is served at about
20    11:10, am I correct?
21         A.   Yes, sir.
22         Q.   How long do you have for lunch?
23         A.   We have 55 minutes for lunch to go back to work.
24         Q.   55 minutes for lunch?
25         A.   They let us stay 55 minutes.  We have to be at

1    work by quarter of 12.

2         Q.  By 11:45?

3         A.  That's right.

4         Q.  Then you are at work until what time?

5         A.  3:45.

6         Q.  What time is dinner served?

7         A.  Dinner is after 4:00 count.  It is around 5:15,

8    to 5:30.

9         Q.  You go back to your room, am I correct, after

10   you finish the days work and your door opens for dinner

11   after count?

12        A.  Yes.

13        Q.  After 5:15?

14        A.  Yes.

15        Q.  Does the facility serve any food between the end

16   of lunch and the beginning of dinner?

17        A.  No, sir.

18        Q.  What time do you finish with dinner?

19        A.  The last unit finish around because we go by

20   units.  Whichever unit comes to have the room clean.  The

21   dinner finish around 6:30.

22        Q.  Around 6:30 dinner finishes, then you go back to

23   your room?

24        A.  Yes, sir.  If you want to go to gym.

25        Q.  So between the end of dinner and breakfast the

1    next day, does the facility serve any food?

2         A.   No, sir.

3         Q.   Does it serve any snacks?

4         A.   No, sir.

5         Q.   Serve hot chocolate, anything like that?

6         A.   No, sir.

7         Q.   This facility doesn't serve any food between the

8    end of dinner and breakfast the next morning, correct?

9         A.   No, sir.

10        Q.   Let's talk about how you eat.  You eat in a

11   dining room; am I correct?

12        A.   Yes.

13        Q.   Would you tell me how the regular population

14   gets their food in the dining room?

15        A.   Everybody first come.  We stand in a line.  We

16   go by line and then set up the food service.  They serve

17   the food.  They dish the food out and give to you by

18   tray.  You go stand by the line and get your water,

19   whatever juice and then go sit and have lunch.

20        Q.   So the general population inmate takes a tray,

21   am I correct?

22        A.   Yes.

23        Q.   And standing in a line?

24        A.   Yes.

25        Q.   And then goes to the food service area?

1      A.  Right.

2      Q.  And other inmates who work in the kitchen serve

3  the food, am I correct?

4      A.  Yes.

5      Q.  And that food is put on plates on the tray or do

6  the trays have compartments?

7           MR. SOLOWAY:  Objection.  Leading, your Honor.

8           THE COURT:  It is a bit but I'm not sure.  I

9  think it is all right at this stage.

10          MR. SOLOWAY:  I will withdraw it, your Honor.

11          THE COURT:  I think we're still in background.

12     A.  The inmates that serves the food, puts the food

13  on the plates and pass it over to you and then put it on

14  your tray.

15     Q.  You put the plate on your tray?

16     A.  Yes.

17     Q.  You go to another line?

18     A.  They give you fruits, pick up your fruits and go

19  to another line where you get your juice and drink of

20  water.

21     Q.  You indicated there's approximately 10 inmates

22  who keep kosher?

23     A.  Yes, about.  We have about 10 Jewish inmates in

24  Danbury then about seven or eight keeps kosher.

25     Q.  Do you know the rules of keeping kosher?

 1          A.  Yes.

 2          Q.  You don't mix milk with meat?

 3              MR. SOLOWAY:  Leading.  Objection.

 4          A.  Yes.

 5              THE COURT:  I think on this we ought to have the

 6     witness testify.

 7          Q.  Would you describe for the court some of the

 8     basic rules that you live by keeping kosher?

 9          A.  Okay.  For example, you cannot eat meat and milk

10     at the same time.  You cannot mix like cheese with milk.

11     Cheese and meat at the same time.  You can't eat things

12     like that at the same time.  We're not allowed to get any

13     food from the population of the line.  When they give us

14     our food, we're not allowed to get anything from the line

15     except drink of water.

16          Q.  Is there a restriction on the type of meat that

17     you can get, you can eat?

18          A.  Yes.

19          Q.  Why don't you tell the court what the

20     restriction on meat is?

21          A.  The meat that we have to eat is supposed to have

22     kosher.  Everything that we eat is supposed to be kosher.

23     They don't bring it.  They send the hot meal.  They bring

24     it from outside.  All from outside but they stock it in

25     the same place where they stock the population food.  The

 1    inmates, only one inmate, one person is allowed to take

 2    it and heat it up on Passover.  That's us.  All our meat

 3    has to be kosher.

 4        Q.  Now the seven to eight inmates who keep kosher.

 5    You have already described the general population and how

 6    they described their food.  Would you describe how the

 7    seven to eight kosher inmates normally get their food?

 8        A.  Okay.  When we come, we stand in the line.

 9    We're supposed to stand in the line.  When we get to the

10    inmate take their plate, we come out and go straight to

11    the line.  The lady who prepares the kosher food for the

12    Jewish people.  She hands us our tray.  The tray is

13    covered and sealed up.  Everything that sits inside that

14    tray is sealed up.

15        Q.  You indicated that when you said it was wrapped

16    or sealed, how is it wrapped?

17        A.  It is wrapped with what you call it, foil paper.

18        Q.  Is it foil?

19        A.  Yes.  It is wrapped.  The whole tray is wrapped.

20    When you open it in front of the officer, we hand them

21    back the foil paper.  We take our tray.  The drinks.

22    Everything in that tray.  So then we go to our table and

23    eat.

24        Q.  When you get a tray it is wrapped in aluminum

25    foil or foil?

```
 1          A.  Um-hum.

 2          Q.  In front of the guard?

 3          A.  Um-hum.

 4          Q.  You have to unwrap it?

 5          A.  Yes.

 6          Q.  You hand the guard the aluminum foil?

 7          A.  Yes.

 8          Q.  On that tray is your food?

 9          A.  Yes.

10          Q.  Your drink?

11          A.  Everything.

12          Q.  Everything except water.  That tray is what you

13     eat from?

14          A.  Yes.

15          Q.  Are there any seconds?  Can you go back for

16     seconds?

17          A.  No.

18          Q.  You get one tray?

19          A.  And that's it.

20          THE COURT:  Do other inmates go back for seconds

21     who aren't kosher?

22          THE DEFENDANT:  If they want to, they can go if

23     they want to.

24          THE COURT:  Do you know whether there are only

25     seven or eight trays prepared?  Withdrawn.  Do you know
```

1    whether there ever any extra kosher trays prepared?

2         A.  For I know, no because they told us if the tray

3    is counted.  They counted the trays.  Both Jewish and

4    Muslim together so how many Jews and how many Muslims

5    that's involved.  Those trays is counted that amount and

6    that's it.  No extra.

7         Q.  Now as we said there's breakfast, lunch and

8    dinner and no other meals are served; am I correct?

9         A.  Yes.

10        Q.  Let's talk about the commissary.  Is there a

11   commissary at Danbury and when I say Danbury, I'm talking

12   about the prison?

13        A.  Yes, sir, there is.

14        Q.  Is that commissary available to everybody in the

15   13 units?

16        A.  Yes, sir.

17        Q.  Would you tell the court what the commissary is?

18        A.  The commissary is where you buy your extra

19   stuff, snacks, your clothes, all snacks like chocolates,

20   coffees, creamer, your tennis shoes, your boots, your

21   sweat pants, everything, fruits, rice.  All kind of

22   stuff.

23        Q.  How to -- now the items at the commissary are

24   they for purchase?

25        A.  Yes.

1     Q.  Are the items at the commissary there for just

2   giving out?

3     A.  No.  You go there you buy them with your own

4   commissary money.  Money that's sent to you.

5     Q.  If they have to purchase things at the

6   commissary, an inmate needs commissary money, am I

7   correct?

8     A.  Yes.

9     Q.  How does somebody get commissary money?

10    A.  Someone has to send it from outside to you.

11  They send it to them.

12    Q.  So everyone with commissary money or a

13  commissary account is entitled to purchase things at the

14  commissary, am I correct?

15    A.  Yes.

16    Q.  Now when you purchase items at the commissary,

17  where are they kept?

18    A.  In your room.  In your locker.  We have locker

19  and box if you choose to but in the locker or blue book.

20    Q.  Let's talk about the locker.  Every inmate has a

21  locker?

22    A.  Yes, sir.

23    Q.  Does that locker lock?

24    A.  You have your own lock.

25    Q.  When you us your hand, does that mean there's a

```
 1    combination lock that you have?

 2         A.   Yes, sir.

 3         Q.   You know the combination for your particular

 4    lock?

 5         A.   Yes, sir.

 6         Q.   You can put items in your locker, then lock it

 7    with your combination lock?

 8         A.   Yes, sir.

 9         Q.   Then you said that you have a blue box or a boot

10    box?

11         A.   Blue box.

12         Q.   B L U E?

13         A.   Yes.  Box that store your stuff, put your food

14    or clothes or whatever you feel like then you lock it

15    too.

16         Q.   You have a blue box that you keep in your room?

17         A.   Yes, sir.

18         Q.   That's also locked, am I correct?

19         A.   Yes.

20         Q.   What do you keep in the locker and the blue box?

21         A.   Some put clothes, some part I put some of my

22    foods and my hygiene.  The blue box some of them I have

23    food inside.

24         Q.   The food that goes in the locker and in the blue

25    box, where do you get that food from?
```

1          A.   The commissary.

2          Q.   Are you allowed to take anything from the dining

3     room and put it in the locker or the blue box?

4          A.   No, we're not allowed.

5          Q.   Not allowed to take anything?

6          A.   We're supposed to get one fruit.  Now it is

7     canceled.  Can't take no food outside.  Nothing at all.

8          Q.   How about things from family and friends.  Can

9     they send you food?

10         A.   No, sir.

11         Q.   So the food that you have has to come from

12    where?

13         A.   Commissary.

14         Q.   Now, is there a time limit with which you can

15    keep food?  Do you understand my question?

16         A.   No.

17         Q.   Does the prison require you to get rid of food

18    after a particular time?

19         A.   No, sir.

20         Q.   So you can buy food at the commissary and keep

21    it for how long?

22         A.   Until you finish it.  How long as you want.

23         Q.   Let me approach and show you what I had marked

24    as Petitioner 2 for identification.  Do you recognize it?

25         A.   Yes.  That's our commissary list.

1       Q.  Before you tell me what it is -- let me ask you

2    to look at this.  Do you recognize it?

3       A.  Yes, sir.

4       Q.  What do you recognize it to be?

5       A.  Commissary list where we can, we're allowed to

6    purchase anything from this list.

7       Q.  Is that a commissary list from the facility at

8    Danbury?

9       A.  Yes, sir.

10      Q.  And does that list list all the items for

11   purchase at Danbury?

12      A.  Yes, sir.

13      Q.  Have you seen that list before?

14      A.  Yes, sir.

15      Q.  Is that a fair and accurate depiction of the

16   list that you would have had if you had gone to the

17   commissary and asked what products you sell?

18      A.  Yes.  This is the one.

19      Q.  Does it have a date on it?

20      A.  This was issued October 1 because sometime it

21   change.  They have updated list.  That prices go higher,

22   then they change it.

23      Q.  But this is a list that you would get at the

24   commissary?

25      A.  This it is list that I get from the commissary.

1              MR. KOFFSKY:  I move this as Petitioner's 2

2       full.

3              MR. SOLOWAY:  I'm not disputing that

4       representative list.  Whether it is the current list is

5       not clear.  I have no objection being admitted for the

6       limited purpose of what a representative list would be.

7              THE COURT:  Petitioner's Exhibit 2 is admitted.

8       When you say you are not sure it is the current one but

9       it is representative.  They may, for example, take off

10      sharp cheese but didn't add a different cheese or they

11      might remove an item.

12             MR. SOLOWAY:  Correct.

13             THE COURT:  Generally there's these categories

14      with some offering of this type.

15             MR. KOFFSKY:  It is dated October 2007.

16             THE COURT:  I understand.  I want to be sure he

17      wasn't saying more than that.

18             MR. KOFFSKY:  I made sure I got the most current

19      list that I can get.

20         Q.  Ms. Kole, this two-page list lists all the items

21      that are for sale at the Danbury commissary, correct?

22         A.  Yes, sir.

23         Q.  And it shows the clothing, personal hygiene,

24      hobby crafts, radio, stationery items that you can

25      purchase at the commissary?

1     A.  Yes, sir.

2     Q.  It describes some of the food stuff that you can

3  purchase at the commissary?

4     A.  Yes, sir.

5     Q.  The items on this list you can purchase, am I

6  correct?

7     A.  Yes, sir.

8     Q.  You have money in your commissary and you are

9  entitled to purchase them?

10    A.  Yes, sir.

11    Q.  But you indicated to the court that you keep

12  kosher?

13    A.  Yes, sir.

14    Q.  So during the normal year, let's go through it.

15  Would you keeping kosher be able to purchase the candy on

16  the list?

17    A.  Candy on the list?  If it is kosher, yes, sir.

18  Personally I don't really eat candies.

19    Q.  Knowing what you know about keeping kosher,

20  would you if it had -- are there different symbols that

21  show whether an item is kosher or not?

22         MR. SOLOWAY:  Objection.  Leading.

23         THE COURT:  I will allow it.

24    Q.  Are there different symbols that indicate

25  whether an item is kosher or not?

1          A.   The symbol is K, U.   K and U.

2          Q.   When an item has a K, it is an indication it is

3     a kosher product?

4          A.   Yes.

5          Q.   Or when it has a U on it, it is also indication

6     that that is kosher?

7          A.   Yes, sir.

8          Q.   You indicated to the court that you may not buy

9     candy.  Is it your testimony that if the candy has a U or

10    a K, that it would be kosher and that you could purchase

11    it?

12         A.   Yes, sir.

13         Q.   There's another item there chips with about 10

14    items.  Would your testimony be the same if it had a U or

15    a K that it would also be kosher and that you could

16    purchase it?

17         A.   Yes, sir.

18         Q.   How about the condiment list?  Would your

19    testimony be if it was a U or K would that be kosher?

20         A.   Yes, sir.

21         Q.   Cookies, crackers?

22         A.   The same thing goes.

23         Q.   Dairy, fish, ice cream, health foods, nuts,

24    pasta, pastry, produce, rice, snacks and spices would

25    your position be that all of those items you could

1    purchase if it had a U or K on it, indicating it was

2    kosher?

3         A.   Yes, sir.

4         Q.   Other items say meats and the other says soups

5    and stew.  The meats say beef, deli stick, summer

6    sausage, pepperoni, spam singles, chicken, roast beef

7    with gravy.  Then on the soups vegetable cup, beef soup,

8    chili soup, chicken and stars, chili with beans and rice.

9    Now would at any time those items be kosher?

10        A.   This one some kosher.  But they are not telling

11   us, you can't buy it anyway.

12        Q.   The list under meats for you are not kosher?

13        A.   Are not kosher.

14        Q.   How about the ones under soups and stews?

15        A.   Some of this vegetable chicken, some of them are

16   kosher, just for the deli kosher, not for Passover.

17        Q.   Then there's another list that says kosher and

18   halal meals.  Are those all kosher products?

19        A.   Yes, kosher and halal, that's the hot meal.

20        Q.   That you can purchase?

21        A.   Yes but it is not for Passover.

22        Q.   We'll get to that in just a second so on this

23   list, there are items that you can purchase during the

24   year if it says kosher with a K or a U, am I correct?

25        A.   Yes, sir.

1          Q.  And there's also a list of meats -- there are

2     four meats, there's cheese tortellini, lasagna, matzoh

3     crackers, figs and dates all under the kosher section

4     that you can purchase because they are kosher?

5          A.  Yes, sir.  But the meats are not kosher.

6          Q.  The meats aren't kosher?

7          A.  No, sir, but the fish is.

8          Q.  Now during the year, you are able to buy these

9     food products, am I correct?

10          A.  Yes, sir.

11          Q.  And you get them at the commissary, and what do

12     you do with them?

13          A.  I get them at the commissary.  I take it to my

14     unit.  That's stored in my blue box.

15          Q.  So you store your foods in your blue box?

16          A.  Yes, sir.

17          Q.  When can you eat those foods?

18          A.  When I come back from work.  When the dining is

19     closed.  I'm hungry.  We have a microwave.  I take it to

20     the microwave or heat it up or cook it in my little bowl

21     and eat.

22          Q.  Do you know whether all the other inmates have

23     the blue box?

24          A.  Yes, sir.  They all have the blue box.

25          Q.  Do you know whether the other inmates, I think I

1    may have asked this, have the ability to buy food at the

2    commissary?

3         A.  Yes, sir.  Unless you have no money.

4         Q.  And there's a microwave provided by the

5    institution?

6         A.  Yes, sir.

7         Q.  And where is that microwave?

8         A.  In every unit.  We have two microwave in the

9    unit.  One downstairs and one upstairs.

10        Q.  The facility allows you to use that microwave to

11   heat your food?

12        A.  Yes, sir.

13        Q.  Is there any time during the day when you are

14   not allowed to use that microwave?

15        A.  No, sir.

16        Q.  Whenever you are not locked in like during

17   count?

18        A.  Yes.

19        Q.  You are allowed to go and use that microwave?

20        A.  Yes, sir.

21        Q.  If the dining hall closed at 6 or 6:30 and you

22   were hungry, what would you do?

23        A.  Get to my blue box and get something and cook

24   it.

25        Q.  Do other inmates do the same and you have seen

1    that?

2         A.  Yes, sir.

3         Q.  Now you mentioned that these items are not

4    kosher for Passover, the items on the commissary list?

5         A.  None of that is kosher for Passover.

6              THE COURT:  None of them are?

7              THE DEFENDANT:  No.  All kosher for Passover

8    says U P.  None of them is kosher for Passover.  The

9    matzoh that's in the commissary is not kosher.

10             THE COURT:  I understand but the fish doesn't

11   have anything leavened in it.  I suspect there might be

12   disagreement on whether you need to buy fish from a

13   kosher fishery to be compliant.  If that's her view, I

14   accept that.

15             MR. KOFFSKY:  If the Rabbi is here, maybe you

16   can pose that question.

17             THE COURT:  We might have to pose it to a few

18   more because there's always more than one opinion.

19             MR. KOFFSKY:  That's the nature of the Jewish

20   religion.

21             THE COURT:  I'm not saying it disrespectfully.

22             MR. SOLOWAY:  I will stipulate.

23             THE COURT:  Go ahead.

24        Q.  Let's talk about what you know about keeping

25   kosher for Passover.  Would you tell the court what the

1      Passover holiday is about?

2          A.  Passover holiday is about when the Jews get

3      freedom.  We are not allowed to eat leaven in it, leaven

4      in bread.  Anything contains yeast made of the bread,

5      wheat we're not allowed to eat it.  There are some type

6      of spices that contains yeast and things we're not

7      allowed to eat them.  We're not supposed to touch bread,

8      flour.  Anything that has leaven, we're not supposed to

9      touch it for eight days.

10         Q.  So the Passover holiday is eight days?

11         A.  Yes, sir.

12         Q.  You described to the court how the Passover

13     holiday is the holiday of the  --

14         A.  Out of Egypt.

15         Q.  When the Jews left Egypt?

16         A.  Yes, went to the Promise Land.

17         Q.  Went to the Promise Land.  It's a celebratory

18     holiday?

19         A.  Celebration in generation to generation.

20         Q.  And you follow the celebration for the eight

21     days?

22         A.  Yes, sir.

23         Q.  Now, you indicated that one of the things that

24     you do not eat is leavened bread?

25         A.  Yes, sir.

1    Q.  What steps do you take to make sure that you

2    don't eat leavened bread -- withdrawn.

3         You indicated before that the items on this list

4    on Petitioner's 2 are not kosher for Passover?

5    A.  Yes, sir.

6    Q.  Would you tell the court what kosher for

7    Passover foods are?

8    A.  The kosher for Passover is items that we

9    purchase every Passover time.  Sister Raftery, the

10   supervisor from the religious department, gives us the

11   form to order our items from Aleph.  So everything that

12   we order say kosher for Passover.

13   Q.  You celebrate the Passover holiday?

14   A.  Yes, sir.

15   Q.  During the Passover holiday, you only eat kosher

16   for Passover foods?

17   A.  Yes, sir.

18   Q.  Would you describe for the court whether you

19   make any preparations in getting ready for the Passover

20   holiday?

21   A.  Yes, sir.  During the time of Passover when the

22   Passover coming up, the day before Passover or two days

23   before Passover, I clean up all my locker.  Everything.

24   All the food that's not kosher for Passover. I clean it

25   up.  I put it in my commissary bag and tie it up and put

1    it up.  Clean all my blue box and empty where I will

2    store my food for Passover.  I put them in and took out

3    everything the rise everything that I have.  Everything

4    that's not kosher for Passover take them out and keep

5    them somewhere.  Up to 8 days.  When Passover is over.

6        Q.  I think you said for a day or two before the

7    Passover holidays, you collect all your non-kosher for

8    Passover food and put it in a bag?

9        A.  Yes.

10       Q.  And remove it from where you keep your food?

11       A.  Yes, sir.

12       Q.  Why do you do that?

13       A.  Because I have to I cannot mix my food.  The

14   Passover food with other food because I can't seat

15   leavened.

16       Q.  If you had kosher for Passover food, that came

17   into contact with non-kosher for Passover food, would

18   that ruin?

19       A.  Yes.  That would ruin my Passover.

20       Q.  So you clean up your blue box?

21       A.  Yes.

22       Q.  Do you clean up the locker?

23       A.  I clean up everything.  That's food that's

24   leavened.  I clean it up.

25       Q.  That cleaning is that part of the religious

1     observations?

2          A.   Yes, for Jews for keep kosher for Passover.

3          Q.   For people who keep kosher for Passover, part of

4     the observance is the cleaning?

5          A.   Yes, sir.

6          Q.   You said you have been locked up since 1998?

7          A.   1996.  I have been in Danbury since 1996.

8          Q.   In the last couple of years has Danbury served

9     you -- withdrawn?

10              Do the meals on the first two nights of the

11    Passover.  You said it is an eight-day holiday?

12         A.   Yes.

13         Q.   Do the meals on the first two nights of Passover

14    have a name?

15         A.   A name?

16         Q.   Have a name the first two meals?

17         A.   Seder.

18         Q.   What is the seder?

19         A.   The seder that's where the first day of the

20    preparation.  Not eating none.  We don't eat nothing

21    that's leavened.  We all go.  This is how they do it with

22    seder.  We all eat together with one of the officers.

23    Nobody is there.  They give us everything that was

24    provided for us that has no leaven inside and it is

25    kosher and verified it is kosher for Passover.  There's a

1    sign saying U and P that means kosher for Passover.

2         Q.   So the first two nights you are given a seder

3    which is a ceremonial meal?

4         A.   Yes, sir.

5         Q.   And have you been having seder since you have

6    been in Danbury?

7         A.   Yes.

8         Q.   Do they make it the first night or the first two

9    nights?

10        A.   We make it the first night and the second night

11   again.

12        Q.   Now during the Passover holiday that you

13   celebrate the eight days, are you given breakfast, are

14   you served breakfast?

15        A.   During the eight day.

16        Q.   During the eight days are you served breakfast?

17        A.   Yes, sir.

18        Q.   Are you served lunch?

19        A.   Yes, sir.

20        Q.   Are you served dinner?

21        A.   Yes, sir.

22        Q.   Dinner the first two nights are they the seder?

23        A.   Yes.

24        Q.   How about the remaining six nights?

25        A.   Regular food for Passover.

1    Q.  When you get your meal, your breakfast, is it

2    similarly wrapped as it is on the other days when it is

3    not Passover?

4    A.  Yes, it is wrapped.

5    Q.  Does it say anything that signifies that it is

6    kosher for Passover?

7    A.  Yes.  Kosher for Passover says and then we have

8    a table.  No inmates allowed to sit at that table.

9    Nobody is allowed to eat any food that's not Passover

10   meal on that table.  So when we go there, every food

11   there have a sign of U P.  Kosher for Passover so every

12   meal has it and we look at it first.  We make sure it has

13   a sign of kosher for Passover.  If it doesn't have kosher

14   for Passover, we send it back to them.

15   Q.  There's a table that's set aside for people

16   keeping kosher for Passover?

17   A.  Yes, sir.

18   Q.  Other inmates with non-kosher for Passover food

19   aren't allowed to sit there?

20   A.  No, sir.

21   Q.  Does it have a tablecloth on it?

22   A.  Yes, sir.

23   Q.  A paper tablecloth?

24   A.  Yes, sir.

25   Q.  When you take your tray with the kosher for

1    Passover meal, you go and sit at that table to make sure

2    that your kosher for Passover food doesn't become

3    unkosher for Passover?

4        A.  Yes, sir.

5        Q.  Do you sit there with  --

6        A.  The other Jewish people.  Jewish family.

7        Q.  Who are keeping kosher for Passover?

8        A.  Yes, sir.

9        Q.  So you get those three meals?

10       A.  Yes, sir.

11       Q.  Now, you have indicated that at the commissary,

12   they don't have kosher for Passover foods?

13       A.  No, sir.  They don't have it.

14       Q.  You also indicated that when you get ready for

15   Passover and you clean up, you collect --

16       A.  Yes.

17       Q.  -- the bread?

18       A.  Everything.  The rice, the soup, all the stuff

19   that's on the commissary list.

20       Q.  You put it in a commissary bag and put it away?

21       A.  Yes, sir.

22       Q.  Is that also ceremonial putting the food away?

23       A.  Yes.  Depending how long you keep it kosher for

24   Passover.  That practice sort of written.  Even on the

25   street, the same thing happens.

1      Q.  So you have testified there's nothing in the

2   commissary that's kosher for Passover?

3      A.  No, sir.

4      Q.  You already put all your food away?

5      A.  Yes, sir.

6      Q.  Now before 2007, were you able to purchase food

7   from an outside organization that was kosher for

8   Passover?

9      A.  Yes, sir.

10     Q.  What was that organization?

11     A.  Aleph but it goes through the Sister Raftery.

12  She keeps the form.  We fill it out and we pass it back

13  to her and she takes it to the business office, then they

14  are the one that purchase it for us.

15         THE COURT:  For Terri's benefit it's A-l-e-p-h.

16     Q.  Do know it as the a Aleph Institute?

17     A.  Yes.

18     Q.  Do you know where they are based out of?

19     A.  I think they are based in is it Florida?

20     Q.  Have you ever had any contact with anybody at

21  the Aleph Institute?

22     A.  Except when the Rabbi comes in.  Comes to check.

23  Rabbi Katz goes around the same prison.  He comes once a

24  year.  Sister Raftery supervise for the religious

25  department so she comes and put us on call and advise us

```
 1    that the Rabbi is coming on a same day.  So she put it on

 2    call out.  So we'll all be there.

 3               MR. SOLOWAY:  I didn't catch that.

 4               THE COURT:  He comes once a year for the sister

 5    arranges for them to be called out to meet with the

 6    Rabbi.

 7         Q.  You indicated that there is a form.  What does

 8    the Aleph Institute do for you during the time just

 9    before Passover?

10               MR. SOLOWAY:  At what point in time?

11               THE COURT:  Before 2007.

12         A.  The form goes right to Sister Raftery.  They

13    send us the form.  Sister Raftery brings the form.  We

14    know the items already.  We have copies of it.  And then

15    she has copies and she brings it back and gave to us.

16         Q.  Before we go too far, who is sister?

17               MR. SOLOWAY:  Anne R-a-f-t-e-r-y.

18         Q.  Who is Sister Raftery?

19         A.  She's supervision of the religious department.

20         Q.  She's the advisor?

21         A.  Supervisor.

22         Q.  For the religious.  Is she the person at Danbury

23    that handles all the religious questions?

24         A.  Yes, sir.

25         Q.  How long have you known Sister Raftery?
```

1          A.  Since 1996 I came in there.

2          Q.  Now you testified that there's a form that you

3     fill out to get kosher for Passover food?

4          A.  Yes, sir.

5          Q.  Is it also your testimony that you get that form

6     directly from Aleph?

7          A.  No.  The form. Aleph sends us one.  We don't use

8     the one he sent us.  Just for us to know they are getting

9     ready for Passover.  So we have the form but the one that

10    we use is the one that Sister Raftery gives you on the

11    tray.  That's the one we have to use.  She passes them

12    out to us.  We fill out the form and the quantity we hand

13    it back.  She takes it and signs off and the business

14    office are the one that get the SPO done for us.

15         Q.  What's SPO?

16         A.  Special purchase order.

17         Q.  Let's take this is a little slower.  There comes

18    a point in time when you get a form from Aleph and it

19    describes the foods that are kosher for Passover that

20    they provide prisons, am I correct?

21         A.  Yes, sir.

22         Q.  That form is called a special purchase order, am

23    I correct?

24         A.  Yes, sir.

25         Q.  Does the special purchase order have any

1    information for you about the timing of the order?

2          A.   Yes, sir.

3          Q.   What is that information?

4          A.   The information tells us you cannot order

5    directly from them.  You have to go straight to the staff

6    members.  The staff member is the ones who put in the

7    orders for you.  We cannot order directly.  Anything

8    that's sent from a inmate is unaccepted one.  It has to

9    go through the staff member.

10         Q.   How about the timing of the order are there

11   deadlines?

12         A.   Yes.  There's deadline.  I think the deadline

13   was supposed to be --

14         Q.   We're talking about before 2007?

15         A.   We have deadlines.  I forgot the exact dates.

16         Q.   Let's talk about before 2007.  You had contact

17   with Aleph.  But Sister Raftery also had can't with

18   Aleph, am I correct?

19              MR. SOLOWAY:  Objection to what Sister Raftery

20   did.

21              MR. KOFFSKY:  I apologize.

22              THE COURT:  I should say on the record as

23   opposed to my look his objection was sustained.

24              MR. KOFFSKY:  I withdraw it anyway.

25         Q.   At some point in time, Sister Raftery came to

1    you with the special purchase order form from Aleph?

2         A.  Yes, sir.

3         Q.  You don't know how she got it?

4         A.  I don't know.  It is written in the purchase

5    department for religious.

6         Q.  At some point in time, Sister Raftery came with

7    you for a special purchase order form?

8         A.  Yes, every year.

9         Q.  Did she bring it to the other eight inmates who

10   keep kosher for Passover, if you know?

11        A.  She give to us when we come to Friday.  When

12   Rabbi comes in, she hands it over to us.

13        Q.  You meet for Friday night services?

14        A.  Yes, sir.

15        Q.  And that's the Sabbath service?

16        A.  Yes, sir.

17        Q.  And you also meet for Torah study?

18        A.  Yes, sir.

19        Q.  Torah is the five books of Moses?

20        A.  Yes, sir.

21        Q.  And you read from the Torah on the Sabbath?

22        A.  We have our prayer books that we read from when

23   the Rabbi comes once a week.  That's every Thursday.

24        Q.  On occasion or at the time prior to Passover, it

25   is your testimony that Sister Raftery comes in with this

1    form for Aleph and hands it out to the people who are at

2    the Torah study class, correct?

3         A.  Yes.

4         Q.  Let me ask you to look at Petitioner's 3 for

5    identification.  It is the STO form.

6         A.  When we got this from Aleph.  Sister Raftery

7    gets it.  She prints, has in a different form and hand it

8    over to us.  This is the one we get from Aleph.  But she

9    has those and print it different and give to us but it is

10   the same item.

11        Q.  Have you seen this form before?

12        A.  Yes, sir.

13        Q.  It's your testimony this is the form that Aleph

14   send to you, am I correct?

15        A.  Yes, sir.

16        Q.  There's typing that says Mr. Koffsky if you

17   need, who typed that?

18        A.  My friends types it.

19        Q.  This is from you?

20        A.  Yes, sir.

21        Q.  Where it says up here Mr. Koffsky and two lines

22   of type that's not from the Aleph institution?

23        A.  No.

24        Q.  They didn't highlight this in orange, you did?

25        A.  I did.

1      Q.  Ms. Kole you typed those two lines or you had

2  them typed. Highlighted?

3      A.  Yes.

4      Q.  This was attached to a letter you sent to me?

5      A.  Yes.

6      Q.  I make no claim it says if you need further

7  information contact Robert Burns at 30.  He's with Aleph

8  institute?

9      A.  Yes.

10      Q.  He's in Florida?

11      A.  Yes, sir.

12      Q.  This is the form that you receive from Aleph,

13  correct?

14      A.  Yes, sir.

15      Q.  But this isn't the form that you received from

16  sister Raftery, correct?

17      A.  It is the same items.

18      Q.  Same items.

19          MR. KOFFSKY:  Your Honor, I move this in as

20  Petitioner's 3 full.

21          MR. SOLOWAY:  May I have a brief voir dire, your

22  Honor.

23          THE COURT:  Certainly.

24  VOIR DIRE EXAMINATION BY MR. SOLOWAY:

25      Q.  Good morning, Ms. Kole.  Looking at Exhibit 3,

1    did you receive this either in 2008 or 2007?

2         A.   The date is 2007 and one is 2008.  Every year we

3    receive like this.

4         Q.   Did you receive that sometime this year from

5    Aleph?

6         A.   Yes.  Sometime this year I received one.

7    Sometime last year I received one.

8         Q.   Did you receive something like that from Aleph

9    last year?

10         A.   Yes, sir.

11              MR. SOLOWAY:  Thank you.  No objection, your

12    Honor.

13              THE COURT:  Three is a full exhibit.

14         Q.   Did you receive something like that in 2006 and

15    2005 and 2004?

16         A.   Yes.

17         Q.   2003?

18         A.   Yes.

19         Q.   Has the food list been about the same?

20         A.   There's a time it changed.  They take off one

21    item and replace, for example, there's they took out one

22    item.  They replace it with one other item.  Let me

23    check.  They took out the fish that comes in a conk.

24    They took it out and order the cheese snacks.

25         Q.   But other than that, has the list been

1    relatively consistent?

2           A.   Yes, sir.

3           Q.   Has the list been relatively consistent over the

4    last couple of years?

5           A.   Yes, sir.

6           Q.   It is your testimony that you have not ordered

7    through that list, that was just a list that you were

8    provided by Aleph?

9           A.   Yes, sir.  I did not order from that list.  We

10   order from the one sister Raftery gives to us.

11          Q.   Let me approach and let you look at Petitioner's

12   4 for identification.  Let me show you what I have marked

13   as Petitioner's 4 for identification.  Can you look at

14   that?

15          A.   Yes, sir.

16          Q.   Have you seen that before?

17          A.   Yes, sir.

18          Q.   What is that?

19          A.   This is the list that we order from.  The form

20   that we order.  Sister Raftery gives to us.

21          Q.   So it is your testimony that you received the

22   list from Aleph that gave you a list of items that you

23   could purchase but that wasn't the list that you ordered

24   from?

25          A.   That's to show us what they have available to

1    purchase.  We have to order through this form that sister

2    Raftery gives to us.

3         Q.  That form that you have in front of you is the

4    type of form that Sister Raftery used to come to you

5    with, am I correct?

6         A.  Yes, the religious service department.  Inmate

7    purchase from this form.

8              THE COURT:  She may reference to prelast year.

9              MR. KOFFSKY:  That's correct.

10        Q.  Have you seen that form before?

11        A.  That's last year's form.

12        Q.  That's 2007?

13        A.  Yes, sir.

14        Q.  Did you have a similar form in 2006?

15        A.  Yes.

16        Q.  A similar form in 2005?

17        A.  Yes, sir.

18        Q.  A similar form for the last number of years?

19        A.  Yes, sir.

20        Q.  Have the items on that list been approximately

21   the same?

22        A.  Yes, sir.

23        Q.  So Sister Raftery would come to you with that

24   list -- Withdrawn.

25             Would she come to you with that list on the day

1    that Passover holiday started?

2         A.  No.

3              THE COURT:  Counsel would like to see the list

4    while you are examining on it.

5              MR. SOLOWAY:  Yes.

6         Q.  I'm going to move it in as petitioner's 4 as

7    full?

8              THE COURT:  Any objection?

9              MR. SOLOWAY:  Yes, your Honor.  Actually no.

10   I'm going to withdraw that objection.

11             THE COURT:  Exhibit 4 is a full exhibit.

12        Q.  It is your testimony that you have had these

13   forms before and this is -- withdrawn.

14             You have had forms similar to this in prior

15   years and that's what you ordered off of to purchase

16   kosher for Passover foods, am I correct?

17        A.  Yes, sir.  Without this label.

18             THE COURT:  I didn't understand.

19        Q.  She said without some of this information.  I

20   will get to that in a second.

21             Your testimony is that you had the ability to

22   purchase off of sister Raftery's list?

23        A.  Yes, sir.

24        Q.  When you ordered kosher for Passover food?

25        A.  Yes, sir.

1      Q.  My question is did you order those foods on the

2   day before Passover?

3      A.  No.  She gives us this form like three weeks

4   before the Passover and then we fill out whatever we

5   want, amount of food we want and hand it back over to her

6   and she signs and send it to the business office.

7      Q.  She would give it to the business office and

8   they would take care of it?

9      A.  Yes.

10     Q.  Would it be at some point in time you got a

11   package of food?

12     A.  Yes.  We go to commissary and we hand over the

13   ID and the package, they check the package.  And they

14   hand us all of the stuff.

15     Q.  Let's talk about this list.

16        MR. SOLOWAY:  When you are referring to this

17   list, you are referring to petitioner 4.

18        MR. KOFFSKY:  Petitioner's 4 in full.

19     Q.  When we're talking about the list that you got

20   from Sister Raftery in the years prior to 2008, were you

21   able to buy salmon, the fish?

22     A.  Yes, sir.

23     Q.  Were you able to buy chicken with matzoh ball

24   soup?

25     A.  Yes.

1             THE COURT:  I'm sorry, Attorney Koffsky.  I have

2     an exhibit.  I can read it.  I don't need you to go one

3     by one with the witness.  Thanks.

4         Q.  You were able to buy these kosher for Passover

5     foods?

6         A.  Yes, sir.

7         Q.  You described that the list would go to the

8     business office?

9         A.  Yes, sir.

10        Q.  And at some point you would be contacted?

11        A.  Yes, sir.

12        Q.  What would happen?

13        A.  They would call us.  I would be at work.  They

14    would page all Jewish inmates to come to the commissary.

15    We come to the commissary.  They ask for ID.  They give

16    I.D, check the stuff and hand it to you.

17        Q.  Would it be a box or package?

18        A.  The package.  They package.  It goes to the camp

19    and they check it to the camp before it comes to the

20    commissary.  They give it to you two, three days before

21    Passover.

22        Q.  Is that before or after you've cleaned your

23    locker?

24        A.  I have my locker cleaned before I take my stuff

25    from them.

1    Q.  What did you do with the packages of foods?

2    A.  Take it to my room.

3        MR. SOLOWAY:  Time frame, your Honor.

4    Q.  We're talking prior to 2008.

5    A.  2008.

6    Q.  Prior to 2008?

7    A.  I take it to my room to the clean blue box that

8    I have cleaned out and pack them in there.

9    Q.  That would be your food?

10   A.  For Passover.

11   Q.  For the eight days of Passover?

12   A.  Yes, sir.

13   Q.  Prior to 2007, before 2007, your testimony was

14   that you had money in a commissary account?

15   A.  Yes, sir.

16   Q.  Was there a spending limit on the amount of

17   money that you could spend on kosher for Passover food?

18   A.  Before?

19   Q.  Before 2007.

20   A.  No, sir.

21   Q.  You had no spending limit whatsoever?

22   A.  No.  We can spend as much as we want.  It has to

23   be within your spending limit.  290 is our spending

24   limit.

25   Q.  You had a monthly spending limit of $290?

1       A.  Yes, sir.

2       Q.  Is it your testimony that you could spend up to

3   the spending limit on kosher for Passover foods?

4       A.  Yes.  However I want.  If I want to spend up

5   290, if I don't want to.

6       Q.  Was there a food limit?  Were you limited to the

7   number of items that you could purchase?

8       A.  No.  It was only on 2007.

9       Q.  Let's talk before 2007.

10      A.  On 2006 they tried to limit.  Then we ordered it

11  and she told us to cut it off.  All the Jewish inmates

12  ask why you cut it off in 2006, so and she cut of matzoh.

13  That with cannot order matzoh.  We argue and argue.  She

14  left that you can't order matzoh.  Grape juice and the

15  regular things.  We argued.  She let it go.  We ordered

16  them.  So we ordered them.

17      Q.  But before 2007, you could purchase --

18      A.  Anything.

19      Q.  As much --

20      A.  As we want.

21      Q.  As you want.  Okay.  In 2006 and 2005 and 2004

22  and before, did you buy food products from sister

23  Raftery?

24      A.  Yes, sir.

25      Q.  What type of food products did you buy?

1        A.  Kosher for Passover.

2        Q.  Take a look at the list if you can and tell the

3   court what food products you bought to eat during that

4   week?

5        A.  I bought grape juice.

6             MR. SOLOWAY:  What list is she referring to?

7             THE COURT:  I believe it is petitioner's

8   Exhibit 4.

9             MR. KOFFSKY:  Yes, it is.

10       A.  Okay.  I brought grape juice, I bought matzoh

11  balls.  I bought chicken, potato.  I bought everything.

12       Q.  And during the Passover holiday before 2007, did

13  you have occasion to eat these foods at times other than

14  at meal times?

15       A.  Yes, sir.  Because I get hungry.

16       Q.  Ms. Kole, directing your attention to 2007.

17  There is two lines of type on the top of Petitioner's 4.

18  It says this is the 2007 kosher.  This type.  This wasn't

19  on Sister Raftery's form; am I correct?

20       A.  No.

21       Q.  You typed that, am I correct?

22       A.  Yes, sir, because I typed this to get your

23  attention.

24       Q.  Then you highlighted it.

25       A.  Yes, sir.

1          Q.   That's not on the original form on petitioner's
2     4?
3          A.   No.
4          Q.   Down below it says your special purchase order
5     may not exceed $100.  Do you see that on that form?
6          A.   Yes, sir.
7          Q.   Prior to 2007, was there a spending limit?
8          A.   No, sir.
9          Q.   It was just?
10         THE COURT:  Isn't that claim moot?  Isn't that
11    claim moot?
12         MR. KOFFSKY:  I'm taking the court through the
13    history of it.  I hope I'm not boring the court.
14         THE COURT:  It is not a matter of whether I'm
15    bored.  It is a matter of whether we're dealing with the
16    relevant evidence or going through exhibits.
17         MR. KOFFSKY:  I think it is relevant. One of the
18    issues the court has inquired about is the Fourteenth
19    Amendment due process claim where the petitioner claims
20    that this has been retaliatory.
21         THE COURT:  I didn't inquire.  I asked you what
22    the claims were since no attorney complaint was filed
23    since after the pro se complaint was filed.  It is not
24    clear to me.  You suggested for the first time she had a
25    substantive due process claim.  That's how the claim came

1    up.

2         MR. KOFFSKY:  I believe the substantive due

3    process claim is also indicated in the petitioner's

4    complaint but I think this is relevant, your Honor.

5         Q.  Was there a $100 spending limit prior to 2007?

6         A.  No, sir.

7         Q.  Would you tell the court?

8         THE COURT:  Are you up for a reason, Attorney

9    Soloway, or just stretching?

10        MR. SOLOWAY:  I was anticipating the next

11   question, your Honor.

12        Q.  Did there come a point in time when that $100

13   spending limit began?

14        MR. SOLOWAY:  Objection.

15        THE COURT:  If he says objection, you need to

16   wait until I rule.  The basis?

17        MR. SOLOWAY:  Relevance.

18        THE COURT:  Why wouldn't it be relevant?

19        MR. SOLOWAY:  What happened in that period of

20   time would be irrelevant to what's happening today.

21        THE COURT:  That's my point of mootness several

22   moments ago but Attorney Koffsky claims we need to know

23   about it in connection with her substantive due process.

24   So I guess we'll learn about it in connection with the

25   substantive due process claim.

1      Q.  Did there come a point in time when there was a

2   $100 special spending limit?

3          THE COURT:  The yes answer can stand and you

4   don't need to have it answered again.

5      Q.  Who indicated to you that there was going to be

6   a $100 spending limit on the special purchase order foods

7   that you had previously been allowed to purchase?

8      A.  Sister Raftery.

9      Q.  What did she tell you?

10      A.  She just put a spending limit on it $100 because

11   and we all asked her why giving us putting a spending

12   limit.  She said that's it.  She didn't give us no

13   answer.  She said that's it.  I took the form to the AW

14   and complain.

15      Q.  Who is the AW?

16      A.  The AW at this time was Ms. Clay.  She left.

17      Q.  What's AW?

18      A.  Assistant warden.

19      Q.  Let's go back for a second.  You indicated that

20   there was a $100 spending limit?

21      A.  Yes.

22      Q.  Placed on the kosher for Passover food?

23      A.  Yes, sir.

24      Q.  You said something about a time limit.  What was

25   the time limit?

1      A.   The time limit that we have to eat all this food

2   within when Passover is over.  She gave us that month, in

3   the month time.  Three weeks time we had to finish it up.

4      Q.   You had to finish all the kosher for Passover

5   that you purchased in a three-week period of time?

6      A.   Yes, sir.

7      Q.   After that happened and you went to the

8   assistance warden, what happened next?

9      A.   The assistant warden didn't resolve the problem

10   so I wrote it up.

11      Q.   What do you mean you wrote it up?

12      A.   I put to resolve the problem.  From inhouse to

13   resolve, then you go now put it in writing to get to the

14   warden.  I put it in writing to get to the warden to

15   resolve the problem.  But the problem was not resolved.

16   The problem resolved we can have the food as long as we

17   want.  From now on we have to purchase it through

18   commissary.  No longer through the religious department.

19      Q.   I will next mark Petitioner's 1.  Let me show

20   you what I have had marked as Petitioner's 1 and ask you

21   to take a look at it.  Are you familiar with it?

22      A.   Yes.

23      Q.   What does it look like?

24      A.   This is the one I sent?  It is a copy of 8 and a

25   half.

1      Q.  Let's look at the whole document first.  Is this

2   the application for habeas corpus that you filed with the

3   court?

4      A.  Yes, sir.

5      Q.  Attached to it are several documents?

6      A.  Yes.  That I sent to the region, the warden, the

7   AW.

8      Q.  Attached to the habeas are the grievance

9   procedures that you took when they put the $100 spending

10  limit on the special purchase order foods?

11     A.  Yes, sir.

12         MR. KOFFSKY:  Your Honor, I will move this as

13  Petitioner's 1 in full.

14         THE COURT:  Any objection?

15         MR. SOLOWAY:  May I inquire, your Honor.

16         THE COURT:  Certainly.

17  VOIR DIRE EXAMINATION BY MR. SOLOWAY:

18     Q.  Attached to what's been marked Defendant's

19  Exhibit 1, are certain administrative remedies that you

20  sought to pursue with the Bureau of Prisons; isn't that

21  correct?

22     A.  Yes, sir.

23     Q.  Initially you pursued an informal resolution

24  with Sister Raftery, did you not?

25     A.  Yes, I did.

1      Q.   That was not resolved in the way that you saw

2   fit, was it not?

3      A.   Yes, sir.

4      Q.   Subsequent to the administrative remedy that you

5   pursued with Sister Raftery, you pursued an

6   administrative remedy with the warden; is that correct?

7      A.   Yes, sir.

8      Q.   How was that resolved?

9          MR. KOFFSKY:   I'm not sure this is voir dire or

10   just cross.   I ask if it is voir dire it be limited to

11   the document that I attempted to move into evidence.   If

12   it is cross, he probably should wait until I'm done.

13          MR. SOLOWAY:   All of the items that speak of

14   administrative remedy are attached to the exhibit.

15          THE COURT:   Correct.   Are you questioning the

16   authenticity of it?

17          MR. SOLOWAY:   I wanted to.   I just wanted to --

18          THE COURT:   Go to the basis for the admission of

19   the exhibit?

20          MR. SOLOWAY:   That's right.

21          THE COURT:   So what are you doing with those

22   bases.

23          MR. SOLOWAY:   I wanted to detail what

24   administrative steps were taken as that may be relevant

25   with regard to the admissibility of the exhibit in full.

1              THE COURT:  Why would it be relevant to the

2      admissibility.

3              MR. SOLOWAY:  To make sure these were actually

4      remedies that she pursued.

5              THE COURT:  I will let you cross on it.  I don't

6      think it goes to the exhibit.  The exhibit is what it is.

7      It is a matter of judicial record.  I can take judicial

8      notice of it.  I may not accept it as true.  I may

9      conclude it is incomplete or something else.  I leave it

10     for cross, Attorney Soloway.

11             MR. KOFFSKY:  I move it in as full as

12     Petitioner's 1.

13             THE COURT:  Do you object, Attorney Soloway?

14             MR. SOLOWAY:  No.

15             THE COURT:  Petitioner's 1 is a full exhibit.

16        Q.  Ms. Kole, you indicated that Sister Raftery

17     placed a $100 spending limit on your Passover food

18     purchases and then you filed a grievance; am I correct?

19        A.  Yes.

20        Q.  In 2007, were you subject to the $100 spending

21     limit, 2007?

22        A.  Yes, sir.

23        Q.  So in 2007, you could only purchase $100 of

24     kosher for Passover food from Sister Raftery's list.  The

25     list that included the meats and the cheese, am I

1    correct?

2         A.  Yes, sir.

3         Q.  And did there come a time when your

4    administrative remedies, your attempts to get the prison

5    itself to change from the $100 spending limit to no

6    spending limit when it ran its course?

7         A.  Yes, sir.

8         Q.  What happened?

9         A.  We can spend our spending limit but now we have

10   to purchase through the commissary.  No longer from

11   Sister Raftery.  That's what it says there.

12        Q.  The administrative result?

13        A.  That we can spend our spending limits.

14        Q.  You can spend up to $100 -- you can spend up to

15   $290?

16        A.  Yes, sir.

17        Q.  So there was no longer a $100 limit?

18        A.  Yes, sir.

19        Q.  But you could no longer purchase through the

20   special purchase order, am I correct?

21        A.  Yes, sir.

22        Q.  Did there come a time when you were told what

23   products you were able to purchase that were kosher for

24   Passover?

25        A.  Yes.  That was about three weeks ago or last

1    month.  Sister Raftery came to see us.  We went to see

2    the Rabbi for Torah study.  That was on Friday.  They

3    hand us the form saying this is our new items for

4    Passover, kosher for Passover.  It was about just four

5    items there.  We all pick it up and I asked her the

6    question I said.

7        Q.  Before we get there.  You said that you were

8    given a list of only four or five items?

9        A.  Yes.

10       Q.  Let me show you what's been marked as

11   petitioner's 5.  Have you seen that?

12       A.  Yes, sir.  This is it.

13       Q.  That's the list?

14       A.  Yes, sir.

15       Q.  It also has some typing on the top and pink

16   highlighting.  That's what you typed and sent to me.

17   That wasn't on the list?

18       A.  Yes, sir.

19       Q.  So in 2007, you were able to purchase off sister

20   Raftery's list?

21       A.  Yes, sir.

22       Q.  That had about 10 items which included meat but

23   it had the special -- it had the $100 spending limit on

24   it, am I correct?

25       A.  About 12 items on it.

1      Q.  Then you filed an administrative grievance?

2      A.  Yes, sir.

3      Q.  The administrative process went forward and you

4  were told that you were no longer going to have the $100

5  spending limit.  You were now going to be able to buy at

6  the commissary everything you wanted that was kosher for

7  Passover up to the $290 monthly allowance?

8      A.  Yes, sir.

9      Q.  This was the list that you were given of what

10  you could purchase for Passover, am I correct?

11      A.  Yes.  Sister Raftery hand it to us.

12          MR. KOFFSKY:  I will move that as Petitioner's 5

13  in full.

14          THE COURT:  That's the 2007 list given to them.

15          MR. KOFFSKY:  2008.

16          MR. SOLOWAY:  No objection.

17      Q.  We have already seen the regular commissary list

18  that has hundreds of items.  You indicated that none of

19  those were kosher for Passover?

20      A.  Yes.

21          MR. SOLOWAY:  Objection.  Relevance.

22          THE COURT:  It's also been asked and answered.

23  The objection is sustained.

24      Q.  These are the items that were available to you

25  as an inmate that were kosher for Passover, am I correct?

1          MR. SOLOWAY:  At what time?

2          MR. KOFFSKY:  2008.

3      A.  Yes, sir.

4      Q.  You indicated there came a time when sister

5  Raftery handed you this list?

6      A.  Yes, sir.

7      Q.  You said it was about a month ago?

8      A.  Yes, sir.

9      Q.  What did you say to her when she handed you the

10  list?

11     A.  I asked her I said who made up this list and she

12  said well --

13         MR. SOLOWAY:  Objection as to what she said.

14         THE COURT:  I think she's an agent of the

15  prison, isn't she at least on the subject.  The objection

16  is overruled.

17     A.  She said I asked her who made up this list. This

18  is not the same list.  When same people.  She said that

19  when we start getting the lawyers involve, that's what we

20  get.

21     Q.  And other than these six items, have you been

22  able to purchase anything that is kosher for Passover for

23  the upcoming holiday?

24     A.  Yes, sir, not yet.

25     Q.  You haven't been able to purchase anything to

1    put into your blue box for the eight day holiday?

2         A.  No, sir.

3         Q.  And you are unable to get anything from family

4    and friends?  They can't send you any food stuffs, can

5    they?

6         A.  No, sir.

7              THE COURT:  Two questions.  Before you meant

8    exclusive of what's on the list she hasn't been able to

9    purchase anything?

10             MR. KOFFSKY:  For the holiday of Passover that

11   are kosher for Passover.

12             THE COURT:  I thought there was a list of some

13   items.

14             MR. KOFFSKY:  If I may go back.

15             THE COURT:  Perhaps if I had a copy of the

16   exhibits, it would make the questioning and my

17   understanding of it a lot easier.

18             You told me Exhibit 5 is a list for 2008,

19   correct?

20             MR. KOFFSKY:  Incorrect.

21             THE COURT:  Five is beginning April 14, 2008.

22             MR. KOFFSKY:  Yes, that's the list for 2008.

23             THE COURT:  You asked her the prior question

24   before the last.  Was she not able to order anything

25   kosher for Passover this year?

1          MR. KOFFSKY:  Except what's on Petition 5.

2          THE COURT:  I don't believe that was in the

3     question which is why I stopped and asked if what the

4     question implied except when's on the Exhibit 5.  You

5     said no.  Now that I have that clarified, you may move

6     on.

7          MR. KOFFSKY:  I apologize.

8     Q.  I wanted to say other than the six items that

9     are on Petitioner's 5?

10    A.  That's five items, not six.

11    Q.  That's all you are allowed to order at the

12    commissary for your holiday of Passover that's coming up

13    within a week?

14    A.  Yes, sir.

15    Q.  And you are no longer able to purchase anything

16    off the Aleph special purchase order list, am I correct?

17         MR. SOLOWAY:  Objection.  Asked and answered.

18         THE COURT:  Yes.  It has been sustained.

19    Q.  Now, you have been at the facility for awhile.

20    You know that there are other religious groups at

21    Danbury, am I correct?

22    A.  Yes, sir.

23    Q.  Are you familiar with a special holiday

24    commissary list for Christmas?

25    A.  Yes, sir.

1        Q.  May I approach?

2            THE COURT:  Yes.

3        Q.  Let me show you what I had marked as

4   Petitioner's 6 for identification and ask you to look at

5   it.

6        A.  Yes, sir.

7        Q.  Have you seen that before?

8        A.  Yes, sir.

9        Q.  What is that?

10       A.  This is for Christmas holiday but the holiday

11   for Christmas.

12       Q.  That's 2007?

13       A.  2007.

14       Q.  And you got that from the facility?

15       A.  Yes, sir.

16       Q.  And that was handed out at the commissary?

17       A.  Yes, sir.

18       Q.  I move it as Petitioner's 6 as full, your Honor.

19           MR. SOLOWAY:  May I voir dire, your Honor.

20           THE COURT:  Sure.

21   VOIR DIRE EXAMINATION BY MR. SOLOWAY:

22       Q.  Can I approach the witness to get the exhibit?

23   May I pose some questions from here, your Honor?

24           THE COURT:  Yes.

25       Q.  Looking at Exhibit No. 6, Ms. Kole, you typed in

1    some material at the top and highlighted it; isn't that

2    correct?

3         A.  Yes, sir.

4         Q.  On Exhibit No. 6, is there any reference to

5    Christmas exclusive of the line that you typed?

6         A.  No.  This is the list for December.  Not the

7    list for Christmas.

8         Q.  Members of the Jewish community can purchase off

9    of exhibit 6, can they not?

10        A.  Yes, sir.

11        Q.  And those of the Muslim faith can purchase off

12   of exhibit 6, can't they?

13        A.  Yes, sir.

14        Q.  And all of the religious denominations that are

15   represented at Danbury can purchase off of the holiday

16   list, isn't that correct?

17        A.  Yes, sir.

18             MR. SOLOWAY:  I have no objection.

19             THE DEFENDANT:  Excuse me.  May I say something?

20             THE COURT:  No.  You don't ask questions.

21             MR. KOFFSKY:  Can it go in?

22             MR. SOLOWAY:  Sure.

23             THE COURT:  Petitioner's 6 is a full exhibit.

24        Q.  Ms. Kole, you know this list as the Christmas

25   list?

1      A.  Yes, sir?

2      Q.  It says holiday list?

3      A.  Yes, it is from December.  That's for Christmas,

4  yes, sir.

5      Q.  And you being an inmate, you know it as even

6  though it says holiday, you know it as the Christmas

7  list?

8      A.  Christmas, yes, sir.

9      Q.  It offers peanut brittle and some other items?

10      A.  Yes, sir.

11      Q.  A makeup kit?

12      A.  Yes.

13      Q.  Was there ever a $100 spending limit for any

14  other prior December holiday or Christmas lists that you

15  know of?

16      A.  No, sir.  Every Christmas or Christmas holidays

17  spending limit is increased to $340, no longer $290.

18      Q.  Every Christmas it is increased to $340?

19      A.  Yes.

20      Q.  During the Christmas holiday?

21      A.  Yes, extra $50.

22      Q.  Do you know of any other religious group that

23  was limited to their $100 for their spending at the

24  commissary?

25      A.  No, sir.

1        Q.  Yours was changed back from $100 to $290 after
2    you complained?
3            MR. SOLOWAY:  Objection.  Asked and answered.
4            THE COURT:  I think it was.  What limit was cut
5    back.  I'm not following the question or answer.  If it
6    was asked and answered, I guess I didn't her it.
7            THE COURT:  Her limit from 340 to 290.
8            MR. KOFFSKY:  The 340, no.  Her spending went
9    from 290 to $100 and only went back to 290 after you
10   complained.
11       A.  Yes, sir.
12       Q.  It went from $100 back to the 290 only after you
13   complained?
14       A.  Yes, sir.
15       Q.  But the net effect of your complaints did what
16   to the list of foods?
17       A.  Come again.
18       Q.  When you complained, what happened to the list
19   of foods that you were able to purchase?
20           MR. SOLOWAY:  Objection because.
21       A.  It was cut.
22           THE COURT:  Just a moment, Ms. Kole.  Counsel
23   stands up, you have to wait with the answer until I
24   decide whether you can.
25           THE DEFENDANT:  Sorry.  The first time I'm a

1     witness.

2              THE COURT:  I understand.  Now I have told you

3     twice.  Do you think you understand you are not to do it

4     again?

5              THE DEFENDANT:  Yes.

6              MR. SOLOWAY:  It is not clear from the question

7     at the point in time that counsel is referring to.

8              THE COURT:  Would you clarify the question and

9     put a time frame for it since we have changed over

10    various periods of time?

11             MR. KOFFSKY:  Certainly.

12        Q.  I think your testimony was is that from 2006 and

13    before you could order off the regular Sister Raftery

14    list that mirrored the list from Aleph, am I correct?

15        A.  Yes.

16        Q.  It was in 2007 that sister Raftery limited it to

17    $100, am I correct?

18        A.  Yes, sir.

19        Q.  And after the 2007 list came out with the $100

20    spending limit, that's when you started your

21    administrative procedure remedy grievance, am I correct?

22        A.  Yes, sir.

23        Q.  When the 2008 list came out, you were told you

24    could spend up to $290 but you were limited to the five

25    items on her list, am I correct?

1        A.  Yes, sir.

2        Q.  Is it your testimony that you can't live --

3    withdrawn?

4            Is it your testimony that it is a hardship to

5    have only those limited items available to you on the

6    2008 list?

7            MR. SOLOWAY:  Objection.  Leading.

8            THE COURT:  No.  I will allow it.  She can

9    answer no.

10       A.  Yes, sir.

11       Q.  Would you tell the court why?

12       A.  Because the tray they gave us on Passover with

13   the matzoh in the morning, get only eggs and grape juice

14   and fruits and then lunchtime we get one box of matzoh

15   and it is in the tray and that's it.  We don't take

16   nothing out except the matzoh.  At night time we get a

17   dinner tray and that's it.  So that period of time for

18   the next morning, you are hungry.  We don't have nothing

19   to eat.  We can't eat anything that's not kosher for

20   Passover so it is hard to live without those things.

21       Q.  As far as you know, or as far as you have been

22   involved in, has kosher for Passover food ever become

23   contraband?

24       A.  No, sir.

25       Q.  Has anybody ever claimed to you in your hearing,

1      that kosher for Passover food has become contraband?

2           A.  No, sir.

3           Q.  Is it your testimony that the three meals you

4      get are insufficient for you to feel comfortable during

5      the 8 days of Passover without any additional food?

6           A.  Yes, sir.

7           Q.  Have you attempted?

8                THE COURT:  Could I have the beginning of the

9      question read back.

10               (Record read by the court reporter.)

11          Q.  Have you attempted to file the appropriate

12     grievances and follow the appropriate process in

13     resolving this issue prior to coming to court?

14          A.  Yes, sir.

15               MR. KOFFSKY:  Nothing further, your Honor.

16     Thank you.

17               THE COURT:  Just about an hour and a half,

18     Attorney Koffsky.

19               MR. KOFFSKY:  Thank you, your Honor.

20               MR. SOLOWAY:  Can we have a brief break, your

21     Honor, so I can make my legal argument then do my cross,

22     if necessary.

23               THE COURT:  I will take the legal argument now.

24               MR. SOLOWAY:  The legal argument is that

25     plaintiff has failed to sustain her burden of proof to

1    show that she's been materially deprived.  The exhibits

2    have demonstrated that she's been afforded due process.

3    The record has demonstrated that the Bureau of Prisons

4    provides the two seder meals during the eight days of

5    Passover.  The bureau has provided at its own expense

6    kosher for Passover meals.  Furthermore, the bureau and

7    by the witness' own exhibits, the bureau has provided

8    kosher for Passover items within the commissary purchase

9    limits.  And the government would suggest, your Honor,

10   that based on the admissions of the petitioner herself,

11   that she's not sustained her burden of proof.

12        THE COURT:  She's I think -- I will hear from

13   Attorney Koffsky very briefly.

14        MR. KOFFSKY:  Very briefly, your Honor.  I don't

15   have a jury here.

16        THE COURT:  Right so please speak accordingly.

17        MR. KOFFSKY:  I'm sort of astounded that the

18   government hasn't seen fit to short circuit this with

19   providing Ms. Kole and the other eight members who

20   practice the Jewish religion and who keep kosher for

21   Passover by giving them what seems to me to be the most

22   de minimus of requests for an eight-day holiday.  I think

23   she's borne out both a First and a Fourteenth amendment

24   claim here that could be redressed in a matter of seconds

25   with the least amount of effort so astounded that we're

1      here at this point.  I think that a claim has been made

2      out and to suggest otherwise would --

3                THE COURT:  We'll take our morning recess.  I

4      will be back in 10 minutes.

5                (Whereupon, a recess was taken.)

6                THE COURT:  I'm not inclined to stop the hearing

7      at this time, Attorney Soloway.  The witness herself has

8      indicated that it is a burden on her to be limited in

9      additional food items that the items are not enough.  The

10     prison allows the purchase of extra food items for

11     inmates generally.  She's testified in effect she's being

12     retaliated against that I have no contrary evidence to

13     weigh against hers.  I will say I don't have any

14     particular reason to not discount what she's testified

15     to.  So I'm not sure what claims we have going forward

16     but I can think of some that we have going forward so I

17     think you should inquire if you wish to.

18                MR. SOLOWAY:  Your Honor, do you have the

19     exhibits?

20                THE COURT:  I have many of them.  I think there

21     was one in front of Terri and I do not have number one.

22                MR. SOLOWAY:  If I can just have a moment, your

23     Honor.  May I inquire, your Honor?

24                THE COURT:  Yes.

25     CROSS-EXAMINATION BY MR. SOLOWAY:

1    Q.  Good afternoon, Mr. Kole.

2    A.  Good afternoon, sir.  You.

3    Q.  You mentioned that you identified yourself as

4    worshipping the Jewish faith to the Bureau of Prisons

5    authorities; is that correct?

6    A.  Yes, sir.

7    Q.  Were you or did you identity yourself as being

8    Jewish prior to your incarceration with the Bureau of

9    Prisons?

10        MR. KOFFSKY:  Objection.  Relevance.

11        MR. SOLOWAY:  The witness during direct

12   examination has put the knowledge of Judaism at issue and

13   in essence has suggested that because she's an observant,

14   Jew that what the Bureau of Prisons provides to her is

15   deficient.  I would submit as a consequence of the

16   petition of putting that at issue, then it would be

17   appropriate for me to make brief inquiry as to her faith.

18        THE COURT:  The objection is sustained.  The

19   Bureau of Prisons in the 12 years she's been in custody

20   at Danbury at least has never questioned her practice,

21   have they in, or her entitlement to kosher food on the

22   grounds she's identified as a Jew so I think today is not

23   a good time to start.  I don't think it is relevant.

24   Q.  What criminal conviction led to your

25   incarceration at FCI Danbury?

1          MR. KOFFSKY:  Objection.  Relevance.

2          THE COURT:  That could go to impeachment.

3     Overruled.

4          A.  Conspiracy of drugs.

5          Q.  Conspiracy of drugs in what quantity?  How much?

6          A.  The government says a kilo 500, something like

7     that.

8          Q.  And prior to your conviction in federal court,

9     you were -- withdrawn.  Prior to your conviction that

10    brings you here today, you have a criminal conviction

11    from the country of the Philippines, do you not?

12         A.  It is the same case going on.

13         Q.  You have a criminal conviction from the

14    Philippines that deals with drugs, is that right?

15         A.  Yes.  The same case.  That's what they charged

16    me on.

17         Q.  And you have got a criminal conviction in the

18    United States, is that right?

19         A.  Yes.  The same thing.

20         Q.  In fact, when you were sentenced by the U. S.

21    District Court judge in the District Court of New Jersey,

22    he departed upwards from the presumptive sentence; isn't

23    that correct?

24         MR. KOFFSKY:  Objection.

25         THE COURT:  Sustained.

1          MR. KOFFSKY:  It is an incorrect statement.

2     Q.  Attorney Koffsky asked you several questions

3  regarding your knowledge of kosher food on direct.  And

4  you mentioned that some thing about -- withdrawn.

5          You mentioned that you can't drink milk and eat

6  meat together, is that correct?

7     A.  Yes.  You can't mix meat and eat milk together.

8     Q.  What other rules of keeping kosher are there?

9     A.  What kind of rules do you want please.

10     Q.  I'm asking you mentioned that you can't eat milk

11  and meat together; is that correct?

12     A.  Yes, that's not kosher.

13     Q.  What does the rule of Kashrut require you to do

14  or not to do?

15     A.  You cannot eat, for example, any meat that's not

16  selected in the kosher way.

17     Q.  What about -- what other than eating milk and

18  meat together is a requirement of keeping kosher?

19          MR. KOFFSKY:  Objection.  I think she's trying

20  to answer that.

21          THE COURT:  Sustained.

22     Q.  You mentioned, Ms. Kole, that you keep your

23  personal items in a locker and a blue box, is that right?

24     A.  Yes, sir.

25     Q.  And that you have locks for each of those; is

1      that correct?

2           A.  Yes, sir.

3           Q.  And you mentioned, Ms. Kole, in response to

4      questions put to you by Attorney Koffsky, that during the

5      Passover holiday, you put some items into a blue bag; is

6      that right?

7           A.  I said in my commissary bag.  The same

8      commissary bag that we use that we use for laundry.  It

9      is a big bag.  I put my stuff in there and tie it up and

10     put it up.

11          Q.  Put it up where?

12          A.  I give it to my roommate to keep for me.

13          Q.  So during the Passover holiday, you give your

14     roommate your not kosher for Passover food.

15          A.  I put it up.  I give it to my roommate to store

16     it by her side.  Last year I give it to the next room to

17     keep it for me.

18          Q.  After Passover, do you expect to have those

19     materials returned to you?

20          A.  Yes, sir.

21          Q.  During direct examination Attorney Koffsky asked

22     you several questions about the SPO.  Do you remember

23     those?

24          A.  Yes, sir.

25          Q.  And you mentioned in response to some of his

1    questions that there were certain items that you would

2    purchase as someone that keeps kosher and certain items

3    that you wouldn't purchase; is that correct?

4         A.   That's the commissary list that's what I said.

5         Q.   What about on the SPO list?  Withdrawn.  On the

6    commissary list are there some items that you would

7    purchase and some items that you wouldn't purchase?

8         A.   Yes, sir.

9         Q.   You mentioned that you would order the fish but

10   you wouldn't order the meat, is that right?

11        A.   Yes, sir.

12        Q.   Are there any fish items that you wouldn't order

13   as someone who keeps kosher?

14        A.   The fish, the tuna is kosher and the sardines is

15   kosher.

16        Q.   If there were other fish items available to you

17   for purchase through the commissary,  -- let me give you

18   an example.  If smoked oysters were available for

19   purchase through the commissary would you order those as

20   someone that keeps kosher?

21        A.   I don't eat that.  I don't eat that thing that

22   you just named.

23             MR. SOLOWAY:  I didn't understand that.

24             THE COURT:  She doesn't eat the thing that you

25   just named.

1    Q.  Why don't you eat the things that I just

2    mentioned?

3    A.  Because it is not kosher.

4    Q.  Now the Bureau of Prisons during the Passover

5    holiday makes certain things available to you as an

6    observant Jew; is that correct?

7    A.  That's the three square meals they give us in

8    the dining room.

9    Q.  So they make the three square meals daily?

10    A.  Three meals.

11    Q.  They also gave you a box of matzoh for each day?

12    A.  Yes, sir.

13    Q.  In addition to the three squares daily plus the

14    matzoh, during the first two nights of Passover, they

15    provide to you an opportunity to attend the ceremonial

16    meal; is that correct?

17    A.  Yes, inside the dining hall.

18    Q.  During the Passover holiday when you eat your

19    meals at the dining hall, there's a special table cloth

20    placed over the table in the food service area?

21    A.  Yes, sir.

22    Q.  During the course of this -- withdrawn.

23    Let's direct your attention back to 2005.  Do

24    you recall Ms. Kole how many items that you ordered for

25    Passover during the 2005 season?

1      A.  I can't remember.  Around 160 something you

2   know.  100 something.

3      Q.  Would it be fair to say, Ms. Kole, that you

4   ordered just under $160?

5      A.  Okay.

6      Q.  And how many other members of the Jewish faith

7   are there if you know at FCI Danbury?

8      A.  How many of them?

9      Q.  Yes.  How many of them?

10      A.  Like I said 10 people.  Eight of us keep kosher.

11   Eight or seven of us keeps kosher.

12      Q.  In the 2005 time frame, how many of the other

13   inmates ordered kosher for Passover food?

14      A.  Sir, I can't remember.  I remember it is not the

15   same set of Jewish people that's still here.  They come

16   and go.  Some of us.  I think some is gone.

17      Q.  Of those inmates that would order kosher for

18   Passover food during the 2005 time frame, how much did

19   they order off of the SPO?

20         MR. KOFFSKY:  Objection unless she knows.

21      Q.  If you know?

22      A.  I don't know.

23      Q.  I would like you to take a look at what's been

24   marked as Defendant's Exhibit No. 1.  In particular the

25   page dealing with the inmate Passover purchase form.  If

1    you can look at the page and when you are done looking at

2    the page?

3            THE COURT:  Did you say defendant's?

4            MR. SOLOWAY:  I meant petitioner's.

5            THE COURT:  That's fine.

6        A.  Yeah.

7        Q.  Doesn't that page say that all items purchased

8    have to be consumed by May 1 of 2005?

9        A.  Yes, sir.

10       Q.  If you would like to look at it, I would show it

11   again?

12       A.  I would like to see it.

13       Q.  May I approach the witness?

14           THE COURT:  Yes.

15       A.  Yes.  To Sister Raftery.  Nothing is going to

16   happen because none of this members will take out food.

17   But then the lieutenant when they did check and

18   confiscated my food and took the to the office and I went

19   and complained.  I think this is religious items.  They

20   can't take it.  I said it says it was supposed to come.

21   Ms. Raftery was not around.  When she came back and I

22   complained to her.  I see the problem they gave us for

23   signing the thing.  She went back to the office and got

24   it back for me and they hand it back to me.  That's when

25   this item came up now.  I tried to say no.  I don't have

1    the same problem we had before.  I made a comment to her.

2    On the Christmas items there's no limit or no time limit.

3    On Muslim time there's no time limit.  Everything they

4    keep for themselves.  Nobody confiscated.  The Lieutenant

5    made a comment because of this thing, that's why he's

6    confiscating my food.  She went to the office and got it

7    back for me.

8        Q.  Did you finish the items that you ordered off of

9    the 2005 Passover purchase form by May 1 of '05?

10       A.  I didn't finish it.  That's why I have the

11   problem.

12       Q.  Where did you store the items in 2005 after the

13   Passover holiday?

14       A.  My locker.

15       Q.  Isn't it in fact that you --withdrawn?

16           Only in your locker.

17       A.  My locker.  My food items in the blue box.

18       Q.  It is your statement after the Passover holiday

19   concluded in the 2005 that you stored all your kosher for

20   Passover food items either in the blue box or your

21   locker?

22       A.  No.  Because at this time after Passover the

23   period of Passover is eight days.  It doesn't matter

24   where I store my food.  I can eat any food.

25       Q.  My question to you is after the eight days of

1    Passover were over, where did you keep your kosher for

2    Passover food items?

3         A.   I said in my locker.

4         Q.   You didn't keep them anywhere else?

5         A.   In my locker.

6         Q.   I would like you to look at what's been marked

7    as Petitioner's Exhibit Number 5.  May I approach the

8    witness, your Honor?

9              THE COURT:  Yes.

10        Q.   Ms. Kole, where did the prison authorities at

11   FCI Danbury obtain the items listed on Petitioner's

12   Exhibit 5?

13             MR. KOFFSKY:  Objection foundation.

14             THE COURT:  If you know.

15        Q.   Do you know where they obtained them from?

16             MR. KOFFSKY:  Objection.

17             THE COURT:  Basis.

18             MR. KOFFSKY:  Foundation, your Honor.

19             THE COURT:  Sustained.

20        Q.   Ms. Kole, do you know where the items that are

21   available for purchase by the Jewish inmates for 2008 are

22   purchased?

23             MR. KOFFSKY:  Objection. Same foundation, your

24   Honor.

25             THE COURT:  Sustained.

1   Q.   How many different administrative claims did you

2   make with regard to your complaints concerning the items

3   that you would have available for purchase of kosher for

4   Passover items?

5   A.   I took it up to the last Washington, D.C.  I

6   took it to Washington.  That's the last one.  I made

7   eight and a half.  I made any nine to the warden.  The 8

8   and a half goes to Sister Raftery and cancels.  The nine

9   went through the warden.  Then the 10 went through the

10  region.  Then 11 went through to Washington.  The head

11  office.

12  Q.   You mentioned a moment ago in response to one of

13  my questions that a lieutenant at Danbury found some of

14  your kosher for Passover items; is that right?

15  A.   Yes.  But they don't know if it is Passover or

16  not.  They don't care.

17  Q.   Back in 2005 a lieutenant from Danbury found

18  some kosher for Passover items belonging to you; is that

19  right?

20  A.   Yes, sir.

21  Q.   And do you know where -- withdrawn.

22       Which lieutenant found those items?

23  A.   I can't remember.  It was the officers then they

24  took it.  They are saying to the lieutenant office.

25  Q.   Lieutenant Guzzick?

1        A.  Yes, sir.

2        Q.  And do you know where the officer or officers

3    found those items?

4        A.  Yes.

5        Q.  Where?

6        A.  Because I had it in my blue locker so they told

7    me I can't keep it in my legal locker.  They took it why

8    they claim.  That's my legal locker where I put my legal

9    stuff.

10       Q.  I want to ask you a few questions concerning the

11   2007 holiday commissary list.  That's petitioner

12   Exhibit No. 6.  May I approach the witness, your Honor?

13           Take a look at that please.

14       A.  Yeah.

15       Q.  Inmates of all faiths can order off of

16   Petitioner's Exhibit No. 6, is that right?

17       A.  Yes, sir.

18       Q.  In fact, Exhibit No. 6 is made available to

19   inmates shortly after the Thanksgiving holiday; is that

20   right?

21       A.  Yes, sir.

22       Q.  And in fact the purchase limit, your monthly

23   purchase limit is increased from $290 to $340 for that

24   time period where holidays are worshipped by members of

25   all faiths; is that correct?

1          A.   Members of all faiths.

2          Q.   All faiths.  It is not just a holiday season for

3     Jews; is that correct?

4          A.   It is for Christmas. They did not limit that.

5     They left it for the population.  If you want to buy it

6     you can buy.  What we're fighting for --

7               THE COURT:  You don't need to add.  You need to

8     answer his question.

9          A.   Can you repeat your question please?

10         Q.   It is not a holiday for Jews, is that correct?

11    Meaning the November slash December time period.

12         A.   It is holiday for Christmas.  We don't have any

13    items for Hanukkah.  We don't buy things for Hanukkah.

14         Q.   Can members of the Jewish faith purchase off of

15    Exhibit 6?

16         A.   Yes because staff member allows it.

17         Q.   Yes or no.  Can the members of the Muslim faith

18    purchase off of Petitioner's 6?

19         A.   Yes.

20              MR. SOLOWAY:  I have nothing further, your

21    Honor.

22              THE COURT:  Brief redirect, Attorney Koffsky.

23              MR. KOFFSKY:  No.

24              THE COURT:  You may step down, Ms. Kole.  Do you

25    have any further evidence?

1          MR. KOFFSKY:  I believe the government has asked

2     Rabbi Hoenig and Sister Raftery to be present.  I will

3     call the Rabbi.

4          THE COURT:  Is there any objection?  Is he in

5     the building?

6          MR. SOLOWAY:  He's in building.  Can we have a

7     brief argument before he's called?

8          THE COURT:  Yes.

9          MR. SOLOWAY:  Your Honor, I submit that

10    petitioner has demonstrated she's been accorded the

11    appropriate due process rights.  I would further submit

12    that she's failed to sustain her burden of proof.

13    Essentially the same argument I made before my

14    cross-examination.

15         THE COURT:  Her due process rights aren't

16    procedural.  I would agree she's had procedural due

17    process.  I believe I heard Attorney Koffsky when we were

18    in chambers off the record indicating he wanted to press

19    a substantive due process claim.  I don't think it

20    matters what her procedural due process was and would you

21    agree with me that the Turner case controls in term of it

22    is tests that I have to analyze the facts under.

23         MR. SOLOWAY:  Yes.

24         THE COURT:  I don't have anything in the record

25    before me as to why the prison has done what they did.

1    Clearly they made a change.  There may be one or more

2    than one perfectly rational good reasons for it.  In the

3    record before me there isn't any.  I have your

4    affidavits.  I don't know that Attorney Koffsky is

5    agreeable to my taking the affidavit as opposed to having

6    a right to cross-examine people.  Right now I have to say

7    to you that I think there is still a cognizable, by the

8    petitioner, a retaliation claim.  That's for the reasons

9    I said earlier.

10         As to the burden on her First Amendment rights,

11   one of the treatises I looked at talks about it is

12   important to look at why the prison does what it does in

13   terms of establishing the burden is reasonable.  If it is

14   a severe burden, presumably it would take a really good

15   reason.  If it's not severe, perhaps some good reason

16   might work.  I'm saying what I need to look at under

17   Turner, one of the things is what's the interest of the

18   facility.  What I have in front of me is that for several

19   years, if not more, they had a shall we say a fulsome

20   list for persons keeping kosher for Passover.  That they

21   then cut it back, cut back the amount they could spend

22   when that was complained about.  They in my opinion

23   correctly reinstated the amount.  A comment gets made

24   that sounds retaliatory and they have a shorter list.  If

25   I look at the list in the abstract, I might say nobody is

1   going to starve on this.  She gets three meals a day that

2   are kosher for Passover.  She has some supplement.  It

3   doesn't seem to be a tremendous burden for eight days for

4   not having as full a supplement as they used to.  If they

5   have a reason for like Aleph doesn't exist or security

6   issues I suppose.  The difficulty is I look at what's in

7   the year-end holiday times and there is still on that

8   list what I would call more substantive foods.  I don't

9   have the exhibits in front of me.  There's salmon.

10  There's chicken.  There's food food as opposed to the

11  cookies and candy and milk.  So I couldn't imagine the

12  security reason in April, May when it is Passover versus

13  in November, December that would allow certain items of a

14  certain type to be offered at a later period but couldn't

15  be offered at the former.  I'm left with a record that I

16  don't know what I would say under the first prong of

17  Turner whether there's a valid rational connection

18  between the prison regulations and actions for the

19  interest asserted by the government or whether it's

20  irrational.  I don't know how I could form a judgment

21  here other than looking at it in the abstract.  It seems

22  to me they have no rational basis for what they have

23  done.  Again though I as a judge, I'm not running this

24  prison but normally when I'm asked to look at whether

25  something that's been done in the prison context is

1    burdening an inmate's constitutional right, I have an

2    offer or evidence before me of what's the reason.  Now I

3    know you articulated reasons in our telephone conference.

4    I did not go back to see if the affidavits that were

5    attached to your response actually articulated those

6    reasons.  As I said, I don't know that these haven't been

7    offered at the hearing.  I don't know that Attorney

8    Koffsky would be willing to accept them without the

9    ability to cross-examine.  I know that some of the

10   affidavits talk about how this is the way it is at other

11   places but I do recall Sister Raftery gave an affidavit

12   but that was more in the nature of explaining what's

13   happening now.  What happens for awhile.  What the prison

14   can get now and what she can't get and she's reviewed

15   other policies at other prisons.  The petitioner came

16   forward on the 28th suggesting there's lots of other

17   federal correctional facilities followed the Aleph supply

18   process, the larger list.  So just bottom line I'm left

19   without any reason to answer that first question in favor

20   of allowing the prison official running the prison, I

21   don't know what the valid rational connection is with the

22   shorter list, particularly in light of the longer list at

23   year end holidays.

24          MR. SOLOWAY:  Very briefly, your Honor.  The

25   government would submit that the efforts that they extend

1    are constitutionally sufficient to allow Ms. Kole to

2    worship in an appropriate manner.  What she's really

3    complaining of is the breadth of culinary ancillary

4    items.

5            THE COURT:  That may be how she frames the

6    question as a pro se litigant but the bottom line it

7    really boils down to am I being retaliated against,

8    number one, and number two, am I being treated different

9    from others who exercise or practice their religion

10   particularly when you ask the question about there are no

11   foods that are necessary to a Christian to celebrate

12   Christmas that I'm familiar with and I'm a Christian.  I

13   have never heard of any foods.  There may be traditional

14   foods.  There are no food that I need to eat in order to

15   celebrate that holiday of Christmas.  Particularly when

16   we're looking at a religion that needs food to celebrate

17   the holiday.  If you had a shorter list for Christians

18   and there was a reason for it all or there was a reason

19   for it all, I might say the shortened list is enough.  As

20   I said her testimony about the retaliation aspect and her

21   questions framed as to due process substantive claim,

22   that's probably legally not going to be sustainable but.

23           MR. SOLOWAY:  It is those traditional foods that

24   the court seized upon that are provided.  They are

25   provided at the kosher Passover meals, the grape juice,

```
1    matzoh to enable Ms. Kole to worship in a manner that
2    allows her freedom of religion.
3           This really is and let me also draw the
4    distinction, your Honor, that the items that are
5    available off of the holiday purchase list are available
6    to members of all faiths and it is because that is a
7    broader segment of the prison community that there is a
8    higher spending limit set.
9           THE COURT:  That doesn't make any sense.  That's
10   the thing.  None of it makes a whole lot of sense.  The
11   idea being that inmates in celebrating their holidays
12   should be able to splurge a little more or make more
13   purchases than they ordinarily make.  I take no exception
14   to the warden to make a judgment to increase the spending
15   limit.  What it does it makes question in my mind as the
16   discrimination to persons who celebrate their holiday at
17   another time.  Passover is a very important holiday in
18   the Jewish religion.  Those two holidays are extremely
19   important in the Christian religion.  I would say
20   likewise certainly Yom Kippur, the high holidays in the
21   fall and Passover are the two major holidays.  That's the
22   Jewish observes that's casting the net broadly. There's
23   lots of holidays celebrated by Jewish minor or less
24   holidays anyone who calls themselves a Jew observes those
25   two holidays.  Passover is a very important holiday.
```

1    Again not because the Jewish inmate is entitled to spend

2    $340 on kosher.  Raising the question in my mind why is

3    the Jewish holiday treated differently.  The dollar

4    amount isn't raised, is it, and the substantive food what

5    I would call food with protein in it, the more

6    substantive food is no longer being offered where it is

7    still being offered for Christmas.

8           MR. SOLOWAY:  There are certain foods that are

9    customarily eaten by Christians.  There may be certain

10   Italian traditions.

11          THE COURT:  Can I see the exhibits.

12          MR. SOLOWAY:  There are certain traditions in

13   terms of various customs.  There may be a fish meal

14   associated with a holiday or a lamb may be associated

15   with Easter. I think it is important to differentiate it

16   is not the ancillary items that are being provided to the

17   member of the Jewish faith at Danbury. I think to suggest

18   that all the BOP does is provide matzoh, grape juice and

19   two or three types of chocolate, that's not accurate.  In

20   addition --

21          THE COURT:  I'm not familiar with Kwanzaa.  I

22   have some familiarity with Hanukkah and I have familiar

23   with Christmas.  So it may be Kwanzaa that I'm deficient

24   in my knowledge about.  Salmon some Christians like to

25   have a fish meal on Christmas Eve but salmon is a food

1  that Jews eat during Passover if it is kosher Passover

2  and it was offered on the earlier list.  It is not

3  offered now.  You can't tell me it's a security reason

4  not to have salmon if you are offering it in December.

5  Barbequed chicken could be Kwanzaa.  I may be deficient

6  in my holiday knowledge but I certainly never heard of

7  barbecued chicken as a Christmas dish or a Hanukkah dish.

8  Pizza kit.  In my view from a Christian's viewpoint and

9  also from a Hanukkah view point of which I have some

10  knowledge, I really don't identify any of the foods on

11  here as associated with Christmas or Hanukah.  That's not

12  terribly important.  You may tell me there's somebody

13  that has pizza for Christmas Eve in their home and that's

14  important to them, that's fine.  Again I'm not here to

15  micromanage the prison.  I'm not here to say we should

16  have Bumble Bee tuna added to the list.  I have no

17  interest in doing that.  I have no responsibility to

18  doing that.  My point of referring to the holiday list is

19  solely by questions to the questions it raises in

20  connection with comparison to what the list used to be

21  for Passover which had similar kinds of items.  They are

22  different because they are kosher for Passover.  They had

23  protein items and they had candies and things like that

24  that this list also had.  The holiday list. I see now we

25  don't have those on the current list which follows what

1    has been testified to as a retaliatory comment and which

2    raises the second thing in my mind.  The question of what

3    is the penological reason for not continuing to offer

4    items like those on the Aleph list, if not exactly the

5    Aleph list, something that has substance to it.  By

6    substance, I mean has protein or vegetables.  Soup, food

7    that you would like your children to eat to have a

8    healthy meal as opposed to the peanut brittle or

9    chocolate or opposed to the macaroons or opposed to the

10   chocolate-covered cherries or holiday cookies.

11            MR. SOLOWAY:  If I may hopefully briefly.

12   Because the holiday list is made available to all members

13   of the prison population, there is less of an issue of it

14   being used for inappropriate barter system within the

15   prison confines because all of the inmates have that list

16   available to them to make purchases.  The same cannot be

17   said for the kosher for Passover items.  The kosher for

18   Passover items are made available only to the 16 members

19   of the Jewish faith that currently reside at Danbury and

20   that's specifically because of the limited availability

21   and let me also add, your Honor, once the Passover

22   holiday is concluded, if there are items that were kosher

23   for Passover that have not reached the expiration that

24   they are then made available to the general population.

25   It is because the kosher for Passover items are only made

1    available to 16 people there is and has become an issue

2    relating to the barter system.

3         THE COURT:  If you brought the warden in, how

4    many times would she say that someone was ticketed for

5    bartering kosher food during the Passover season with

6    another inmate in the last three years?

7         MR. SOLOWAY:  I can tell you with regard to this

8    particular inmate in 2005 and although there wasn't a

9    discipline assessed that the government is prepared to

10   offer testimony this morning that a substantial amount of

11   kosher for Passover food belonging to Ms. Kole was found

12   in a location other than the blue box, other than the

13   locker and was found substantially after the Passover

14   holiday secreted away or I should say secreted away in a

15   location other than in her individual living area.

16   There's a --

17        THE COURT:  Was she bartering it?  Was she

18   ticketed for bartering it?

19        MR. SOLOWAY:  She was not.

20        THE COURT:  How many people have been written up

21   in the last three years for bartering this food?

22        MR. SOLOWAY:  I don't have that information.

23        THE COURT:  What other penological reason is

24   there?  The fact it is made available to everybody at the

25   year end holidays, I don't know that that --

1          MR. SOLOWAY:  I think what the prison

2     administration's concern is to have all inmates put on an

3     even footing.

4          THE COURT:  Unfortunately the Constitution

5     doesn't allow that when it comes to religion.  If I'm

6     Christian, I don't get to eat her kosher meals.  If you

7     are serving turkey for Christmas because the BOP

8     splurges, she's not going to be able to eat it.  I assume

9     it is not going to be -- it applies to chicken and

10    poultry.  It will not be prepared properly by a kosher

11    butcher.  You are not treating people the same and

12    similarly.  I would say that's actually part of my

13    problem with the case right now is you are not treating

14    them the same in the sense of you can't treat them

15    identical but I would think it would be a reasonable

16    objective to treat different groups as close as possible

17    to each other and by eliminating the items that were on

18    the Aleph list, you are not doing that.  I don't mean you

19    personally and so I still am left with the question why.

20    And that's the first question under the Turner analysis.

21    You are correct.  There's not many cases out there to

22    support the plaintiff's position.  I think there's one.

23    It is not really on point.  Most of the cases deal with

24    situations where no kosher food was provided.  Clearly

25    that's not the case here and in Passover, you are

1    provided kosher food for Passover.  While she may be

2    hungry, I doubt I didn't see any meals, I assume there's

3    sufficient calories to sustain her for eight days plus

4    she has additional matzoh.  If somebody had no money.  I

5    don't imagine you would have people starving to death if

6    they are Jewish.  If they had no money. I presume you are

7    feeding them with enough calories to sustain.  I can also

8    imagine you would get hungry.  So I think the case begs

9    the question why as I say a retaliatory comment is one

10   basis for her claim.  As to why the switch from the Aleph

11   list to the shortened list and the other is a general

12   question why is the holiday list at year end contain

13   items that are like ones that used to be on the Aleph

14   list but aren't on the Aleph list anymore.

15            MR. SOLOWAY:  I think because it is made

16   available for the entire population and the Passover list

17   is not.

18            THE COURT:  That's what it boil down to.

19            MR. SOLOWAY:  I think so.

20            THE COURT:  You can't barter or hoard sweet

21   chocolate.

22            MR. SOLOWAY:  You can.  The major distinction is

23   because there's a broader spectrum of the inmate

24   population that has availability or has access to those

25   materials.  The potential for inappropriate use of those

food stuff is lessened because everybody has access to
that.

THE COURT:  The fact everybody has access to it,
doesn't go to your concern you raised a moment ago that
people hoard food.  The fact I can buy as much as you
want to up to $290 a month.  If hoarding food is a
problem because it leads to bartering or hoarding food is
a problem, the fact that both of us can hoard or not
hoard doesn't do away with the problem anymore than I can
buy during Passover and you can't.  Okay so I will hoard
again but I could have hoarded during November or
December.  I don't know why the fact this only a small
number of inmates can buy certain items for an eight day
period creates a different situation than otherwise faced
generally by the warden at Christmastime or any other
time.  There's items in the commissary that people might
want to barter for I suppose.  Those are offered.  It is
a very long list.  There are a lot of things I suspect
could be the subject of barter.  But none of them are
things that this petitioner can eat.  Is there any other
reason that you offer other than the concern about
hoarding and bartering by a small number of people?  I'm
not sure that's why I asked has this ever been a problem.
I don't know how or why grape juice -- grape juice is on
the commissary list so I don't know what would make it a

more attractive item to hoard or barter if it is kosher
for Passover than if it is just grape juice.  If I'm not
Jewish, I don't really care whether it is kosher.  The
macaroons let's see what we have for cookies we don't
have macaroons.  I suppose there could be some non-
Jewish person that craves macaroons and might want to
barter for them.  You have chocolate.  I don't know if
the quality of the kosher chocolate is better or not.
You have milk.  Milk chocolate.  Instant milk.  I don't
know if it is instant or fresh milk.  I suppose that's
different.  And the matzoh is on the general list so that
would be something that -- matzoh crackers is on the
general commissary list so I suppose it is a kosher for
Passover matzoh.  I guess the bottom line, Attorney
Soloway, I'm left to puzzle over what is the valid
rational connection between the regulation and the
interest of the government.  I'm not even at the part of
rational connection. I'm not sure I have heard the
interest of the government.  I'm very reluctant to being
involved in making decisions absent retaliation claim
which I think is valid or viable at this point.  Absent
that, I would be very reluctant to intrude in the running
of the prison.  The reason why judges are reluctant is
because the prison officials have the responsibility.
They have the danger.  They have the responsibility for

1    caring for the inmates.  They have the obligation to

2    protect the public.  Those are assignments I don't wish

3    to second guess them.  They need to act rationally.  They

4    need to have a reason for what they are doing and

5    normally that's not too hard to come up with in these

6    context.  If you came in and told me we have no more

7    holiday list and no more kosher for Passover list, I

8    would be much less concerned than I am right now.  They

9    have the authority to do that.  There's no entitlement to

10   this.  Nobody is gone to starve to death.  It is the

11   existence and the contrast causing questions in my mind

12   as to what's the rational reason for having this now

13   Passover list.

14        MR. SOLOWAY:  I don't see that there's a

15   contrast and if what the Bureau of Prisons exclusively

16   provided for the benefit of the Jewish inmates were the

17   four or five items as detailed on the list, perhaps there

18   might be a suggestion that the regulations were overbroad

19   but I think incomplete to look at those items as entirely

20   representative of what the burden of proof is doing in

21   terms of making those ceremonial foods available.

22   Ceremonial foods are being available on the first night

23   and second night of Passover, the seder, if you will.

24   The ceremonial foods are being made available on a daily

25   basis with three hot square meals a day.  To supplement

those 16 inmates, Jewish inmates in question are being
given a box of matzoh for which they do not have to pay.
If in fact the Jewish inmate finds the three squares a
day plus the matzoh are not sufficient to worship as they
see fit during the eight day Passover holiday, within the
discretion of the executive of the institution, the
warden, the warden has determined that the four or five
items that are available on that list are items that she
wishes to make available so that members of the Jewish
faith can supplement what's already being provided to the
inmates on a gratis basis.  I don't think the court can
look at this case solely on the basis of Aleph provided a
broader spectrum of food.  I will concede that when the
inmates were allowed to purchase off the SPO, the items
that they had to choose from were clearly broader than
the items that were available now but doing that ignores
the other efforts that the Bureau of Prisons is making
with regard to the constitutionally mandated or perhaps
that's an inaccurate term to use but is already provided
those ceremonial foods that are necessary for the Jewish
inmates to worship the holiday in the manner they see
fit.  In particular the foods that are most clearly
indicia of that are grape juice and matzoh.

            THE COURT:  Perhaps I should ask you if you
disagree with this statement because I'm making an

1    assumption and I could be mistaken.  My view of Passover,

2    is it is a religious ceremony, the seder.  It is the

3    equivalent of a Catholic going to midnight mass for

4    Christmas.  It is celebrated within the home context and

5    it is focused around food but it is a religious

6    celebration.  Am I mistaken in that view?

7           MR. SOLOWAY:  It is a family experience.  It is

8    an experience to retell the story of the Exodus of the

9    Jewish people.

10          THE COURT:  Readings are done, prayers are said.

11   Someone leads the ceremony, usually the father figure in

12   the family and certain foods are prepared as symbols of

13   the Exodus story.  You don't eat the lamb bone.  It is

14   there.  They all have religious meaning.  You know, and

15   whether your family makes brisket or they have chicken, I

16   suppose that can vary from family to family.  The concept

17   of having a ceremony in your home is a religious ceremony

18   even though it is not within a temple or a church.  Just

19   like a mass said in a room in Danbury is still a mass for

20   a Catholic if it is said by the priest.

21          MR. SOLOWAY:  I would not consider the Passover

22   meal the functional equivalent of midnight mass.

23          THE COURT:  I don't want to make things

24   equivalent.  Religions are different.  I'm saying it's a

25   religious ceremony.

```
 1              MR. KOFFSKY:  If I may, your Honor, I don't mean
 2    to interrupt but just to go to the crux of it, your
 3    Honor.  Passover is a biblically mandated holiday in
 4    which Jews are commanded to recount the story of the
 5    Exodus.  Deuteronomy 16:3.  That thou mayest remember the
 6    day when thou camest forth out of the land of Egypt all
 7    the days of thy life.  To eat matzoh, maror and to
 8    abstain from eating chametz which is leaven.  Exodus
 9    12:14 commands in reference to God's sparing of the first
10    born from the Tenth Plague plate and this day shall be
11    unto you for a memorial, and you shall keep it as a feast
12    to the lord throughout your generations.  It is a
13    religious ceremony akin to the holiest east day in any
14    other religion.  Thank you.
15              THE COURT:  I appreciate, Attorney Soloway, I
16    mentioned at least twice that those who observe the
17    Jewish religion are being fed three meals a day.  This is
18    not like the cases in the '70s and '80s.  People were not
19    getting any kosher food at all.  One meal.  A number of
20    cases came out that, made it clear that absent some
21    prison limitations of extraordinary proportion, kosher
22    food of some sort had to be provided.  And clearly the
23    Bureau of Prisons recognizes that special today and
24    preparations are necessary to allow a Jewish person to
25    celebrate the first two nights of Passover and to
```

1   continue to be observant and celebratory of it for the

2   remaining six days.  As I say, the record is before me

3   right now though is that the cut back in what is offered,

4   I have no reason for it other than testimony that

5   suggests it was retaliatory.  That's what I have.  I

6   don't have any other testimony.  I don't think the

7   affidavits really address the reasons you have been

8   advancing but I have to say the reason you are advancing,

9   I have to hear it from somebody because I don't

10  understand it.  I don't see that it holds water right

11  now.

12          MR. SOLOWAY:  I'm prepared to offer testimony,

13  additional testimony if the court wishes.  The point I

14  was trying to make that it was the government's position

15  that the case put before this court as a matter of law by

16  petitioner is insufficient.  If the court wishes to hear

17  additional information, I'm prepared to do that.

18          THE COURT:  When are we going to do that?

19          MR. SOLOWAY:  I'm ready to put witnesses on the

20  stand now.

21          THE COURT:  We'll take our luncheon recess.

22  We'll be back at 1:30 and we'll begin with your witness

23  then.

24              (Whereupon, a recess was taken from 12:57 p.m.

25  to 01:37 p.m.)

1          MR. KOFFSKY:  May I raise one issue with the

2     court?

3          THE COURT:  Sure.  Don't tell me Ms. Koles

4     didn't get a kosher lunch.

5          MR. KOFFSKY:  It has to do with my scheduling.

6     I have a 6:30 flight from LaGuardia to Phoenix I arranged

7     with the government travel office.  I got permission from

8     Judge Kravitz to travel to Phoenix to interview a

9     defendant who has been in a drug rehabilitation facility

10    since his release on detention.  It is a five defendant

11    case.  Four pled out.  I made the plans sometime ago.  I

12    just wanted to indicate to the court that I have those

13    plans.

14         THE COURT:  Okay.  The problem is you have to

15    get to LaGuardia.  To get to LaGuardia, you have to leave

16    here by when?

17         MR. KOFFSKY:  If we broke at 3:30.  I haven't

18    packed yet.  I would go to the house and grab some

19    clothes.

20         THE COURT:  The difficulty is not so much today

21    to be honest with you.  I could benefit from knowing what

22    your claims are that I have to rule on on the record.

23    Put them on the record and two briefing.  I have had

24    briefing in response sort of to the petition and I have

25    had briefing last week from you.  The former should

1    reflect I was pointing at Attorney Soloway and the latter

2    I was pointing at Attorney Koffsky.  If you are claiming

3    retaliation which you indicated you are for which there's

4    some evidence then, I haven't had any briefing on that.

5    I have never had a prison retaliation.  This morning with

6    Attorney Soloway I assume such a claim exists.  All

7    because they exercised the First Amendment rights that

8    there would be such a claim.  I'm sure there's case law

9    that expounds on how you prove it, what the elements are

10   and what the burden is.  The Fourteenth Amendment is

11   mentioned in her petition.  As I indicated in chambers,

12   I'm familiar with substantive due process.  That was a

13   very active claim in the '70s or '60s but it hasn't been

14   very alive lately and the First Amendment claim I think

15   we all identified Turner and other cases as the proper

16   standard so I don't need a lot of help on that one.  I

17   don't assume you are making a claim under the statute

18   ressiper or whatever.  That hasn't been mentioned I don't

19   think.  As I say, I do need you to put your claims on the

20   record.  I realized when I came out on the record this

21   morning I didn't ask you to do it.  Before you do it, my

22   concern is we're looking at a holiday that is starting a

23   week from Saturday evening.  Realistically if I rule

24   against the petitioner, that's easy.  I can do that on

25   Friday before and I presume she'll order what she could

1    have ordered on the shortened list, and she'll have to

2    decide whether to appeal.  I don't want to wait until

3    Friday.  If I'm ruling for the petitioner and she's going

4    to get any real relief, I need to give the defendant some

5    time to try to obtain items to whatever it is I say

6    should be done and/or I suppose going to the circuit and

7    asking for a stay because I haven't done the analysis

8    correctly.  That doesn't leave me a lot of time

9    especially if you are getting on a plane and can't do a

10   brief.  When will you be returning?

11        MR. KOFFSKY:  On the red eye Wednesday evening

12   to land Thursday.  I'm not good at that briefing stuff.

13        THE COURT:  I know.  I don't think we should be

14   doing -- we're not the advocates here.  Let's start first

15   with what your claims are that are supportable by the

16   petition that's currently before me.  I don't think you

17   can add claims now without filing an amended complaint.

18        MR. KOFFSKY:  The court has a copy of the

19   petitioner's claim.  I'm going to make a copy.  It is

20   admitted as an item of evidence.  We have a First

21   Amendment claim.  That's relatively clear, your Honor.

22   We have as the court knows, a claim that's based in

23   retaliation that we would turn to Turner versus. Safley

24   and indicate that the regulation as applied to the

25   petitioner and the other Jewish inmates is flawed under

1    the four point Turner versus. Safley rubric.  We would

2    claim that there has been religious discrimination under

3    the Equal Protection clause of the Fourteenth Amendment.

4    I would cite Lee versus. Washington.  390 U.S. 333, 1968

5    case.  Due process claim under Wolf versus. Mcdonald 418

6    U.S. 539.  Both of those cases are cited in Turner versus

7    Safley 482 U.S. 78, 1987 decision.

8              Just so I read so the court knows I'm

9    reading from the paragraph in Turner, we begin as did the

10   courts below with our decision in Procunier versus

11   Martinez that describes the principles that necessarily

12   frame our analysis of prisoners' constitutional claims.

13   The first of these principles is that federal courts must

14   take cognizance of valid constitutional claims of prison

15   inmates.

16             THE COURT:  We have a straight up First

17   Amendment claim analyzed under Turner I presume.

18             MR. KOFFSKY:  That's correct.

19             THE COURT:  We have retaliation under the First

20   Amendment which I don't know if that's analyzed just

21   under Turner or whether retaliation case law, there case

22   law in a prison context under retaliation that makes it,

23   puts a wrinkle on the underlying claim and then equal

24   protection which you say I will find some discussion of

25   in Turner in references to other cases.

1          MR. KOFFSKY: That's right.  Lee versus.

2     Washington, Wolff versus McDonnell.

3          THE COURT:  Isn't there a Wolfish case in this

4     are, W-o-l-f-i-s-h?

5          MR. KOFFSKY:  I'm not sure.  I know that Wolff

6     is a 1974 Supreme Court decision.

7          MR. SOLOWAY:  There's a Wolfish case in this

8     area.

9          THE COURT:  Let's try to get as much evidence on

10    as we can.

11         MR. KOFFSKY:  I agree with some of the Court's

12    questioning of the government in this case that there is

13    no valid rational connection between prison regulation

14    and any legitimate government interest put forward.  That

15    there's no logical connection between the regulation and

16    any asserted goal as made by the government that the

17    policy as stated is arbitrary and irrational and that the

18    objective as stated isn't legitimate nor has it been

19    found.  Nor has it been scribed to be neutral.  That's

20    Pell versus Procunier, 417 U.S. at 828, Bell versus.

21    Wolfish.  That's the case.  441 U.S. at 551.

22         THE COURT:  I think we best try to get testimony

23    on because I can't decide without giving the defendant an

24    opportunity to make a record and we'll see where we are

25    at 10 past 3.

1          MR. SOLOWAY:  We're ready, your Honor.

2          THE COURT:  Call your first witness.

3          MR. SOLOWAY:  May I go get the first witness?

4          THE COURT:  Yes.

5          MR. SOLOWAY:  This witness would prefer to

6     affirm and not swear.

7          THE COURT:  That's fine.

8          Good afternoon.  If you would come up to the

9     witness stand area.  When you arrive I ask that you

10    remain standing so the oath can be administered -- the

11    affirmance can be administered to you.

12      S I S T E R   A N N E   M A R I E   R A F T E R Y.

13    having been called as a witness, was first duly

14        sworn and testified on his oath as follows:

15         THE CLERK:  State your full name and city and

16    state that you are from.

17         THE WITNESS:  My name is Sister Anne Marie

18    Raftery and I work at the Federal Correctional

19    Institution Danbury, Connecticut.  My role there is a

20    supervisory chaplain.

21         THE COURT:  You may inquire, Attorney Soloway.

22    DIRECT EXAMINATION BY MR. SOLOWAY:

23      Q.  Sister, can you briefly tell us about your

24    education background?

25      A.  I have a masters in religious education and

     1     masters in theology and I have clinical pastor education.

     2          Q.  Are you an ordained nun?

     3          A.  I'm a professed nun.  We use professed.

     4          Q.  Sorry for the terminology.  And how long have

     5     you been a nun?

     6          A.  40 plus years.

     7          Q.  And who is your president employer?

     8          A.  My present employer is the Federal Bureau of

     9     Prisons Warden Donna Zickefoose at the present time.

    10          Q.  How long have you worked for the Bureau of

    11     Prisons?

    12          A.  17 years.

    13          Q.  And in what capacity are you employed presently

    14     for the Bureau of Prisons?

    15          A.  As chaplain, staff chaplain.

    16          Q.  Are you familiar with Ms. Kole?

    17          A.  Yes, I'm familiar with Agnes Kole.

    18          Q.  And I want to direct your attention back to --

    19     are you familiar with the -- withdrawn.

    20               Directing your attention back to the 2005 time

    21     frame, Sister Raftery, do you recall having a

    22     conversation with a member of the correctional services

    23     staff relative to Ms. Kole in the spring to summertime

    24     frame?

    25          A.  Yes.  I do.  I was called  to the lieutenant's

1    office.

2         THE COURT:  Just answer what he asked you.

3    He'll take it piece by piece.

4         Q.  What was the general substance of that

5    conversation?

6         MR. KOFFSKY:  Objection hearsay.

7         THE COURT:  Certainly as to the other side of

8    the conversation.

9         Q.  Did you have after having that conversation with

10   the member of the prison staff, did you have occasion to

11   have a conversation with Ms. Kole?

12        A.  Yes.  Ms. Kole was present.

13        Q.  And what did Ms. Kole say to you?

14        A.  Agnes identified the items that were found to be

15   hers and she was permitted by the lieutenant to keep them

16   because I vouched that yes, indeed she had paid for them

17   and they are her items.

18        Q.  Where were the items found?

19        A.  They were found in unit one in a closet.

20        Q.  And that's in a closet that was located adjacent

21   to where Ms. Kole lived within unit one?

22        A.  It was in the same unit.

23        Q.  As a result of that statement that was made to

24   you by Ms. Kole, were the Bureau of Prisons's policies in

25   place at FCI Danbury changed as it relates to the breadth

1    of items available for purchase for kosher for Passover

2    items?

3         A.   The same number of items were maintained.

4         Q.   Did there come a time when the number of items

5    changed?

6         A.   Yes.

7         Q.   If I can have a moment to find the page, your

8    Honor.  I will show you a page in what's been marked as

9    Petitioner's Exhibit 1, Sister and ask you to look at it

10    then I wish to put some questions to you.  When you are

11    done looking at the document, please look up so that I

12    know that you finished.

13         A.   Yeah, I got it.

14         Q.   If I can have the document back, Sister, just

15    for one moment.

16              MR. KOFFSKY:  Can you indicate what document?

17              MR. SOLOWAY:  The page within Petitioner's

18    Exhibit 1 bearing the marking 05-0107.  It is the form

19    relating to Ms. Kole's kosher for Passover purchase items

20    from Passover 2005.

21         Q.   Looking at that page, Sister, does it indicate

22    what date the items that were ordered have to be consumed

23    by?

24         A.   May 1, 2005.

25         Q.   And without going into the substance of the

1    conversation you had with a member of the correctional

2    services staff, did that conversation with a member of

3    correctional services staff take place after May 1?

4        A.  Yes, it did, yes.

5        Q.  Sister, did you have a conversation recently

6    with Ms. Kole concerning this lawsuit?

7        A.  No.  We have never discussed it.

8        Q.  Did you at any time ever state to Miss Kole

9    words to the effect of that's what you get for bringing a

10   lawsuit?

11       A.  No.  No, I did not.

12       Q.  You said that you been a chaplain at FCI Danbury

13   for how long?

14       A.  Since 1994.  How long is that?  1994.

15       Q.  And you saw the page within Petitioner's

16   Exhibit No. 1, that detailed Miss Koles' kosher for

17   Passover purchase items for the Passover season of 2005,

18   is that correct?

19       A.  Yes.

20       Q.  And are you familiar with the kosher for or were

21   you familiar with in the 2005 time frame with the volume

22   of products ordered by the other Jewish inmates again

23   during the Passover 2005?

24       A.  It was the same list of items.

25       Q.  The same list of items.  Did the other Jewish

1    inmates or those seeking to order Passover food items

2    order the same volume or the same amount that Ms. Kole

3    did?

4         MR. KOFFSKY:  Objection.  Foundation.

5         Q.  I will rephrase.  You have been a chaplain at

6    FCI Danbury for some period of time; is that right?

7         A.  Yes.

8         Q.  In the 2005 time frame, the kosher for Passover

9    purchase items were purchased off of something called an

10   SPO; is that correct?

11        A.  Yes.  Special purchase order.

12        Q.  You were the person responsible for seeing that

13   those special purchase order items were turned into the

14   business office, weren't you?

15        A.  That's right.

16        Q.  Is it fair to say that you would be responsible

17   for the volume of products ordered by all of the Jewish

18   inmates during that time period?

19        A.  Yes, yes, I was.

20        Q.  Did the other Jewish inmates order products in

21   the amount that Ms. Kole did during the 2005 time frame?

22        A.  On an average less, much less.  They had access

23   to order the same amount but the volume was less on an

24   average.

25        Q.  What would the average be aside from Ms. Kole,

1    be for the average purchase for kosher for Passover food

2    items by the other Jewish inmates during the Passover

3    2005 season?

4         A.   Approximately 40 to 50 dollars.

5         Q.   Again I would like to show you that same page

6    from Petitioner's Exhibit No. 1 and can you tell the

7    court after looking at that document how much Ms. Kole

8    ordered during Passover 2005 season?

9         A.   159.50.

10        Q.   And again, Sister, this is an order that would

11   have been placed through your offices; is that correct?

12        A.   Yes.

13        Q.   What items -- withdrawn.

14             Do you attend the seder, Sister?

15        A.   Yes, I do.

16        Q.   What happens?  Tell me what the seder is like at

17   FCI Danbury?

18        A.   Well, we have two seders.  We have the first

19   seder is a program, ceremonial meal in addition to the

20   seder plate and the seder ritual which lasts about three

21   hours.  In conjunction with that, we have a regular meal

22   that starts out with matzoh ball soup, gefilte fish, a

23   salad bow. Then we have the main entry which are the

24   heated up kosher for Passover meals.  They come already

25   prepared with the meat, vegetable and like a starch

1        Usually potato.  We have the ritual of seder whereby we

2        have the seder plate and we read the haggadot which is

3        the story of the liberation of the Israelites from Egypt.

4        We have the required amount of grape juice.  It is a very

5        symbolic but yet joyful occasion because it is

6        reminiscent of the spiritual liberation of the Israel and

7        in fact, all people.  After we finish the seder, we have

8        dessert.  We have a bowl of fresh fruit and fresh fruit,

9        of course, the ever present macaroons which the women

10       love and they tell stories.  They share family stories,

11       their personal history.  Each year there are new women.

12       And it lasts about -- it starts about I think this year

13       we would like to start lighting candles 8:20.  It goes to

14       11:30 p.m.  We get special permission from the captain to

15       keep the women in food service during the 10:00 count.

16       We put them on count.  The office counts them in food

17       service and then.

18              MR. SOLOWAY:  I'm having difficulty hearing the

19       witness.

20              MR. KOFFSKY:  Sorry.

21          A.   The Hurrah matzoh that goes with the seder

22       plate.  The women are given a box of matzoh each day

23       during Passover because as you know, starting at noontime

24       on the eve of Passover, they may not have any type of

25       bread or anything that's with leaven.  We have to eat

1   unleavened bread.

2        Q.   In addition to the two seder meals and the box

3   of matzoh that you mentioned were given to each inmate,

4   does the Bureau of Prisons do anything else on a daily

5   basis to allow those Jews who wish to eat only kosher for

6   Passover product?  Does the bureau do anything for them?

7        A.   Of course.  Passover lasts eight days.  It

8   starts at noon on the eve and we have the women sit

9   separately and we use new tablecloths each day because it

10  is very important that no crumbs or bread from other

11  tables that they don't contaminate the place where they

12  eat.  In addition to the box of Mitzvah's each day, each

13  women gets three kosher for Passover meals.  These are

14  hot meals starting with breakfast, noontime and evening

15  and again these are kosher for Passover.  They include

16  hot meals.  They vary.  There's a menu that's printed

17  out.  Actually comes from the center office and for eight

18  days, they get three hot meals a day.

19       Q.   In addition to access to the seder and the

20  kosher for Passover meals and the matzoh, are there any

21  other items available for purchase by the Jewish inmate

22  during the Passover season?

23       A.   Yes, sir.  They may purchase some kosher for

24  Passover snacks in the prison store that we call

25  commissary.

1    Q.  You are aware, Sister, that in the 2005 time

2    frame, the breadth of items that were available for

3    purchase by the Jewish inmates who wish to eat kosher for

4    Passover foods was substantially different than the

5    breadth of items available for purchase by a Jewish

6    inmates today; is that correct?

7    A.  That was changed just this year for Passover

8    2008.

9    Q.  Was that narrowing of the breadth of items

10   available for purchase in retaliation for anything that

11   petitioner did?

12   A.  No.  Not that I know of.

13   Q.  And what was the basis upon which or why did

14   that narrow, if you know?

15   A.  Well, first those items may no longer be bought

16   through the special purchase order or through the

17   chaplain.  Commissary deals with those items now.

18   Q.  Was the narrowing of the items to be purchased

19   retaliation against petitioner?

20   A.  No.  No.

21   MR. SOLOWAY:  If I can have one moment, your

22   Honor.

23   THE COURT:  Sure.

24   Q.  Who do you -- withdrawn.

25   I'm going to show you -- may I approach the

1    witness, your Honor?

2              THE COURT:  Yes.

3         Q.  I'm going to show you what's been marked as

4    Petitioner's Exhibit 5 and ask you to take a look at that

5    document.  After you have looked at that document, please

6    let me know.

7         A.  Yes.  I recognize this.

8         Q.  What is it, Sister?

9         A.  It is this year's commissary list of kosher for

10   Passover items for sale.

11        Q.  Are you aware who the Bureau of Prisons

12   purchases those items from?

13        A.  You mean the vendor?

14        Q.  Yes.

15        A.  Aleph from Miami.

16        Q.  Thank you.  If I can have the exhibit back,

17   Sister?

18             THE COURT:  That's the current list?

19             MR. SOLOWAY:  Yes.

20             I have no further questions of this witness at

21   this time.

22             THE COURT:  Attorney Koffsky gets to ask you

23   some questions so you need to stay put, Sister.

24   CROSS-EXAMINATION BY MR. KOFFSKY:

25        Q.  Good afternoon.  You said that you have been a

1    professed nun for 41 years?

2         A.   Yes.

3         Q.   17 years at the Danbury prison?

4         A.   I was 14 years at Danbury, three years in

5    Marianna, Florida.

6         Q.   Is that a federal correctional facility?

7         A.   Yes.

8         Q.   M-a-r?

9         A.   M-a-r-I-a-n-n-a, Florida.

10        Q.   Do you know Mr. Pat Pitts the chaplain or the

11   person involved in the commissary at Marianna Federal

12   Correctional Institute?

13              M-a-r-i-a-n-n-a?

14        A.   Yes.

15        Q.   That's a federal correctional institute in

16   Florida?

17        A.   Yes.

18        Q.   Mr. Pat Pitts he is the general who orders the

19   food from of Aleph down there.  Do you know him?

20        A.   No, I don't.  I work in Danbury now.

21        Q.   And is there also a camp at Marianna?

22              MR. SOLOWAY:  For the record so the record it

23   happens to be a Marian also.

24        Q.   I'm talking about Marianna.  Not Marian.  That's

25   the federal connectional institute in Florida?

1          A.  Yes.

2          Q.  Do you know if they purchase the special

3     purchase order foods through Aleph?  Did you know that?

4          A.  I really don't know.

5          Q.  Do you know of any other the federal

6     correctional institutes that order flew Aleph through the

7     special purchase order program?

8          A.  I know some prisons do but which ones I really

9     don't know.

10         Q.  Did the government did he share any of my

11    documents with you that list the federal correctional

12    institutes that do purchase through the special purchase

13    order?

14              MR. SOLOWAY:  Objection.  Relevance.

15              THE COURT:  When he objects, I have to hear him

16    out.  Relevance as to other facilities?

17              MR. SOLOWAY:  The question was did Attorney

18    Soloway share this with you.  I don't think that's

19    relevant.

20              THE COURT:  I think he's trying to ask if you

21    shared with him.  I agree it is not proper.  It may get

22    into attorney/client privilege.

23              MR. KOFFSKY:  I'm not asking for any kind of

24    comment.

25              THE COURT:  Can we rephrase it?  Is she familiar

1    with the fact that other institutions offer something

2    different.

3         MR. KOFFSKY:  My question is different than

4    that, your Honor.

5         Q.  Did you see the documents that I filed?

6         A.  Yes, I did.

7         Q.  So you had an opportunity to read a document

8    that was filed in this case that listed our claims; am I

9    correct?

10        A.  Yes.

11        Q.  And it listed the federal correctional

12   institutes at least that we claim also get special

13   purchase order foods through the Aleph institute.  You

14   read that?

15        A.  Yes.  Which ones I don't know.  I don't

16   remember.

17        Q.  You don't remember.  You know that certainly

18   some federal correctional institutes and camps get their

19   kosher for Passover foods through the Aleph institute

20   special purchase?

21        A.  Yes.

22        Q.  In fact you worked with them for a number of

23   years, correct?

24        A.  Yes.

25        Q.  Prior to 2005, what would happen is you would

1    get a list of the Aleph institute special purchase order

2    list, correct?

3        A.  Yes.

4        Q.  And you would create your own list using the

5    food products that they provided, right?

6        A.  Yes.

7        Q.  You would put it up on your old list.  Let me

8    just approach for a second.  Let me show you what I have

9    had marked as Petitioner's 3 and isn't that Petitioner's

10   3 what the Aleph institute would send you the special

11   purchase order form that they would send to you?

12       A.  Yes.

13       Q.  You would take that form and you would create

14   your own religious. Service Department Purchase Form and

15   that would be Petitioner's 4, am I correct?

16       A.  Yeah.

17       Q.  You would create that?

18       A.  I did.

19       Q.  You would take the food off the Aleph Institute

20   Special Purchase Order and put it on your own form?

21       A.  Right.

22       Q.  And you would hand these out to the kosher

23   inmates at Danbury for them to fill out?

24       A.  Right.

25       Q.  They would give it back to you with enough time

1    so you would give them the business office?

2        A.   Right.

3        Q.   The business office would send them to Florida

4    and a week or more, about a week before Passover they

5    would come -- they would be delivered to Danbury and they

6    would be distributed, correct?

7        A.   Yes.  Um-hum.

8        Q.   You testified about -- let me withdraw that.  I

9    have to imagine that a lot paperwork at the facility it

10   has to be kept, am I correct?

11            MR. SOLOWAY:  Objection.

12            THE COURT:  Excuse me for a moment.  Basis.

13            MR. SOLOWAY:  Relevance.

14            THE COURT:  I assume it is preliminary.  I hope

15   it will end up being preliminary you can answer.

16            MR. KOFFSKY:  I will withdraw that question.

17       Q.   The inmate Passover purchase forms from this

18   year have you kept them?

19       A.   I didn't get them yet this year.

20       Q.   You haven't got them yet?

21       A.   I don't do it anymore.  Commissary does that

22   now.  I don't have anything to do with it anymore.

23       Q.   How about 2007?

24       A.   Yes, I did.

25       Q.   You had them in 2007?

1    A.   Yes.

2    Q.   Do you still have the forms from 2007?

3    A.   I don't think I do.  I Usually when one Passover

4    is over, I don't keep them from year to year.  I send

5    them all to the business office.  Then the business

6    office takes care of it from there.

7    Q.   Would the business office still have the

8    Passover purchase forms?

9    A.   They might.  What they would have is what they

10   have in the computer what each inmate spent.

11   Q.   How about 2005 would you have this or would the

12   business office have that?

13   A.   Business office.

14   Q.   2004 business office?

15   A.   This only started, this hasn't been going on for

16   a long time.  This started 2003, 2004, this Aleph extra.

17   Q.   When was the last time you looked at the list of

18   people who ordered foods from 2005?

19   A.   The last time probably 2005.

20   Q.   Because you testified that on average you think

21   the average amount was between 40 or 50 is that your

22   recollection of what it was?  Have you gone back an

23   looked at the list?

24   A.   When the business office challenged me on the

25   amount of items that were being ordered, their suggestion

1    was 40 to 50 dollars.  That was prior to this year.

2    Probably last year and they suggested that I have the

3    women limit their amount to I think it was 50 dollars.

4    The women were not happy with that so I went back to the

5    business office manager and my supervisor and asked them

6    if we could raise that 50 dollar suggestion to $100

7    because an SPO cannot be over $100 because the SPO to buy

8    other religious. Items such as the Star of David, the

9    star and crest.

10       Q.  Sister Raftery, could you provide to the court a

11   list of the Jewish inmates and what they purchased in

12   2004, 2005, 2006, and 2007, would you be able to do that?

13       MR. SOLOWAY:  Objection.  Compound question,

14   your Honor.

15       THE COURT:  The objection is overruled.  The

16   answer requires an answer that she could do it for all.

17   If he wants to know about anyone, he has to ask a

18   different question.

19       Q.  Would you be able to provide to the court a list

20   of people that purchased and the amount that they

21   purchased for 2007?

22       A.  I personally could not but the business office

23   probably could.

24       Q.  Would you be able to make that request from the

25   business office?

1      A.  I could, um-hum.

2      Q.  Would you be able to make that request for 2006

3   the number of inmates and amount of purchases requested?

4      A.  The commissary manager I think could, um-hum.

5      Q.  How about 2005?

6      A.  If they still have the records for 2005.

7      Q.  Because it is my understanding that before it

8   went to the commissary in 2007, it was your

9   responsibility, am I correct?

10      A.  It was my responsibility to hand out papers and

11   to have the women pick and choose what they wanted.

12      Q.  Then you took the documents back from the

13   inmates and brought them to the business office; am I

14   correct?

15      A.  Right.

16      Q.  The commissary wasn't involved back then, was

17   it?  The commissary has only been involved since 2007?

18      A.  You are right.

19      Q.  The commissary has only been involved since

20   2008?

21      A.  2008, right.

22      Q.  2007 you took the documents from the inmates and

23   brought them to the business office?

24      A.  I did, right.

25      Q.  In 2006, you took the documents you previously

1   handed out and brought them back to the business office,

2   correct?

3        A.  Right, um-hum.

4        Q.  Now, in your role as supervisor chaplain, I have

5   to imagine that you come in contact with a lot of

6   religions; am I correct?

7        A.  Yes, um hum.

8        Q.  Catholic, correct?

9        A.  Yes.

10       Q.  Protestant?

11       A.  Right.

12       Q.  Jewish?

13       A.  Yes.

14       Q.  Muslim?

15       A.  Yes.

16       Q.  Hindu?

17       A.  Yes.

18       Q.  Many, many religions and you become familiar

19  with their practices; am I correct?

20       A.  Absolutely.

21       Q.  And you became familiar with the practice of

22  religious. Jews, Jews who keep kosher; am I correct?

23       A.  Yes.

24       Q.  And you are aware that to assist those inmates,

25  the commissary has kosher foods for them to purchase, am

1    I correct?

2         A.   Right.

3         Q.   Those kosher foods primarily are meat products

4    because the normal meat product at the commissary are not

5    kosher, correct?

6         A.   We have kosher meals with the shelf life and it

7    is specifically kosher.

8         Q.   Those meals, those foods are primarily meat

9    based because the non-kosher meat can't be eaten by

10   people who keep kosher, correct?

11        A.   Say that again.

12        Q.   The kosher products at the commissary are

13   primarily meat products because the non-kosher meat

14   products are non-kosher, correct?

15        A.   Um-hum.

16        Q.   But if you are keeping kosher, you can still

17   purchase the potato chips, correct, yes or no or you

18   don't know?

19        A.   I don't know.

20        Q.   You don't know.  You said that you don't know.

21   You are not completely aware of the practices of people

22   who keep kosher, are you?

23        A.   Oh yes, I am.

24        Q.   You are.  Let me ask you again.  The products at

25   the commissary if somebody who kept kosher went to the

1    commissary, there are food stuffs there that they can

2    purchase that are not meat, am I correct?

3        A.  There are food items that are kosher and

4    non-kosher.  Let's put it that way.

5        Q.  And there are a lot of products there that are

6    not kosher that they can purchase to eat, am I correct?

7        A.  Yes.

8        Q.  There are drinks, correct?

9        A.  Yes, um-hum.

10       Q.  Candies, correct?

11       A.  Yes.

12       Q.  Condiments?

13       A.  Yes.

14       Q.  Cookies?

15       A.  Yes.

16       Q.  Dairy products?

17       A.  Yes.

18       Q.  There's the whole kosher meat section, correct?

19       A.  Yes.

20       Q.  With chicken noodle and beef stew, correct?

21       A.  Yes.

22       Q.  There's also some lasagna?

23       A.  Yes.

24       Q.  Have you seen Petitioner's 2?  This is the

25    commissary list from 2007?

1         A.  Yes, I'm familiar with this.

2         Q.  Now you are familiar with many people at the

3    institution, aren't you?

4         A.  Yes um-hum.

5         Q.  Just about everybody attempts to have commissary

6    money?

7         A.  They all have commissary money.

8         Q.  They all have access to the commissary?

9         A.  Yes.

10        Q.  And would you agree with me that going to the

11   commissary is an important part of institutional life?

12        A.  Yes, um-hum.

13        Q.  And it's so important that the facility has a

14   well-stocked commissary, correct?

15        A.  Yes, um-hum.

16        Q.  And the facility allows for places, private

17   places to keep your own personal foods, correct?

18        A.  Yes.

19        Q.  The institution doesn't allow you to take food

20   out of the dining room, does it?

21        A.  No.  It doesn't.

22        Q.  So people have lockers to keep food in?

23        A.  Yes.

24        Q.  And people have blue boxes that are locked that

25   they keep food stuff in, am I correct?

1      A.  Yes.

2      Q.  And inmates during the day, not part of the

3   regular meal service, the breakfast, lunch and dinner,

4   inmates invariably snack, correct?

5      A.  I guess they do.

6      Q.  You know that the institution provides

7   microwaves?

8      A.  Yes.

9      Q.  That's to heat meat, correct?

10      A.  Yes.

11      Q.  And soups?

12      A.  Yes.

13      Q.  They have instant rice and instant oatmeal,

14   correct?

15      A.  Yes.

16      Q.  So the institution not only provides the food,

17   it provide a way of heating it and preparing it; correct?

18      A.  Yes.

19      Q.  You know that most of the people at the

20   institution keep the food stuff to keep them going during

21   the day and to have additional meals and to snack; am I

22   correct?

23      A.  Correct.

24      Q.  You would say a pretty important part of the

25   institution?

1          A.   Yes.

2          Q.   The commissary is important?

3          A.   Yes.

4          Q.   The microwave and blue box and the lockers and

5     the locks and the ability to maintain the food are sort

6     of an essential part of the personal well-being of each

7     individual inmate.  Would you agree with that?

8          A.   Yes.

9          Q.   You also know that during the holiday of

10    Passover, people who keep kosher for Passover have

11    different rules to comply with, am I correct?

12         A.   Yes.

13         Q.   So the kosher foods that are at the commissary

14    are for those eight days offlimits, am I correct?

15         A.   During the eight days of Passover, yes.

16         Q.   So all the foods that are at the commissary that

17    are simply marked kosher are offlimits for the people who

18    keep kosher for Passover, correct?

19         A.   It is up to the individual inmate.

20         Q.   But the inmates that keep kosher for Passover,

21    who maintain a level of observance that says they keep

22    kosher for Passover, the food at the commissary that are

23    simply labeled kosher, those foods are offlimits; am I

24    correct?

25         A.   They are still available but the Jewish

1    observance Jewish inmate will not shop during those eight

2    days.

3        Q.  They also won't purchase items that aren't

4    labeled kosher for Passover?

5        A.  Right.

6        Q.  So all that's marked kosher as I said is

7    offlimits would you agree with me?

8        A.  Off-limits to.  I'm not sure.

9        Q.  I hope I'm not getting difficult.  If you keep

10   Passover, if you follow a strict observance of Passover

11   and you eat only foods that are kosher for Passover, the

12   foods that are marked kosher, are still offlimits to you,

13   am I correct or you don't know?

14       A.  I don't know.  I really don't know, yes.  I

15   really don't.

16       Q.  Now, in 2005, you said that you found some

17   kosher for Passover foods from Ms. Kole but you didn't

18   find them, did you?

19       A.  No.

20       Q.  You don't know where they are.  You know they

21   were in the lieutenant's office, am I correct?

22       A.  Yes.

23       Q.  When you got to the lieutenant's office, you saw

24   some foods that had been purchased and they had been

25   kosher for Passover food, correct?

1      A.  Yes.

2      Q.  You knew Ms. Kole?

3      A.  Yes.

4      Q.  You know her to be Jewish?

5      A.  Yes.

6      Q.  You know her to follow an observant level of

7   religious observance; am I correct?

8      A.  Yes.

9      Q.  You vouched for her and she got to take those

10   kosher for Passover foods back to her room, am I correct?

11      A.  Yes.

12      Q.  And that was 2005?

13      A.  Yeah.

14      Q.  In 2005, she was able to purchase off your list

15   which you got from the Aleph institute; am I correct?

16      A.  Yes.

17      Q.  She purchased meats?

18      A.  There were meats.

19      Q.  There were soups?

20      A.  Soups and meats and fish on the list, yes.

21      Q.  Bouillon cubes?

22      A.  Yes.

23      Q.  And salmon?

24      A.  Yes.

25      Q.  Let me show you Petitioner's 4.  You know that

1    she purchased many of those items?

2         A.  Yes.

3         Q.  She kept them as we were speaking about how

4    important it is for inmates to have this sort of sense of

5    self that they have their own foods.  She had those, am I

6    correct?

7         A.  Yes.

8         Q.  And at some point in time 2005, 2006, the

9    facility decided to have a $100 spending limit, am I

10   correct?

11        A.  Right.

12        Q.  The $100 spending limit was for the Jewish

13   inmates who practiced a specific level of observance who

14   only purchased and eat kosher for Passover foods; am I

15   correct?

16        A.  During those eight days, yes.

17        Q.  The $100 spending limit didn't apply to real

18   inmates who didn't buy Passover for kosher because they

19   didn't have the $290 spending limit; didn't they?

20        A.  I don't know.

21        Q.  The $100 spending limit only applies to your

22   list of foods that you got from Aleph; am I correct?

23        A.  Yes.

24        Q.  It didn't apply to the regular commissary, did

25   it?  The people who ordered off your kosher for Passover

1    list, had a $100 spending limit, correct?

2        A.  Yes.

3        Q.  The people who went to the commissary had the

4    normal $290 limit, correct?

5        A.  There weren't any Passover items in the

6    commissary.

7        Q.  If you didn't follow the kosher for Passover

8    rules and simply ate whatever you wanted even though you

9    were Jewish, you had no limit, correct?

10           MR. SOLOWAY:  Objection.  Calls for speculation.

11           THE COURT:  Overruled.  What I'm confused is

12    about Passover doesn't last a month.  The 290 is for the

13    month.  So I don't see the relationship between the $100.

14    Presumably Ms. Kole has her $290 limit albeit she can't

15    spend anything.  The day after Passover she can go and

16    spend it.  I may be wrong about it.  We didn't testimony

17    that it affected her $290 spending.

18        Q.  There's a $100 limit that's created for the

19    people who practice that level of observance where they

20    only eat kosher for Passover food, correct?

21        A.  For eight days.

22        Q.  For eight days.  Was there ever a similar limit

23    for people who practiced the Muslim religion?

24        A.  If they ordered through SPO, there would be the

25    $100 limit.

1      Q.  Do you know of any -- do you know

2  at -- withdrawn.

3          Do you know if the Muslim's, the people who

4  practiced the Muslim religion were ever limited to a $100

5  spending limit?

6          THE COURT:  You have to clarify that.  $100 per

7  what.  If they have the $290 monthly.  If it is for

8  religious items.  I have seen a regulation that no one

9  can spend more than $100 on a religious item.  So I think

10  you have to clarify the question.

11     Q.  The facility placed a $100 spending limit on

12  Ms. Kole and the other Jewish inmates who practice kosher

13  for Passover; am I correct?

14     A.  Yes.

15     Q.  But that $100 spending limit allowed her to buy

16  anything on your list; am I correct?

17     A.  Right.

18     Q.  We have described what your list is.  It is

19  Petitioner's 4 which we have already talked about, am I

20  correct?

21     A.  Yes.

22     Q.  And Ms. Kole objected, correct?

23     A.  Yes.

24     Q.  And she filed a grievance?

25     A.  Right.

1    Q.  She filed a grievance with the warden, am I

2    correct?

3    A.  Right.

4    Q.  She filed a grievance after the warden comes

5    what?

6    A.  The regional.

7    Q.  And then after regional, what she did do?

8    A.  The central office.

9    Q.  Then she filed it with Washington?

10   A.  With Washington, D.C.

11   Q.  At some point in time, it was determined that

12   the $100 spending limit was going to be removed, am I

13   correct?

14   A.  Yes.

15   Q.  And she was told or all the Jewish inmates were

16   told from now on there was going to be no more spending

17   limit, am I correct?

18   A.  Right.  Whatever commissary allows per month.

19   Q.  It is now $290 except when it is Christmas, it

20   is $340, am I correct?

21   A.  I don't know about if it is Christmas.  We don't

22   have anything for Christmas.

23   Q.  We'll get to that in a second.  And at some

24   point in time, you, Sister, decided what the kosher

25   products that were going to be stocked at the commissary

```
1     were, am I correct?

2          A.   No.   That was the administration.

3          Q.   That wasn't you?

4          A.   No.

5          Q.   You were in contact with Aleph; am I correct?

6          A.   No.

7          Q.   You have never had contact with Aleph?

8          A.   No.

9          Q.   You never had contact with Rabbi Katz?

10         A.   Not when it pertains to.

11         Q.   You have had contact with Rabbi Katz?

12         A.   Yes.   When he sends the medical students to the

13    facility.

14         Q.   You know Rabbi Katz?

15         A.   Yes.

16         Q.   You know he knows about this issue, am I

17    correct?

18              MR. SOLOWAY:  Objection.

19         A.   I have no idea.

20              MR. SOLOWAY:  How does she know what Rabbi Katz

21    knows?

22              THE COURT:  Sustained.  The answer is stricken.

23              MR. KOFFSKY:  Withdrawn.

24         Q.   There came a point in time when the kosher for

25    Passover list for 2008 -- withdrawn.
```

1                There came a point in time when Ms. Kole filed a

2      habeas corpus petition; am I correct?

3           A.  Yes.

4           Q.  You were made aware of that?

5           A.  Yes.

6           Q.  You got a copy of it?

7           A.  Sure.

8           Q.  You had an opportunity to talk to the government

9      about it.  I know that you filled out an affidavit in

10     support of its dismissal, am I correct?

11          A.  Yes.

12          Q.  You knew it had to do with the fact that she was

13     being deprived of her ability to purchase kosher for

14     Passover food, correct?

15          A.  Yes.

16          Q.  And there came a point in time when you provided

17     her with a list of kosher for Passover foods that she

18     could purchase this year, am I correct?

19          A.  I posted the list.

20          Q.  And the list didn't have any meats on it, did

21     it?

22          A.  No.

23          Q.  No cheese?

24          A.  Just snacks.

25          Q.  No cheese, nothing that you could heat up,

1 right?

2   A. Right.

3   Q. Nothing that would be considered sustenance,

4 correct?

5   A. What do you mean by sustenance?  You mean a

6 meal.

7   Q. Like a meal.

8   A. Meal just snacks.

9   Q. Everything that was a meal was taken off the

10 list; am I correct?

11   A. Looks like it, yes.

12   Q. Let me show you.  It is petitioner's 5.  And

13 that's the list that was posted.  And you have had an

14 opportunity to talk to Ms. Kole about this because you

15 see her?

16   A. I see her every other day.  Actually we didn't

17 discuss recently.  We didn't discuss this.

18   Q. You have had contact with her, haven't you?

19   A. Yes.

20   Q. Do you find her to be a trustworthy person?

21   A. Yes.

22   Q. Let me finally, Sister, show you Petitioner's 6.

23 Now, we have already talked about the importance of the

24 Passover celebration, am I correct?

25   A. Yes.

1    Q.  Both on direct and on my questioning.  That's a

2    2007 holiday list.  Am I correct?

3    A.  That's what it says.

4    Q.  There are many holidays in December, am I

5    correct?

6    A.  Yes.

7    Q.  There's the Jewish holiday of Hanukkah?

8    A.  Um-hum.

9    Q.  Do you know of any food stuff that are eaten

10   during the December season so celebrate Hanukkah?

11   A.  During Hanukkah, we have the lights and there's

12   no specific food requirements.

13   Q.  Absolutely.  You don't know of any food

14   requirements, do you?

15   A.  For Hanukkah.

16   Q.  Not potato pancakes or apple sauce?

17   A.  Nothing required.

18   Q.  Or a chocolate dreidels or let's say potato

19   pancakes aren't on the list; are they?

20   A.  No religious requirement.

21   Q.  Does Kwanzaa have any food stuffs, you are

22   familiar with Kwanzaa?

23   A.  Yes.

24   Q.  Does Kwanzaa have any food stuff that are used

25   in celebration to celebrate Kwanzaa?

1        A.   Just the symbolic fruits with the candles.

2        Q.   That's not on that list; is it?

3        A.   I don't see anything on Kwanzaa.

4        Q.   That's really a Christmas list, isn't it?

5        A.   I really don't know anything about the Christmas

6   list to be honest with you.

7        Q.   Holidays cookies, holiday Christmas cookies.

8   Are they in the shape of a tree?

9        A.   I know about them but there's no religious.

10  Nothing we don't have anything related to services.

11       Q.   They are not services.  There's no prayer over a

12  Christmas tree cookie but it is a Christmas tree cookie?

13            MR. SOLOWAY:  Objection relevance.

14            THE COURT:  I will allow it.  You can answer.

15       A.   A prayer over a Christmas tree cookie?

16       Q.   There's no prayer.  It is a treat, am I correct?

17       A.   Yeah.

18            THE COURT:  The cookie is in the shape.

19       A.   Okay.

20            THE COURT:  I don't know that's what he's asking

21  you.

22       A.   A Christmas tree cookie, okay.

23            THE COURT:  But the really question is the

24  cookies that are sold in the commissary if you have seen

25  them, do you know are they round like a generic or in

1    what they would be called a holiday shape like a

2    Christmas tree?

3         A.  I have only seen them in food service but not

4    commissary.

5         Q.  And the holiday greeting card those are

6    primarily Christmas cards; am I correct?

7         A.  I don't know.

8         Q.  And that 2007 holiday commissary list that never

9    came with a spending limit, did it?

10        A.  You mean.

11        Q.  As far as you know the holiday commissary list,

12   did that ever come with a spending limit?

13        A.  I have no idea.  I don't have anything to do

14   with commissary.

15        Q.  What is the prison's reason -- withdrawn.

16            You give Agnes Kole an extra box of matzoh for

17   Passover, correct?

18        A.  Food service does.

19        Q.  No.  Here on the commissary.  You represent the

20   prison here?

21        A.  Yes.

22        Q.  So I'm asking you a question about the prison.

23   Agnes Kole gets an extra box of matzoh for eight days?

24        A.  Right.

25        Q.  Does that impact the prison system in a negative

1    way?

2          MR. SOLOWAY:  Objection.  I fail to see the

3    relevance of the question, your Honor.

4          THE COURT:  It is relevant to the problem is if

5    there's any foundational basis.

6          MR. KOFFSKY:  That I understand.  I'm left with

7    what I offered.

8          THE COURT:  Is this witness going to be the only

9    witness?

10         MR. SOLOWAY:  No.

11         THE COURT:  I guess he can ask as long as you

12   end with an if you know.  Perhaps another witness would

13   be better to put the question to.

14     Q.  The box of matzoh that Ms. Kole gets to purchase

15   for those eight days, does that impact on the prison

16   system in a negative way as far as you know?

17     A.  I don't know.

18     Q.  How about the grape juice.  Does that negatively

19   impact on the penological process, if you know?

20     A.  I don't know because I don't think I fully

21   understand your question to be honest with you.  I'm so

22   sorry.

23     Q.  That's quite all right.  If the macaroons that

24   are on this list that you posted was changed to chicken

25   soup with matzoh balls, now you have been at the facility

1    a long time, do you see that change, that change from

2    macaroons to chicken soup with matzoh balls, do you see

3    that changing the prison environment in any substantial

4    way?

5              MR. SOLOWAY:  Objection.  Relevance.  Compound

6    question.

7              THE COURT:  Overruled.  You may answer, Sister.

8         A.  All I can say is I really don't know because I

9    don't have anything to do with commissary.

10        Q.  Let's not talk about commissary. I'm asking you

11   as a woman what has been involved in the prison system

12   for a very long time.  I'm asking you whether if I

13   replaced macaroons with chicken soup and matzoh balls

14   whether in your experience that would change the prison

15   environment in a negative way?

16        A.  I don't think so.  I don't think it would make

17   any difference.

18        Q.  You don't think it would make any difference?

19        A.  I don't think so.

20        Q.  And would your answer be the same if I kept

21   macaroons and added the chicken soup with matzoh balls?

22        A.  It may make -- on the overall prison, I don't

23   think so.  There's such a variety of items in commissary.

24        Q.  If you can order it, there's a very wide variety

25   of things in the commissary if you can order them,

1    correct?

2         A.  Yes.

3              MR. KOFFSKY:  Thank you, nothing further.

4              THE COURT:  Brief redirect, Attorney Soloway.

5    REDIRECT EXAMINATION BY MR. SOLOWAY:

6         Q.  Sister, you mentioned briefly in response to a

7    question asked by Attorney Koffsky that you were familiar

8    with the Muslim population; is that right?

9         A.  Yes.

10        Q.  And you are familiar, are you not, with the

11   Muslim holiday of Ramadan?

12        A.  Yes.

13        Q.  And does FCI Danbury make provisions to allow

14   the Muslim population that worships Ramadan to order

15   special food stuffs that are central to the celebration

16   of that fast and that holiday?

17        A.  Yes.  For the observance of Ramadan, the

18   participating women may order dates and figs during that

19   month.

20        Q.  Is there any limit placed on that order?

21        A.  I think it is $100.  Right now they are sold in

22   commissary as of last year.

23        Q.  During Ramadan or during the time immediately

24   proceeding Ramadan, there was a limit placed on the

25   ability of the Muslim inmate to order foods that were

1    essential to their celebration of the holiday; isn't that

2    correct?

3         A.  Yes.

4              MR. SOLOWAY:  Thank you, your Honor.

5              THE COURT:  Can I inquire the types of items

6    that would be ordered to observe Ramadan that are subject

7    to the $100 limit.  What are those foods?

8              THE WITNESS:  No.  Fruits.  Usually dates and

9    figs.

10             THE COURT:  Which are not available in the

11   commissary?

12             THE WITNESS:  Yes.  Well, they were prior to

13   last year they were done through an SPO and they would

14   fill out the number of boxes of figs and dates.  There

15   was never any problem with the amount because when they

16   come to the chapel every day we give them a date.  We

17   provide a date from food service for them to bring their

18   fast along with glass of water.  Now the women who want

19   additional dates and figs, to have on their own, to eat

20   after they have their no pork meal because they can once

21   the fast over for the day, they can eat whatever they

22   want because of fasting all day, they need something like

23   dates, figs or it can be dried food.  They prefer dates

24   and figs.

25        Q.  Are the dates and figs available through the

1    commissary?

2         A.  As of the last Ramadan, they were through

3    commissary.  We don't do any SPO's anymore.

4              THE COURT:  I think you are excused.

5              THE WITNESS:  Thank you all very much.  Thank

6    you, Agnes.

7              THE COURT:  Your next witness.  If you would

8    come up to the witness stand.  Before you arrive, if you

9    would remain standing while I administer the oath.

10              F E L I P E   R O D R I G U E Z .

11         having been called as a witness, was first duly.

12         sworn and testified on his oath as follows:

13              THE COURT:  State your name and spell jury last

14    name.

15              THE WITNESS: Felipe Rodriguez.  Last name

16    R-o-d-r-i-g-u-e-z, Danbury, Connecticut.

17    DIRECT EXAMINATION BY MR. SOLOWAY:

18         Q.  Good afternoon, Mr. Rodriguez.

19         A.  Good afternoon.

20         Q.  I would like you to keep the microphone closer

21    to you and make sure you speak up so we can all hear you.

22    In what capacity are you employed?

23         A.  I'm the associate warden of program and

24    operations at the federal correction institute of

25    Danbury, Connecticut.

1      Q.  I'll remind you to try to keep your answers slow

2   How long have you been -- withdrawn.

3          When did you begin your Bureau of Prisons

4   service?

5      A.  I began my work with the Bureau of Prisons in

6   December of 1990.

7      Q.  And you are familiar with Chaplain Raftery, are

8   you not?

9      A.  Yes, I am her supervisor.

10     Q.  And the religious. Service Department reports to

11  you; is that right?

12     A.  Yes, sir.

13     Q.  And how long have you worked for the Bureau of

14  Prisons?

15     A.  Since December of 1990.  A little over 17 years

16  now.

17     Q.  How long have you been -- withdrawn.

18         Where was the first posting when you were made

19  an associate warden?

20     A.  June of 2007 at FCI Danbury.

21     Q.  And prior to that --

22         MR. KOFFSKY:  Can I have that date?

23         MR. SOLOWAY:  June '07.

24     Q.  Prior to June '07, how were you employed by the

25  bureau if you give us a brief summary of your career?

1       A.   December 1990 at the Metropolitan Correctional

2    Center in New York.   Transferred to the Federal

3    Correction Institute in Fairton, New Jersey, 1996.

4    Transferred to the Federal Correction Institute in Fort

5    Dix, New Jersey in January 2001.   Transferred to Central

6    Office Processing in June 2003 and currently at FCI

7    Danbury since June 2007.

8       Q.   You have read the petition in this particular

9    case, have you not, Mr. Rodriguez?

10       A.   Yes.

11       Q.   And you are aware that there's been a change of

12    policy with regard to the purchase of kosher for Passover

13    food stuffs from the 2005 time frame until today, is that

14    right?

15       A.   Yes.

16       Q.   Is there a valid correctional purpose to limit

17    the amount of items available for purchase through the

18    commissary that are kosher for Passover?

19       MR. KOFFSKY:  Objection.

20       THE COURT:  Basis?

21       MR. KOFFSKY:  There's no foundation.  No basis

22    to ask that question at this point.

23       THE COURT:  Who would you ask the question of?

24    He's an associate warden.

25       MR. KOFFSKY:  He's been there from June '07.

1    Under the circumstance seems to me the question came out

2    of the blue.

3            THE COURT:  You were willing to ask the Sister

4    her view about penological interest.  I assume we can ask

5    the warden that.  You may challenge it.  I don't mean to

6    say it is the last word.

7            MR. KOFFSKY:  I make objections all the time.

8    They are only right some of the time.

9            THE COURT:  You may proceed.

10            (Record Read by the Court.)

11    A.   There would be a valid correctional purpose as

12    these items are only specific and only available during

13    Passover.  A lot are special items that are typically not

14    sold in the commissary.  They can be utilized as monetary

15    instruments in a correctional institution whereby inmates

16    can purchase these and save them and in the future, you

17    know, sell them for other goods which is a prohibited in

18    prison.

19    Q.   You have looked at much of the paperwork

20    concerning this particular case, have you not?

21    A.   Yes.

22    Q.   Did you know whether or not there have been

23    issues with regard to recovery of kosher for Passover

24    food items at FCI Danbury prior to your arrival there in

25    June '07?

```
 1              MR. KOFFSKY:  Objection.
 2              THE COURT:  What would be the foundation for
 3       that?  How would he know?
 4          Q.  Are you aware -- withdrawn.
 5              If I can approach the witness, your Honor, and
 6       show him Petitioner's Exhibit 5.  If you take a look at
 7       that document, Mr. Rodriguez, and tell me if you know
 8       what it is.
 9          A.  Yes.  It is the current list of items that are
10       available, kosher for Passover items that are available
11       for sale during the Passover season 2008.
12          Q.  Did you look at various papers with regard to
13       this specific case, Mr. Rodriguez?
14          A.  Yes.
15          Q.  And, in fact, do you recall looking at SPO's for
16       kosher for Passover food items with regard to years prior
17       to your arriving at FCI Danbury?
18          A.  Yes.
19          Q.  Whose decision is it, Mr. Rodriguez, as to
20       whether -- withdrawn.
21              How are kosher for Passover food items chosen?
22          A.  How are they chose in?  Typically the ultimate
23       decision is the warden's decision.  Typically the
24       religious services in this case Chaplain Raftery would
25       take a poll of the inmates what would you like to see.
```

1    We compile the list and the warden makes the ultimate

2    decision.

3         Q.  The decision of whether or not to provide for

4    purchase of kosher for Passover food items as to whether

5    it is done by commissary or whether it is done by an SPO

6    that's left to the chief executive of the institution,

7    isn't it?

8              MR. KOFFSKY: Objection leading.

9              THE COURT:  Sustained.

10        Q.  Whose decision is it as to what to order for

11   those inmates may wish to purchase kosher for Passover

12   food items?

13        A.  Ultimately the warden.

14        Q.  You are aware that federal correctional

15   facilities either a penitentiary or correctional

16   institution, different institutions purchase their kosher

17   for Passover food stuffs in other ways?

18             MR. KOFFSKY: Objection.  Leading.

19             THE COURT:  Sustained.

20        Q.  How do other institutions purchase their kosher

21   for Passover food stuff?

22        A.  A variety of ways.  Some purchase it directly

23   for sale through the commissary and some allow the

24   inmates to do it with SPO's or special purchase order.

25        Q.  Whose decision is it whether or not it is an SPO

1    or through the commissary?

2              MR. KOFFSKY:  Objection.

3              THE COURT:  If you are talking about Danbury, I

4    will allow it.

5         Q.  At Danbury whose decision is it?

6         A.  It would be the warden's.

7         Q.  Which facility were you at prior to coming to

8    Danbury?

9         A.  Prior to Danbury it would have been MCC

10   New York.  FCI Fairton and FCI Fort Dix.

11        Q.  At MCC New York, whose decision was it?

12        A.  It would have been the warden's.

13        Q.  At Fort Dix who decision was it?

14        A.  It would have been the warden's.

15        Q.  At Fairton who was it?

16        A.  It would have been the warden's.

17        Q.  Other than -- withdrawn.  If I can have a moment

18   to go through the exhibits, your Honor.

19             THE COURT:  Sure.

20        Q.   Mr. Rodriguez, I will show you what's been

21   marked as Petitioner's Exhibit 6.  I would like you to

22   look at that document.  When you are done, please let me

23   know.

24        A.  Okay.

25        Q.  Are Jewish inmates allowed to purchase off of

1       that exhibit?

2           A.  Yes.

3               MR. KOFFSKY:  I would like to know what the

4       exhibit is.

5               THE COURT:  Six.

6           Q.  Are Jewish inmates allowed to purchase items off

7       that exhibit?

8           A.  Yes.

9           Q.  Are Christian inmates allowed to purchase off of

10      that exhibit?

11          A.  Yes.

12          Q.  Are all inmates allowed to purchase off of that

13      exhibit?

14          A.  Yes.

15          Q.  I'm going to show you what's been marked as

16      Petitioner's Exhibit 5.  That's the 2008 list.  If you

17      can take a look at this, Mr. Rodriguez.  When you are

18      done with your review, please let me know.

19          A.  Okay.

20          Q.  Who's able to purchase off of that exhibit,

21      Mr. Rodriguez?

22          A.  For the week beginning or the week beginning

23      Monday, April 14, it would be just Jewish inmates.

24          Q.  After Passover is concluded -- withdrawn.

25              What happens when the items on that list that

1    are left over at the end of the Passover holiday?

2         A.   Well, it is actually during Passover.  After the

3    inmates purchase, the Jewish inmates are allowed to

4    purchase a week before.  During Passover, anything that's

5    left on commissary stock would be available to all

6    inmates of the institution.

7         Q.   So initially only Jewish inmates are allowed to

8    purchase; is that right?

9         A.   That's right.

10        Q.   At some point after the Jewish inmates purchase,

11   if there's some food items on that list that happen to be

12   available, then it is opened up for the general

13   population?

14        A.   That's correct.

15        Q.   Does the fact that those food stuff are

16   available to a food stuff -- withdrawn.

17             Approximately how many inmates does FCI Danbury

18   have inside the walls of the prison at the present time?

19        A.   Approximately 1200.

20        Q.   Approximately how many inmates are Jewish?

21        A.   Last count was 16.

22        Q.   From a correctional perspective, does it present

23   an issue for you as a correctional professional to have

24   certain food stuffs only available to 16 inmates out of

25   1200?

1    A.  Yes, it would.

2    Q.  What concerns do you have?

3    A.  Again as specifically stated, when you make

4    items available to a certain group of inmates, once again

5    you create a position for them to be able to barter or

6    trade or once again to run elicit businesses that are

7    prohibited practices in the institution.

8    Q.  Muslim inmates have certain food stuffs that

9    they can order during the Ramadan holiday; is that right?

10   A.  Correct.

11   Q.  And do you have a professional correctional

12   concern with regard to their purchase of food stuffs

13   during and immediately proceeding the Ramadan holiday?

14   A.  Well, not necessarily because it is also made

15   available to the general population inmates after.

16   Q.  But during your concern with the Muslim inmates

17   is the same concern with the Jewish inmates; is that

18   correct?

19   A.  During the purchase time if it was just limited

20   to them, yes.

21        MR. SOLOWAY:  I have no further questions.

22        THE COURT:  You may inquire.

23   CROSS-EXAMINATION BY MR. KOFFSKY:

24   Q.  Assistant Warden Rodriguez, you are not Jewish,

25   are you?

1          A.  No, sir.

2          Q.  You have never practiced the Jewish religion?

3          A.  No, sir.

4          Q.  And you have never took to kosher?

5          A.  No.

6          Q.  You have never worried about keeping kosher?

7          A.  No, sir.

8          Q.  Do you have friends that keep kosher that you

9     know of?

10          A.  No.

11          Q.  And you don't go to temple?

12          A.  No.

13          Q.  Your children aren't being brought up Jewish?

14              MR. SOLOWAY:  I didn't object to the first few.

15              THE COURT:  Yeah.

16          Q.  Kosher for Passover food, you know that's

17     different than kosher food; am I correct?

18          A.  Yes.

19          Q.  Because the commissary at FCI Danbury has kosher

20     food, correct?

21          A.  They do stock kosher food, yes.

22          Q.  Anybody can purchase that kosher food?

23          A.  Correct.

24          Q.  Throughout the year?

25          A.  Correct.

1      Q.  And in fact, you have a relatively well-stocked

2  commissary, would you agree with me?

3      A.  Yes.

4      Q.  Hundreds of food items there in addition to

5  clothing, radios, watches, am I correct?

6      A.  Right.

7      Q.  A well-stocked commissary.  But you indicated

8  that there were 16 Jewish inmates right now?

9      A.  Yes.

10     Q.  But you know that only eight of them keep

11  kosher, correct?

12     A.  No.  I do not know that.

13     Q.  Do you know how many of them keep kosher?

14     A.  No, I do not.

15     Q.  You don't know how many inmates keep actual

16  kosher?

17     A.  No, I do not.  We have 16 inmates that profess

18  that they are Jewish.

19     Q.  Other than that, you don't know how many keep

20  kosher?

21     A.  There's no.  No way of me knowing.

22     Q.  Do you know how many kosher meals are served

23  every day?

24     A.  No, I do not.  But we do not serve kosher meals.

25  I should clarify that.

1        THE COURT:  He has a right to clarify.  I think

2   he made the point you would concede.  If you want to

3   clarify your answer, if your answer is misleading.

4        A.  We don't call it kosher meals.  Inmates that

5   have requested to be given kosher meals are a certified

6   religious diet.

7        Q.  Certified religious diets Jewish inmates at

8   least to me equal kosher meals?

9        MR. SOLOWAY:  Objection.  Argumentative.  Not a

10  question.  It is a statement of Mr. Koffsky.

11       THE COURT:  Sustained.

12       Q.  Do you know how many Jewish practioners get

13  certified religious diets?

14       A.  No.  But I would say more than likely it would

15  be those 16, specifically no.

16       Q.  You don't know how many daily get these meals,

17  do you?

18       A.  Jewish inmates specifically, no.

19       Q.  Do you know how many order kosher for Passover

20  meals?

21       A.  No.

22       Q.  Do you know how many individuals attend the

23  seder?

24       A.  This year the list has 16 people on it.

25       Q.  Do you know how many out of this 16 people only

1    eat kosher for Passover foods during the eight days?

2        A.  No.  I do not.

3        Q.  How many tickets have you given out or are you

4    aware of being given out as a result of people bartering

5    kosher for Passover foods?

6        A.  I'm not familiar with the term tickets.

7        Q.  How many reprimands or reports or write ups are

8    you aware of as a result of people bartering kosher for

9    Passover foods since you have gotten to Danbury?

10       A.  Since I have gotten to Danbury, none.

11       Q.  Do you know the value of a kosher for Passover

12   item the day after Passover is over?

13       A.  No.

14       Q.  It is your testimony that the day after Passover

15   ends, everybody in the facility has access to the kosher

16   for Passover foods that are in the commissary, am I

17   correct?

18       A.  It is the week of Passover that it becomes

19   available to them.  To the general population.

20       Q.  The week of Passover?

21       A.  Correct.  That's what it says on the form.

22       Q.  That's what it says on the form.

23           THE COURT:  While he's looking can I ask a quick

24   question.  If I was a Jewish inmate, I put on a form that

25   I wanted macaroons and I ordered that the week before as

1      I'm required to, when would that be delivered to me or

2      pick it up?

3          A.  They get it the same day.

4              THE COURT:  Even though it is ahead of Passover.

5          A.  Correct.

6              THE COURT:  It starts one week before the first

7      night?

8          A.  We make available to them the week before

9      Passover.

10             THE COURT:  Sorry.  Attorney Koffsky.  I wanted

11     to ask that.

12         Q.  You talked about the elicit business of hoarding

13     and using foods as a monetary item.  Since you got to

14     Danbury, have you uncovered any instances of kosher for

15     Passover food products being used in any illicit

16     business?

17             MR. SOLOWAY:  Objection.  Asked and answered.

18             THE COURT:  That's a little bit different.  They

19     may not have written the person up if it is was

20     discovered.

21         A.  Repeat the question.

22             (Record read by the court.)

23         A.  No, I have not.

24         Q.  Deputy Warden, let me show you what's been

25     marked as Petitioner's 2.  It is in evidence.  There's a

```
 1    list of nine items under kosher and halal meals, am I

 2    correct?

 3              MR. SOLOWAY:  Which exhibit?

 4              MR. KOFFSKY:  2.  The two-page commissary list.

 5         Q.  And all those items under kosher/halal can be

 6    purchased throughout the entire year; am I correct?

 7         A.  That's right.

 8         Q.  There's also regular meat products, beef, deli

 9    sticks, summer sausage.  That includes roast beef and

10    spam singles that are non-kosher meats and those meats

11    can also be purchased throughout the entire year, am I

12    correct?

13         A.  Right.

14         Q.  Now, there's a 2007 holiday commissary list.

15    That's Petitioner Number 6, have you seen that?

16         A.  Yes.

17         Q.  That's holiday list that's a special list for

18    Christmas, am I correct?

19         A.  No.  For holiday.

20         Q.  It offers holiday cookies, correct?

21         A.  Yes.

22         Q.  An peanut brittle?

23         A.  Yes.

24         Q.  It includes Bumble Bee barbeque chicken and

25    Bumble Bee salmon, correct?  Two additional foods that I
```

1    consider meal foods; am I correct?

2             MR. SOLOWAY:  Objection.  What Attorney Koffsky

3    considers them is irrelevant.

4             MR. KOFFSKY:  Withdrawn.

5        Q.  Would you consider a container of salmon or a

6    contain of barbecue chicken a meal-type food?

7             MR. SOLOWAY:  Objection.

8             THE COURT:  Basis.

9             MR. SOLOWAY:  Beyond the scope of direct, your

10   Honor.

11            THE COURT:  I will allow it.

12       A.  As a correctional professional, I view it as a

13   commissary item as a meal or not.

14       Q.  You have no worries about the holiday commissary

15   list.  You have no worries about that -- no obvious

16   worries that the Bumble Bee barbecue chicken is going to

17   be used in an elicit business; are you?

18       A.  As a correctional professional, I have a worry

19   that any type of item will be used for illicit

20   activities, yes.

21       Q.  So really any type of item in the commissary

22   could be used in hoarding or bartering; am I correct?

23       A.  Of course.

24       Q.  So even the items on the every day list.  That's

25   the list that I gave you.  Every item on that could be

1    used as an item of exchange, correct?

2         A.   Quite possible.

3         Q.   And you go through that calculation for that

4    entire list and you look at the inmates and the

5    situations that the inmates are in to determine whether

6    any of those articles are elicit or being used for elicit

7    purposes; am I correct?

8         A.   That would be correct.

9         Q.   Just looking at the holiday commissary list,

10   there's nothing about the pizza kit, the Bumble Bee

11   salmon or Bumble Bee barbecue chicken that stands out

12   being more responsible to hoarding or trading than any

13   other item, am I correct?

14            MR. SOLOWAY:  Objection.  Asked and answered.

15            THE COURT:  It is a little bit different so I

16   will allow it.

17        A.   Repeat the question.

18               (Record Read by the Court Reporter.)

19        A.   I would say yes.

20        Q.   That is it is correct to say that?

21        A.   It is correct to say that.

22        Q.   You have shown me Petitioner's 5.  We have

23   looked at Petitioner 5.  That's the holiday list for

24   kosher for Passover.  You have five items on that list,

25   am I correct?

1      A.   Yes.

2      Q.   Did you choose those five items?

3      A.   Me, no.  Specifically, no.

4      Q.   So those aren't specific items that you have, in

5   fact, chosen?

6      A.   No.  I did not choose them specifically.

7      Q.   Do you know on that list what item is any more

8   important than any other list?

9      A.   The matzoh.

10     Q.   The matzoh is the most important?

11     A.   Based on speaking with the Chaplain.

12     Q.   How about macaroons, chocolates, bitter sweet

13   and milk?  Do you know is one more important than this

14   other?

15     A.   I would not able to say that.

16     Q.   If I was to replace macaroons with chicken soup

17   with matzoh balls, just replaced it, would that affect

18   your running of the prison in a negative way?

19     A.   I cannot say that it would.

20     Q.   You can't say it would?

21     A.   I can't say it won't either.  It is a day-to-day

22   process.

23     Q.   You have to gauge everything but sitting there

24   as an assistant warden, knowing what you know about the

25   facility, would replacing macaroons with chicken soup

1   with matzoh balls make your job anymore difficult?

2       A.  Again it would be hard to say yes or no.  It is

3   a day-to-day business and things change from minute to

4   minute.

5       Q.  What about macaroons -- can you tell me what

6   about macaroons makes your job easier than if it was

7   chicken soup with matzoh balls?

8       A.  It doesn't make any job easier.  I can't say the

9   decision to pick macaroons over chicken with matzoh ball

10  soup was the determining factor whether one was this or

11  that.  I think there was a list and they decided okay,

12  we'll pick these things.

13      Q.  They will pick those three things.  You weren't

14  involved in the picking?

15      A.  No, I wasn't.

16      Q.  You weren't involved in the deciding whether it

17  was five rather than seven, am I correct?

18      A.  No.  I speak with the warden.  It was decided.

19      Q.  I'm asking you about your involvement?

20      A.  I didn't pick the specific number.

21      Q.  You didn't pick the specific items?

22      A.  No.  I did not pick the specific items.

23          MR. KOFFSKY:  Nothing further.  Thank you, your

24  Honor.

25          MR. SOLOWAY:  Nothing further.

```
 1              THE COURT:  I may have missed this.  Do you know

 2      who did pick?  You may object on hearsay grounds.  You

 3      don't object on those grounds?  If it is a prison

 4      official, it wouldn't hearsay because --

 5              MR. SOLOWAY:  I have no problem with the court

 6      putting the question.

 7              THE COURT:  Do you know whom within the prison

 8      system determined to create the 2008 list of items

 9      available for those keeping kosher for Passover through

10      the commissary.

11          A.  Yes.  Ultimately it was the warden.

12              THE COURT:  The warden made the judgment.

13          A.  Yes.

14              THE COURT:  Did you have conversations with him

15      or with her?

16          A.  Yes.

17              THE COURT:  You did have conversations?

18          A.  Yes.

19              THE COURT:  And can you tell me what those

20      conversations were.

21          A.  It was merely we had the list of I don't know

22      12, 13 items, whatever it was originally and just

23      speaking with the commissary supervisor and the warden

24      that's pretty much it was just a back and forth

25      conversation where we decided, she ultimately decided
```

1    we'll offer these items.

2          THE COURT:  Did you in any of those

3    conversations, did you offer any opinions or advice to

4    the warden as to why one item would be better than

5    another or having five items were better than having

6    eight items or three items.  Did you have offer any

7    opinions.

8          A.  Me no, not directly.  In speaking in the

9    conversations that I was involved in with the commissary

10   supervisor, there were suggestions made by him due to the

11   fact that the commissary is a business and in the past

12   certain items would sell better than others so as to not

13   realize a loss, they picked items that they believe would

14   be best sellers.

15         THE COURT:  Do you know whether the items -- I

16   don't have the thing in front of me the fish -- that's

17   all right.  I will not ask that.  That's fine.  Do you

18   have any other witness?

19         MR. SOLOWAY:  I do but given Attorney Koffsky's

20   peculiar needs to be en route to the southwest, I don't

21   think.

22         THE COURT:  Is it one more witness?

23         MR. SOLOWAY:  One more. Rabbi Hoenig.  What I

24   can suggest is although I have a. --

25         THE COURT:  We have an affidavit from him.

1          MR. SOLOWAY:  We have an affidavit from him.

2          THE COURT:  Not from that Rabbi.

3          MR. SOLOWAY:  There's Rabbi from Otisville and

4     Rabbi Hoenig from MCC Brooklyn.  I think he would speak

5     to the doctrinal needs being made by those food stuffs

6     that are being made available.

7          THE COURT:  I don't know, Attorney Koffsky may

8     not be happy but I have said three times, three squares a

9     day that are kosher for Passover seems to me to meets the

10    it is doctrinal.  In other words, you are not trying to

11    serve the Jewish inmates who are observant or in Passover

12    foods that are white bread for breakfast as the only food

13    that you are offering.  You are not doing that.  But I

14    don't know, Attorney Koffsky, you may feel that -- I

15    don't think it is on that level if the claim is brought.

16    You may have a different view.

17         MR. SOLOWAY:  I can see if the Rabbi is

18    available Thursday.

19         THE COURT:  I can't do it Friday.  I have to be

20    up in Hartford.  I have other appointments outside of the

21    building.

22         THE COURT:  Thursday I can move something and I

23    would have from 9 to 11 to do it.

24         MR. KOFFSKY:  I will be landing at six in the

25    morning.

1          THE COURT:  You will be wide awake.

2          MR. SOLOWAY:  Can I see if the Rabbi is

3    available?

4          THE COURT:  You should check that.

5          MR. KOFFSKY:  Would the court consider a 1:00

6    Thursday?  How long are you going to be?

7          MR. KOFFSKY:  At least the Rabbi I know

8    something about.

9          THE COURT:  That's what I'm afraid of.

10         MR. KOFFSKY:  How often has someone cited

11   Deuteronomy in this court?

12         THE COURT:  That was very good.  I can make it

13   later in the morning by rescheduling two things.  I can't

14   do it in the afternoon.

15         MR. KOFFSKY:  Ms. Felsen is going to skin me

16   alive.  That's all.

17         THE COURT:  Better her than me.

18         MR. KOFFSKY:  At least with you, your Honor, I

19   have time to heal.

20         MR. SOLOWAY:  I'm informed by the Rabbi his

21   institution is due for a program review and he also keeps

22   Sabbath which would make it extraordinarily difficult for

23   him to testify on Friday.

24         THE COURT:  I'm not available on Friday.  What

25   about Thursday?

1          MR. SOLOWAY:  Thursday is the date he has a

2     program review.

3          THE COURT:  He can't reschedule that.

4          MR. SOLOWAY:  He's in the Metropolitan Detention

5     in Brooklyn.  It is over a period of days.

6          THE COURT:  When does it start?

7          MR. SOLOWAY:  I'm not sure.

8          THE COURT:  I have time on Monday but that's

9     putting me awfully close to the wire.  We could try to do

10    what we can before Monday and have that come in as the

11    last evidence.  We can start at 11 to 2.

12         MR. SOLOWAY:  Let me see if he's available then,

13    your Honor.

14         The 14th presents problems because he's making

15    Passover arrangements at his own institution.  What I can

16    do, your Honor, is I can get him to a phone for the 14th

17    if Attorney Koffsky wouldn't have any objection to that.

18         THE COURT:  Is he somewhere with video

19    conferencing?

20         MR. SOLOWAY:  I don't know if he's going to have

21    that answer.

22         THE COURT:  We have it in this courtroom is all

23    I'm saying.  If he's going to be at the facility, I don't

24    know whether they would have it.

25         MR. SOLOWAY:  The U.S. Attorney's Office in

```
 1    Brooklyn.
 2              THE COURT:  Do you have an objection?  If we can
 3    do video, I would want to do it myself but if we can't do
 4    you have an objection to being telephonically.
 5              MR. KOFFSKY:  That will be very difficult for
 6    me.
 7              THE COURT:  The problem is we're going to be
 8    talking about Passover '09.  What is it the Rabbi going
 9    to talk about?  We're talking about whether people are
10    hungry or not.  I'm not sure that's religiously grounded.
11    If I can't have a snack, I'm hungry whether I'm a
12    Christian or a Jew.  I haven't heard anything that the
13    meals offered during the Passover period are any less
14    substantial than they were ordinarily and second, he's
15    another representative of the Bureau of Prisons.  But
16    he's not a good one to question on why is it different
17    versus the holiday list and this list.
18              MR. SOLOWAY:  He'll be not answering the
19    question why is this different from all other items.  It
20    was the government's thought to put questions to the
21    Rabbi concerning those items that were available for
22    supplemental purchase off of the list made available to
23    the inmates for 2008 and whether those items helped to
24    fulfill the religious needs.  Obviously we will concede.
25              THE COURT:  They are all kosher for Passover.
```

1   Nobody is saying you put tripe on this

2   kosher-for-Passover list.  What the Bureau of Prisons has

3   gone and gotten Kosher for Passover food so there's no

4   dispute that's what's on the list is a person could

5   eighth matzoh for eight days and satisfy the religious

6   obligations trying to be proper in a Jewish speaking

7   sense.  You might be --

8           MR. KOFFSKY:  Constipated.

9           THE COURT:  You might be sick of it.  You could

10   eat the same thing but you could still be doctrinally

11   observant so I'm not really.  If you want to offer the

12   witness, the problem if he's not available and I have a

13   time limit.

14           MR. SOLOWAY:  He's available now.

15           THE COURT:  We have Attorney Koffsky.  I was

16   told this was only an hour and a half.  I can understand

17   he didn't mention it because it never would have been a

18   problem.

19           MR. SOLOWAY:  I didn't anticipate the direct of

20   the initial witness to take the period of time it did.

21           THE COURT:  That's in the nature of hearings.

22   While I'm sympathetic to your problem, we have given him

23   two different dates.  I guess the answer is you are

24   representing to me that this Rabbi has a review by the

25   Bureau of Prisons which is required under the Bureau of

1  Prisons' procedures and regulations and has been

2  scheduled for some time and occurring on Thursday among

3  other days?

4          MR. SOLOWAY:  That's right.

5          THE COURT:  This is in the ordinary course of

6  Bureau of Prisons' business that they scheduled it?

7          MR. SOLOWAY:  That's right.

8          THE COURT:  He's responsible to respond to that

9  for his review?

10         MR. SOLOWAY:  For his department.

11         THE COURT:  Then we'll do it by telephone on

12 Monday, Attorney Koffsky.  It may not be the best thing

13 that you want.  It is going to be video, if it is at all

14 possible.

15         MR. SOLOWAY:  I will check from Mr. Perez of our

16 office.

17         THE COURT:  The prison may have it right there.

18 Some facilities in Connecticut that have it.

19         MR. KOFFSKY:  Cadman Plaza is a couple blocks.

20 So the U. S. attorney could be the second choice.

21         MR. SOLOWAY:  I will give it a shot.

22         THE COURT:  The difficulty if we're starting at

23 11.  Whoever is going to organize it for you, you need to

24 be in touch with Eric on Monday morning at 9:00.   Eric

25 is in our system office.  He's the one who will tell you

sk

1    what you have to do, what our number is, how you call in,

2    that sort of thing, whether there will be any glitches in

3    the equipment, he'll know that.

4         MR. SOLOWAY:  I will have Mr. Perez get in touch

5    with Eric.  We'll stand in recess.

6         MR. KOFFSKY:  Your Honor, am I just to take it

7    we have no sentencing tomorrow?

8         THE COURT:  Yes.  I signed the orders and

9    indicating there will be a telephone conference.

10        (Whereupon, the above proceeding adjourned at

11   03:31 p.m.)

12

13   COURT REPORTER'S TRANSCRIPT CERTIFICATE

14   I hereby certify that the within and foregoing is a true

15   and correct transcript taken from the proceedings in the

16   above-entitled matter.

17

18   /s/  Terri Fidanza

19   Terri Fidanza, RPR

20   Official Court Reporter

21

22   DATE_____

23

24

25

# INDEX

**EXAMINATION**

| Witness Name | Page |
|---|---|
| Agnes Kole | |
|   Direct By Attorney Koffsky | 4 |
|   Voir Dire By Attorney Soloway | 41 |
|   Voir Dire By Attorney Soloway | 55 |
|   Voir Dire By Attorney Soloway | 64 |
|   Cross By Attorney Soloway | 72 |
| Sister Anne Rafftery | |
|   Direct By Attorney Soloway | 110 |
|   Cross By Attorney Koffsky | 120 |
|   Re-Direct By Attorney Soloway | 149 |
| FELIPE RODRIGUEZ | |
|   Direct By Attorney Soloway | 151 |
|   Cross By Attorney Koffsky | 160 |