1                    UNITED STATES DISTRICT COURT

2                      DISTRICT OF CONNECTICUT

3     _____
      AGNES KOLE                    )
4                    Plaintiff.     ) NO: 3:07cv1711(JCH)
                                    )
5     vs.                           ) April 14, 2008
                                    ) 11:03 a.m.
6     HARRY LAPPIN, ET Al           )
                     Defendants.    )
7     _____
                                      915 Lafayette Boulevard
8                                     Bridgeport, Connecticut

9                    HEARING
                     DAY 2
10

11    B E F O R E:
                     THE HONORABLE JANET C. HALL, U.S.D.J.

12    A P P E A R A N C E S:

13

14    For the Plaintiff   :        BRUCE D. KOFFSKY, ESQ.
                                    Koffsky & Felsen, LLC
                                    1200 Summer Street
15                                  Stamford, CT 06905

16

17    For the Defendants  :        ALAN M. SOLOWAY
                                    U.S. Attorney's Office
                                    157 Church St., 23rd floor
18                                  New Haven, CT 06510

19

20    Court Reporter      :        Terri Fidanza, RPR

21

22

23    Proceedings recorded by mechanical stenography,
      transcript produced by computer.

24

25

1          THE COURT:  Has Attorney Koffsky been sighted?

2          MR. SOLOWAY:  He's here.  He may have gone down

3     to talk to his client.  Your Honor, if I may introduce

4     Les Owen who is the supervisor in regional attorney from

5     the Bureau of Prisons up at Fort Devins Massachusetts.

6          THE COURT:  Good morning.

7          MR. KOFFSKY:  Just by way of inquiry, is that

8     attorney going to be filing an appearance in the case?

9          THE COURT:  I don't know whether he's here as an

10    observer and as a courtesy, we'll let him sit at counsel.

11         MR. SOLOWAY:  Advisory.  He's the client.

12         THE COURT:  No problem.  I understand that some

13    briefs have come in over the weekend.  Despite my having

14    been on the computer Saturday and Sunday, they didn't

15    come to my attention probably because they will show up

16    on today's DAR.  So I have not had an opportunity to read

17    them but I'm advised by my law clerk that the plaintiff

18    did not bring the equal protection claim.  My question is

19    whether that means that you no longer pursue it?

20         MR. KOFFSKY:  If I omitted, it I apologize.  I

21    think the equal protection argument and due process

22    argument are somewhat joined.  If the court would allow

23    me to take a brief look at some of my research and make

24    sure I hit all the scaling points.

25         THE COURT:  I apologize.  I realize there's

1    someone already connected by video phone and I hope I'm

2    not sure what he can see but I will advise him that we're

3    waiting for the inmate to be brought up into the

4    courtroom.  That's what the delay is.  All right.

5            MR. SOLOWAY:  The person that's present via the

6    video conferencing facility is the government's witness.

7    Rabbi Jacob Hoenig.

8            THE COURT:  Rabbi, can you hear me?

9            THE WITNESS:  Yes, your Honor.

10           THE COURT:  Did you respond?  I didn't hear you.

11           THE WITNESS:  Yes, your Honor.

12           MR. SOLOWAY:  Just from the brief testing this

13   morning, I believe there's a couple of seconds delay in

14   the audio portion from when the Rabbi speaks and

15   correspondingly when we speak.

16           THE COURT:  Everybody should be aware of that

17   because that can create difficulties.

18           MR. SOLOWAY:  Do we have the exhibits, your

19   Honor?

20           THE COURT:  I hope so.  Alice is filling in for

21   us today.  As always she's on top of things.  She has

22   what you need.  I see Ms. Kole has been brought into the

23   courtroom.  Good morning, Ms. Kole.

24           THE DEFENDANT:  Good morning.

25           THE COURT:  I believe that we were -- we

1    recessed the last time for the purpose we ran out of

2    time, and we recessed in order to allow the defendant to

3    offer -- respondent to offer an additional witness and I

4    gather that the witness is available and on the video

5    phone so we can proceed unless there's any reason not to

6    at this time.

7              MR. SOLOWAY:  Just one brief thing, your Honor.

8    One of the exhibits that I attached to the government's

9    memoranda that was filed on Sunday deal with the kosher

10   for Passover menu at FCI Danbury during the 2008 period.

11   I would request that we can stipulate that that's in fact

12   what the menu is and if Attorney Koffsky and I cannot

13   stipulate to that, then we are prepared to call back

14   Mr. Rodriguez for the very brief purposes of putting that

15   menu before the court in terms of evidence.

16             THE COURT:  All right.  Is there any objection

17   to that coming in?

18             MR. KOFFSKY:  If I may have a second.  This it

19   is first time I'm seeing the menu, your Honor, and my

20   client has not seen it yet.

21             THE COURT:  Take a moment.

22             MR. SOLOWAY:  We are expecting when Attorney

23   Owen and I left the court this morning, we had not seen

24   Mr. Rodriguez as of yet but we're expecting him shortly.

25             THE COURT:  Okay.  Perhaps we should take this

```
 1    issue up when we're not wasting the Rabbi's time and we

 2    can deal with it afterwards.

 3              MR. KOFFSKY:  Thank you.

 4              THE COURT:  So if you want to call your next

 5    witness.

 6              MR. SOLOWAY:  Yes.  The respondents call Rabbi

 7    Jacob Hoenig.

 8              THE COURT:  Rabbi, if you can please stand and

 9    raise your right hand.

10              MR. SOLOWAY:  The Rabbi would prefer to affirm,

11    if we can have him give his business address as posed to

12    the home address.

13              R A B B I   J A C O B   H O E N I G .

14    Having been called as a witness, was first duly sworn and

15              testified on his/her oath as follows:

16              THE CLERK:  Please state your name and business

17    address.

18              THE WITNESS:  My name is a Rabbi Jacob Hoenig.

19    I'm working for the Bureau Of Prisons and my address is

20    80-29 Street, Brooklyn, New York.

21              THE COURT:  You may be seated, Rabbi.

22              MR. SOLOWAY:  Thank you.

23    DIRECT EXAMINATION BY MR. SOLOWAY:

24         Q.  Good morning, Rabbi.

25         A.  Good morning.
```

1      Q.  Rabbi, can you briefly describe your educational

2   background to the court please?

3      A.  I was graduated from Yeshiva University with a

4   bachelor degree in the year 1970, then pursued biblical

5   studies at the Yeshiva University receiving my ordination

6   in 1973, as well as master's degree that same year and I

7   also pursued a doctoral degree which I haven't received

8   my doctorate yet but I have courses toward it.

9      Q.  By whom are you employed, Rabbi?

10     A.  I'm employed by the U.S. Department of Justice

11   Bureau of Prisons.

12     Q.  And how long have you been employed by the U.S.

13   Department of Justice federal Bureau of Prisons?

14     A.  I'm employed for over 31 years.

15     Q.  And in what capacity are you employed by the

16   Bureau of Prisons, Rabbi?

17     A.  I'm the senior Chaplain here at the Brooklyn

18   facility.

19     Q.  And for the record that would be MDC Brooklyn,

20   Rabbi?

21     A.  Correct.  MDC Brooklyn.

22     Q.  Rabbi, have you had involvement in the case at

23   all?

24     A.  What do you mean involvement?

25     Q.  Rabbi, did you submit a declaration in support

1      of the respondent's response to the petitioner's prayer

2      for habeas corpus relief?

3           A.  Yes.  Sometime ago.

4           Q.  And Rabbi, are you familiar with the food

5      offerings made available to the inmates at Danbury for

6      the 2008 Passover season?

7           A.  Yes.

8           Q.  Do the items provided to the inmates at Danbury

9      for the 2008 season, meet the religious requirements set

10     forth to an observe haven't?

11          A.  Yes.

12          Q.  Can you expound upon that a little bit more or a

13     little bit more?

14          A.  As an ordained Rabbi, I'm concerned that the

15     food items given to the inmates meet the required hefsha

16     (ph.).  Hefsha means kosher certification.  Especially

17     during Passover where there's much more stringency in the

18     observance of Passover so the food items need to have

19     what we call a kosher for Passover seal.

20          Q.  Are you aware of the items made available to the

21     observant Jew at FCI Danbury?

22          A.  Yes.

23          Q.  And what are the items made available exclusive

24     of the commissary, Rabbi?

25          A.  Well, they ensre which is typical of all Bureau

1   of Prisons facilities that the entree or the food have

2   the kosher for Passover seal on them and they meet the

3   required observance of the inmate.

4      Q.  What food stuffs are made available at the

5   expense of the Bureau of Prisons to the inmates at FCI

6   Danbury, if you know?

7      A.  As long as again as I said earlier, as long as

8   it is kosher food meeting the required approval whether

9   it be kosher food for year round or kosher food for

10  Passover only.

11     Q.  Are special kosher for Passover foods made

12  available to the inmates at FCI Danbury during the

13  Passover holiday?

14     A.  Yes.

15     Q.  Are you familiar with the terms SPO and

16  commissary, Rabbi?

17     A.  Yes.

18     Q.  And what is the term SPO?

19     A.  SPO is an abbreviation for special purchase

20  order.  These are items that are purchased -- can be

21  purchased on the outside from different organizations.

22     Q.  And what is commissary within the context of the

23  prison?

24     A.  The commissary in addition to foods that are

25  provided by the institution, the commissary provides

1    additional food items also depending upon the religious

2    briefs of that particular inmate.

3        Q.  Who determines, Rabbi, whether an SPO or a

4    commissary purchase list is made available to the

5    inmates for the purchase of kosher for Passover food?

6            MR. KOFFSKY: Objection.

7            THE COURT:  Basis?

8            MR. KOFFSKY:  We're dealing with Danbury.

9            THE COURT:  You have to establish a foundation

10   for his testimony.

11       Q.  Rabbi, does the facility that you work at

12   provide kosher for Passover?

13       A.  Yes.

14       Q.  What method does it use for the purchase of

15   supplementary items for those who want to keep kosher for

16   Passover?

17           MR. KOFFSKY:  Objection.  Relevance.

18           MR. SOLOWAY:  I'm trying to lay the foundation,

19   your Honor.

20           THE COURT:  I'm not sure it is going to get you

21   there.  I will allow it as a preliminary matter.

22       A.  The commissary handles that.

23       Q.  Are you aware, Rabbi, of how those items are

24   handled at FCI Danbury?

25       A.  Not really.

1      Q.  I didn't hear the answer.

2      A.  No.

3      Q.  Are you aware of whether an SPO or the

4  commissary handles the supplemental purchase items for

5  FCI Danbury?

6          MR. KOFFSKY:  Objection.  He already answered he

7  doesn't know.

8          THE COURT:  Sustained.

9      Q.  Who makes the determination at FCI Danbury of

10  what items are made available for purchase?

11          MR. KOFFSKY:  Objection.  Foundation.

12     Q.  Do you know, Rabbi, who makes the decision at

13  FCI Danbury with regard to what supplemental food stuffs

14  are made available to the inmate population at FCI

15  Danbury?

16          MR. KOFFSKY:  Objection.  Based on hearsay.

17          THE COURT:  I apologize for interrupting but

18  counsel made an objection.  You can only -- the delay is

19  making it difficult on your end and our end.  If you

20  could answer that question but limit your answer to yes

21  or no depending upon your answer then counsel may be

22  permitted to follow up.

23     Q.  If we can have the question.

24          THE COURT:  The question was do you know, Rabbi,

25  who makes the decision at FCI Danbury with regard to what

1    supplemental food stuffs are made available to the inmate

2    population.

3              MR. KOFFSKY:  I apologize.  It looks like the

4    Rabbi is talking to somebody in the room.  There's nobody

5    on screen but if he's a witness, he shouldn't be talking

6    to another individual at the table.

7              THE COURT:  Let's back up, Rabbi.  Are you

8    looking at the screen or is there another person with you

9    in the room beside the operator of the camera.

10         A.  I'm looking at the screen.

11             THE COURT:  Who is in the room right now?

12             THE WITNESS:  Adam Johnson, the legal

13   department, head of the legal here at MBC Brooklyn.

14             MR. KOFFSKY:  Your Honor, I'm going to object

15   that this witness has been in contact with an individual

16   from the Bureau of Prisons.  I'm going to move to strike

17   his testimony.

18             THE COURT:  Why and how would you do that?

19             MR. KOFFSKY:  I would expect if we had a live

20   witness here, that this court would not allow, one,

21   somebody to sit next to the witness or allow that witness

22   to have any communication with anybody else other than

23   the court and counsel who is conducting inquiry.

24             THE COURT:  Your comments should be framed with

25   the phrase during his testimony.  You said I'm going to

1    move because he had contact with someone.  You mean

2    during his testimony.

3              MR. SOLOWAY:  So we can clarify the issue going

4    forward.  Perhaps we can have Attorney Johnson move to

5    one of the two chairs that we see behind the Rabbi so we

6    can ascertain if he's seeking any type of cue from

7    Attorney Johnson.

8              THE COURT:  That's my thought as well.  I will

9    ask if counsel who is there, if you would take one of the

10   two seats behind you and I'm not going to strike the

11   testimony but obviously on cross-examination, Attorney

12   Koffsky, you may inquire as to whether any of his answers

13   were the result of communication with counsel during his

14   testimony.

15             MR. KOFFSKY:  I'm going to object to the

16   process.  The fact the screen -- I was in here before

17   when we attempted to set up the viewing of the Rabbi and

18   I asked to see all the different views that I would see

19   and that the Rabbi saw.  There was an individual who was

20   with the Rabbi at the time.  He was questioned whether he

21   was going to be there at the time the Rabbi was

22   questioned and he indicated that he was going to be

23   leaving the room because he had no involvement in the

24   case.  The fact that there's now another individual

25   during the questioning process of this witness seems to

1   be a subterfuge on me and my client during the conducting

2   of this hearing, your Honor.  And I'm a little astounded

3   by it.  I wouldn't imagine -- I can't imagine it would

4   have happened in this courtroom.  The fact is that this

5   witness has had contact with another member of the

6   government legal counsel it appears to me while this

7   witness is testifying in this very important hearing, and

8   I'm a little shocked.  That's all your Honor.

9            THE COURT:  Your shock is noted.  Your objection

10   is noted.  I heard it.  It is over with.  Let's proceed.

11            There's a second gentleman who appeared who now

12   left.  Rabbi, could you confirm for me how many people

13   are in the room with you right now?

14            THE WITNESS:  In addition to myself, two.

15            THE COURT:  Two other people.  Can you identify

16   the person who is in a shirt, not a coat, that was in the

17   picture and left the picture?

18            THE WITNESS:  He's Raoul Watson.  He's in charge

19   of computers.  He's the one who set up this whole process

20   here.

21            THE COURT:  I don't know if he can hear me as

22   well as you can hear me.  I need to have anyone who is in

23   the room be within sight of the camera.  You need to sit

24   with the other gentleman or in the row against the wall

25   what looks like a series of pictures.  There shouldn't be

1    anyone else in the room who is not within the sight of

2    the camera but who would be within sight of the Rabbi.

3             THE WITNESS:  He left.

4             THE COURT:  Thank you.  I drove him away.  And

5    Mr. Johnson, I gather is an attorney?

6             THE WITNESS:  Yes.

7             THE COURT:  I would ask you, although you don't

8    have an appearance, I would ask as an officer of

9    whatever, you are a member of the bar, when anyone comes

10   in the room, if you could alert the court because I can't

11   see the whole room on my screen.  If he returns or

12   someone comes anew, if you would raise your hand.  I will

13   notice and we'll inquire of what's going on. All right?

14            THE WITNESS:  Certainly, your Honor.

15            THE COURT:  The question that was pending

16   sometime ago.

17                  (Record read by the court.)

18        A.  Yes.

19        Q.  Who is that?

20            MR. KOFFSKY:  Objection.

21            THE COURT:  You need to ask how does he know it.

22        Q.  How do you know that, Rabbi?

23        A.  Not only at FCI Danbury but throughout the

24   Bureau of Prisons that my answer is going to be that

25   executive staff makes that determination.

1          Q.   Can I have a moment to consult, your Honor?

2               THE COURT:  Yes.

3          Q.   Who does the executive staff report to?

4          A.   Can you rephrase that question?

5          Q.   Surely.  Who does the executive staff report to,

6     who is their superior?

7          A.   Mr. Harley Lappin in Washington, D.C.

8          Q.   What about at the institutional legal, Rabbi?

9               MR. KOFFSKY:  Objection.  If he knows.

10              THE COURT:  I would limit to his own experience.

11         Q.   To your own experience at the institution who

12    does the executive staff report to?

13              MR. KOFFSKY:  Objection.

14              THE COURT:  Basis.

15              MR. KOFFSKY:  What institution?

16              THE COURT:  I think he said at his own

17    institution.

18              MR. KOFFSKY:  Sorry.

19              THE COURT:  You may answer.

20         A.   The executive staff reports to the regional

21    director whose name is Scott Doddrill who is located in

22    Philadelphia.

23              MR. SOLOWAY:  One moment, your Honor, please.

24         Q.   Who makes up the executive staff, Rabbi?

25              MR. KOFFSKY:  I will object.  I think we have

1     100 different facilities.

2        Q.  At MBC Brooklyn who makes up the executive

3  staff?

4        A.  The executive staff consists of the warden and

5  the associate wardens.

6        MR. SOLOWAY:  No further questions at this time,

7  thank you.

8        THE COURT:  Cross-examination.

9  CROSS-EXAMINATION BY MR. KOFFSKY.

10        Q.  Good morning, Rabbi.

11        A.  Good morning sir.

12        Q.  Rabbi, you went to you Yeshiva University,

13  correct?

14        A.  Yes.

15        Q.  Do you know that I went to Yeshiva University,

16  correct?

17        A.  You told me that in the courtroom last Monday.

18        Q.  Attorney Soloway also went to Yeshiva

19  University; isn't that correct?

20        A.  Correct.

21        THE COURT:  This is relevant.

22        Q.  Rabbi, I would be correct in assuming that you

23  are an Orthodox Jew?

24        A.  Correct.

25        THE COURT:  Did you say are or are not?

1      Q.  Are, your Honor.

2      You wear a kippah, a head covering?

3      A.  Correct.

4      MR. SOLOWAY:  Relevance, objection.

5      THE COURT:  I will allow it.  It is preliminary.

6      Q.  Correct?

7      A.  Correct.

8      Q.  And you attempt to follow, I will try not to

9  pepper my questioning with too much Yiddish, but a

10  Halacha or stringent interpretation of Jewish law, am I

11  correct?

12      MR. SOLOWAY:  Objection.  Relevance.

13      A.  I don't attempt to follow.  I follow.

14      Q.  You follow.

15      MR. SOLOWAY:  Your Honor.

16      THE COURT:  I will allow it but we're going to

17  run out of preliminary questions pretty soon.

18      MR. SOLOWAY:  Could we also instruct the Rabbi

19  when either Attorney Koffsky or I makes an objection, I

20  know it is difficult with the time delay, that we tell

21  him to stop so the court can make a determination whether

22  that objection is valid or not.

23      THE COURT:  Can you see the lawyers on the

24  screen in front of you?  Whom are you seeing on your

25  screen?

1      A.  I really don't know.  Can't see.  It is very

2   unclear.

3            THE COURT:  How many pictures do you see?

4      A.  There's a quad, four pictures.

5      Q.  Do you see me with the red, white, blue hand

6   flag waving my hand?  Am I in the lower left quadrant of

7   the screen?

8      A.  Yes.

9      Q.  If you look at the picture that is above me on

10   the upper left quadrant, if you would pay attention to

11   the right side of the screen, would you tell me when you

12   see the gentleman seated on the right side table but the

13   left of the table stand up.  Attorney Soloway would you

14   stand up.

15      A.  Yes, I see Attorney Soloway.

16            THE COURT:  So you saw him stand up shortly

17   after I asked him to stand up.  I would ask you if you

18   could be attentive to that portion of the screen and if

19   you see Attorney Soloway stand up, it means that you

20   can't answer the question until he makes his objection

21   and I rule on it.  So I would ask you to hold off with

22   your answer until I say you may answer or something like

23   that.  Because of the time delay, it's difficult but

24   hopefully the video stream is relatively contemporaneous

25   with what's happening in the courtroom and that will be a

1    cue to you to hold your answer, all right, sir?

2              THE WITNESS:  Yes, your Honor.

3              THE COURT:  I allowed the question but let's

4    proceed.

5         Q.  Thank you.  If an individual keeps kosher at a

6    federal facility, Rabbi, that individual is offered

7    kosher food at the dining hall, am I correct?

8         A.  Correct.

9         Q.  And in addition to the kosher food offered at

10   the dining room, they are also allowed to purchase food

11   at the commissary, correct?

12        A.  Correct.

13        Q.  Some of the foods offered at commissary are, in

14   fact, kosher foods designated as kosher foods, am I

15   correct?

16        A.  Correct.

17        Q.  But there are a host of items that aren't listed

18   under the kosher sign that are still edible for eating by

19   an individual who keeps kosher, am I correct?

20        A.  If they so determine that.

21             THE COURT:  Who is the they in your answer?  The

22   person eating it.

23             THE WITNESS:  The inmate.

24        Q.  On many food items, certainly packaged food

25   items there are labels that indicate they are kosher,

1    correct?

2         A.   Can you rephrase that question?

3         Q.   You are familiar with a symbol a U inside a

4    zero?

5         A.   Yes.

6         Q.   It is called the O U, am I correct?

7         A.   Correct.

8         Q.   And it is a symbol for a particular rabbinical

9    organization that certifies a particular food product as

10   kosher, correct?

11        A.   Correct.

12        Q.   There's also a symbol with just A K.  That's

13   different rabbinical organization but that rabbinical

14   organization when it places a K on a food product also

15   certifies that it is kosher, correct?

16        A.   Just the K itself?

17        Q.   Just the K.

18        A.   It is not a registered symbol.

19        Q.   Very often that K is accompanied by the word

20   parve, P-a-r-v-e, that indicates the food is neither milk

21   nor meat.  Am I correct?

22        A.   The word parve means meat or milk.

23        Q.   There's food at the commissary that can be

24   purchased that have those symbols that indicate they are

25   kosher, correct?

```
 1              MR. SOLOWAY:  Objection.  It is not clear what
 2     institution the question is directed.  MBC Brooklyn or
 3     Danbury, if the Rabbi knows.
 4          Q.  How about your facility at the commissary if a
 5     food product, wrapped food product has a symbol O U on it
 6     signifies it's been certified kosher, am I correct?
 7          A.  Correct.
 8          Q.  So there are foods at the commissary that during
 9     the year are certified kosher for purchase, correct?
10          A.  Correct.
11          Q.  Those foods can be purchased by inmates,
12     correct?
13          A.  Correct.
14          Q.  You are aware at your institution individuals
15     who keep kosher go to the commissary and purchase foods?
16          A.  Correct.
17          Q.  Those foods are for eating outside of the normal
18     three meals a day that are provided by the institution,
19     correct?
20          A.  Correct.
21          Q.  And there are facilities in your institution for
22     the heating of certain kosher products, correct?
23          A.  Correct.
24          Q.  And so in between meals or after dinner, an
25     inmate is allowed to purchase food at the commissary,
```

1    correct?

2         A.   Can you rephrase that question?

3         Q.   In between meals or after the last meal is

4    served, inmates are allowed to go to commissary and

5    purchase foods, correct?

6         A.   No.

7         Q.   There are specific times when inmates are

8    allowed to go to the commissary and purchase foods,

9    correct?

10        A.   Correct.

11        Q.   And that when they have foods, they are allowed

12   to enjoy those foods outside of the regular meal process,

13   correct?

14        A.   If they want a snack, yes.

15        Q.   And they do.  They snack, don't they?

16        A.   Yes.

17        Q.   They snack and they eat the foods that are

18   provided at the commissary, correct?

19        A.   Correct.

20        Q.   And you have been at the institution now for 31

21   years, correct?

22        A.   Not at this institution.

23        Q.   At a number of institutions, you have been

24   involved for 31 years, am I correct?

25        A.   Correct.

1    Q.   Eating outside of the normal meal process is a

2    regular activity of the inmates, am I correct?

3    A.   Correct.

4    Q.   Let's talk about Passover.  It is a holiday

5    that's fast approaching, isn't it?

6    A.   Correct.

7    Q.   I'm sure that many of the people you counsel as

8    Rabbi are making plans for the Passover holiday, correct?

9    A.   Correct.

10    Q.   And a lot of those plans have to do with food,

11    don't they?

12    A.   Yes.

13    Q.   Now, you filed a declaration in this case, am I

14    correct?

15    A.   Yes.

16    Q.   And it says in your declaration during the

17    Passover observance many Jews observe positive Torah

18    commandments of eating matzoh on the first night of

19    Passover, at the Passover Seder as well as the Torah

20    prohibition against eating or owning chametz that

21    included any leaven products.  Am I correct that you

22    wrote that?

23    A.   Yes.

24    Q.   You signed it?

25    A.   Correct.

1      Q.  Now the possession of leavened products is

2    prohibited during the holiday of Passover, isn't it?

3      A.  Correct.

4      Q.  People who follow the positive Torah

5    commandments of not possessing leavened bread go through

6    a number of rituals to get rid of the chametz, isn't that

7    correct?

8      A.  Correct.

9      Q.  In fact, I'm sure you're family is engaged in

10   many of those rituals the cleaning up of the chametz,

11   correct?

12         MR. SOLOWAY:  Objection.

13         THE COURT:  Basis.

14         MR. SOLOWAY:  Relevance as to what the Rabbi's

15   family is involved in or not involved in.

16         MR. KOFFSKY:  He's indicated he's a religious

17   Jew.  I'm using him as an example of what somebody who

18   follows the positive Torah commandments.

19         THE COURT:  What does the cleaning up ritual

20   have to do with whether or not sufficient food are

21   available on a supplement list?

22         MR. KOFFSKY:  If the court will allow me, I will

23   continue.

24         THE COURT:  I don't know if I will allow you.

25         MR. KOFFSKY:  I will withdraw that question.

1          THE COURT:  Thank you.

2     Q.  Let's not talk about you, Rabbi.  Let's talk

3     about other inmates at a facility such as yours.  They

4     engage in the cleaning up of their personal space to get

5     rid of the leavened products, am I correct?

6     A.  I would hope so.

7     Q.  That's something that you direct them to do?

8     A.  Yes.

9     Q.  And in doing that, they are obligated if they

10     followed the Torah's commandments to collect what other

11     food products they might have.  Whether it be packaged or

12     canned or loose, they gather all of that together to

13     dispose of it, am I correct?

14     A.  That's if they are going to follow the strict

15     Torah observance.

16     Q.  If they follow the strict Torah commandments,

17     those non-kosher food products are sold or given away or

18     disposed of, correct?

19     A.  Yes.

20     Q.  So an individual who follows the strict Torah

21     commandments before the holiday of Passover starts, is

22     left without any commissary food, am I correct?

23          MR. SOLOWAY:  Objection.  Calls for speculation,

24     your Honor.

25          THE COURT:  It is more of a nature of

1    hypothetical.  I don't know why we would be asking him

2    hypotheticals.

3                MR. KOFFSKY:  I will withdraw it.

4         Q.  It is true, is it not, that the positive Torah

5    commandment says that you get rid of all of your leavened

6    bred that would be all non-kosher food and all food

7    that's non-kosher for Passover, am I correct?

8         A.  Can you rephrase that question please?

9         Q.  To keep an observant Passover holiday, you get

10   rid of all the leavened products and all the products

11   that are not kosher for Passover, correct?

12        A.  Yes.

13        Q.  And the hope is -- withdrawn.

14             And to follow the Torah commandments, if you

15   were to have food, those foods would need be kosher for

16   Passover, am I correct?

17        A.  Correct.

18        Q.  Now would you agree with me that kosher for

19   Passover foods can be eaten any time during the year?

20        A.  True.

21        Q.  If you have a kosher for Passover food, you can

22   eat it the day before Passover, am I correct?

23                MR. SOLOWAY:  Objection.

24                THE COURT:  Basis?

25                MR. SOLOWAY:  It is not clear from the question

1    whether it relates to individuals that are at liberty or

2    whether it deals with inmate who are confined within a

3    correctional setting.  If Attorney Koffsky wishes to

4    limit the question to those of us that are at liberty, I

5    would not have an objection to the question.

6            THE COURT:  Why would you have an objection if

7    he's asking about inmates?

8            MR. SOLOWAY:  I just don't think it is clear.  I

9    don't think the question is clear.

10           THE COURT:  The objection is overruled.

11       Q.  Can you answer the question, Rabbi?

12       A.  Can you repeat the question?

13       Q.  You can eat a kosher for Passover food the day

14   before Passover, can't you?

15       A.  Can you give me example?

16       Q.  Sure.  I open a container of chicken soup with

17   matzoh balls that's labeled kosher for Passover.  I open

18   it two days before Passover, I can't eat that, can't it?

19       A.  Yes.

20       Q.  But I'm two days before Passover, it is just a

21   food, isn't it?

22       A.  It's a food.  So happens to be kosher for

23   Passover as well.

24       Q.  If I open it two days before Passover, it is no

25   longer kosher for Passover, is it?

1  A. The process that it was made, it was kosher for

2 Passover.

3  Q. If I open the product two days before Passover,

4 it is no longer kosher for Passover, is it?

5  A. Who said?

6  Q. Well, my Rabbi but we won't get into that.  The

7 value of kosher for Passover foods is on Passover, am I

8 correct?

9  A. Correct.

10  Q. The value of kosher for Passover food on days

11 other than Passover, is that it is just food, correct?

12  A. You have to rephrase your question.  Food is

13 food.

14  Q. Food is food.  Thank you, Rabbi, but on

15 Passover, you are obligated to eat only kosher for

16 Passover food, am I correct?

17  A. Correct.

18  Q. So the value of that food is only evident on

19 Passover, correct?

20  A. Correct.

21  Q. There's nothing wrong with eating kosher for

22 Passover food not on Passover, correct?

23  A. Correct.

24  Q. Rabbi, are you familiar with the Aleph

25 Institute?

```
1              MR. SOLOWAY:  Objection.  Relevance.

2              THE COURT:  I will allow it.

3         Q.  Are you familiar with the Aleph Institute?

4         A.  Somewhat.

5         Q.  You know that they provide kosher for Passover

6    food products to inmates?

7         A.  Yes.

8         Q.  You know that they offer items such as matzoh

9    and grape juice to inmates, am I correct?

10        A.  I have seen that list.

11        Q.  You have seen the list so you know they also

12   offer food products that you can -- withdrawn.

13             MR. KOFFSKY:  Nothing further.  Thank you, your

14   Honor.

15             THE COURT:  I have a few questions.

16             MR. SOLOWAY:  I will also have some redirect but

17   I will defer to the court.

18             THE COURT:  All right.  Rabbi, in your

19   declaration at paragraph 4, you have referred to the fact

20   that the supplemental items may be available to people

21   keeping kosher for Passover at the institution's

22   commissary.  Do you recall that in your affidavit, sir --

23        A.  I don't have the declaration before me but if

24   you say so, it must be there.

25             THE COURT:  Let me read it to you.  During the
```

1    Passover holiday, the Bureau of Prisons provides at no

2    charge kosher for Passover meals and food items (include

3    Seder meals, grape juice, matzoh, a copy of Haggadah and

4    other items) to Jewish inmates for the duration of the

5    Passover holiday.  In addition, at the discretion of the

6    warden at each BOP institution, several supplemental

7    items are made available for purchase by Jewish inmates

8    in the institution commissary for the Passover holiday

9    and then you say see attached list. Do you recall that?

10        A.  Yes.

11        THE COURT:  Attorney Soloway, is there a problem

12   you are up?

13        MR. SOLOWAY:  No.  I was contemplating my

14   redirect.  I apologize.

15        THE COURT:  So it is your understanding as you

16   so attest in your declaration that the warden of each

17   institution can decide what items to offer to people

18   keeping kosher for Passover as a supplemental offering?

19        THE WITNESS:  Yes.  As I said earlier in my

20   statement at the beginning of this session.

21        THE COURT:  And that's not subject to some

22   regional authority telling the warden at your

23   institution, for example, I don't like your list.  It

24   should be a different list.  The warden has the

25   discretion, is that right?

1          THE WITNESS:  Correct.

2          THE COURT:  Could I ask you the list that you

3     attached to your affidavit that's captions MDC Brooklyn

4     commissary kosher for Passover items available for sale.

5     There are about seven items.  Do you know how long that

6     list has been in use Brooklyn?

7          THE WITNESS:  I generally don't see the list.

8     From what I understand from the inmates it's been for

9     awhile.

10         MR. KOFFSKY:  I will object to that.

11         THE COURT:  The objection is sustained and the

12    answer will be stricken from the record.  Give me just

13    one moment to make sure I don't have anything else.  All

14    right.  Brief redirect, Attorney Soloway.

15         MR. SOLOWAY:  I have a question of Mr. Milner

16    relating to our technical ability to show certain

17    exhibits to the witness.  If I can ask Mr. Milner that,

18    then I would like to proceed.

19         THE COURT:  Can you do that, Peter?

20         MR. MILNER:  Yes.

21         THE COURT:  Rabbi, it will be a moment.  They

22    are trying to be able to display for you an exhibit to

23    the hearing so you can see it while being questioned.  It

24    will take just a moment.

25         MR. SOLOWAY:  I have some other questions before

1    I get to the exhibit so perhaps in the view of expediency

2    I will put those other questions to the Rabbi with your

3    permission, your Honor.

4            THE COURT:  Go ahead.

5    REDIRECT EXAMINATION BY MR. SOLOWAY:

6        Q.  Rabbi, are you familiar with the term common

7    fair?

8        A.  Yes.

9        Q.  What is common fair?

10       A.  Common fair is the religious diet program

11   instituted by the Bureau of Prisons for those whose

12   religious penance require foods that be of kosher or

13   halal.

14       Q.  Do those Jewish inmates that wish to keep kosher

15   eat off of the common fair menu?

16       A.  Yes.

17       Q.  Does the Bureau of Prisons, Rabbi, maintain a

18   database to determine which inmates are eating off of

19   common fair and which inmates are not?

20           MR. KOFFSKY:  Objection.  Outside the scope of

21   direct.

22           THE COURT:  Sustained.

23           MR. SOLOWAY:  If I may be heard briefly.  When

24   Attorney Koffsky initially began his cross-examination,

25   he asked many questions concerning kosher food.  This

1    line of questioning goes towards what common fair is and

2    how this particular petitioner may have been part of the

3    common fair program.

4            THE COURT:  But nothing came out about common

5    fair program.  Nothing came out about whether or not the

6    Bureau of Prisons keeps track of who eats common fair.

7    And it is not terribly relevant.  I will add that

8    objection as well.  We're talking about this inmate.

9            MR. SOLOWAY:  I would link it back to this

10   particular inmate in my follow up questions.

11           THE COURT:  How is that redirect?

12           MR. SOLOWAY:  Your Honor.

13           THE COURT:  Attorney Koffsky didn't ask anything

14   about his particular client when he was asking all of the

15   questions to which you were fairly appropriately

16   objecting, not terribly relevant about what was kosher

17   and what wasn't kosher but none of it related to his

18   particular client.

19           MR. SOLOWAY:  Thank you, your Honor.  Exhibit 5,

20   your Honor.

21           THE COURT:  Petitioner's?

22           MR. SOLOWAY:  Yes.

23           THE COURT:  Thank you.

24       Q.  Rabbi, have you seen this document before?

25       A.  Which I can't read the top.  I see a document

1    but I can't read it.

2         Q.  Excluding the very top of the page, do you see

3    from that portion of Petitioner's Exhibit 5 that read

4    from the line FCI Danbury commissary kosher for Passover

5    items down through a line with a denomination milk and to

6    the lower right-hand portion of that an exhibit stamp?

7    Do you see that?

8         A.  Very faintly but I see something.

9         THE COURT:  Do you know how to change your

10   screen from the four picture to the one -- I see it now.

11   Can you bring the picture up so the top is in?

12        MR. SOLOWAY:  I don't think it is going to be

13   necessary for him to see the very top portion.

14        Q.  Have you seen this before, Rabbi?

15        A.  Yes.

16        Q.  And this is the list of items that petitioner

17   has introduced as Exhibit 5; is that correct?

18        MR. KOFFSKY:  Objection.  He wouldn't know that.

19        THE COURT:  We know it is 5. Let's go.

20        Q.  What is Petitioner's Exhibit 5, Rabbi?

21        MR. KOFFSKY:  It is admitted as an item of

22   evidence.  He wouldn't know how to describe it.

23        THE COURT:  It is not going to be helpful to the

24   record.

25        Q.  Do you know, Rabbi  -- withdrawn.

1          Attorney Koffsky asked you a question regarding

2     the Aleph Institute in his cross-examination.  Do you

3     remember that.

4          A.  Yes.

5          Q.  And is the Aleph Institute a manufacturer of

6     kosher for Passover food stuffs?

7          MR. KOFFSKY:  I will object.  I think this was

8     objected to by the respondent and I'm going to object to

9     its relevance.

10          THE COURT:  I don't believe the question about

11     Aleph Institute went very far.  If I recall correctly, I

12     think you did object.  I think he said he was familiar

13     with it but I don't think there was anything asked.  No.

14     It was asked -- there was an objection.  I said I will

15     allow it.  So he answered he was somewhat familiar and he

16     knew they provided kosher for Passover products to

17     inmates and he's seen the list, then you withdrew your

18     next question, Attorney Koffsky, so there was some brief

19     testimony about it.  Go ahead, Attorney Soloway.

20          Q.  Do you know who supplies FCI Danbury with its

21     kosher for Passover food stuffs for 2008?

22          THE COURT:  Just answer yes or no first, Rabbi.

23          A.  No.

24          Q.  Did MBC Brooklyn ever purchase their kosher for

25     Passover food stuffs at any point in time to your

1    knowledge?

2              MR. KOFFSKY:  Objection.  Relevance.

3              MR. SOLOWAY:  I will withdraw it, your Honor.

4    If I can have a moment to consult.  No further questions

5    of this witness, your Honor.

6              THE COURT:  All right. I think that completes

7    your examination, Rabbi.  Thank you for being available.

8    We're going to sign off from this end.  Thank you very

9    much.

10             Attorney Soloway, did you know that the attorney

11   was going to be in the room with the witness?

12             MR. SOLOWAY:  No, your Honor.  When I spoke, I

13   wasn't originally sure whether he was going to be there

14   or not.

15             THE COURT:  All right.

16             THE WITNESS:  If I may.  Mr. Watson when we did

17   have a preliminary discussion indicated that Adam Johnson

18   might be in the room.

19             MR. KOFFSKY:  I think we're still connected.

20             MR. MILNER:  Brooklyn, can you hang up.  I'm

21   trying to drop the call as well.

22             THE COURT:  I'm sorry.  You were about to

23   volunteer something.

24             THE WITNESS:  I wanted to let you know that

25   Mr. Watson when asked if he was going to remain present

1    during the hearing, I indicated he would not but Adam

2    Johnson might be joining.  He did indicate that.  It

3    wasn't obvious that he entered the room because of the

4    angle of the screen.

5              THE COURT:  When you said you indicated that?

6              THE WITNESS:  Mr. Watson indicated that to the

7    group.

8              MR. SOLOWAY:  We spoke briefly with Mr. Watson

9    prior to the court starting the session this morning.

10             THE COURT:  You had an exhibit that we were

11   reviewing I think to see if there was a stipulation from

12   the plaintiff.

13             MR. KOFFSKY:  If I may have another thirty

14   seconds, your Honor.

15             MR. SOLOWAY:  That's the only reason that the

16   government would seek to call Mr. Rodriguez who we

17   believe to be present in the building.

18             MR. KOFFSKY:  Based on Mr. Soloway's

19   representation that this in fact the menu for the

20   upcoming Passover holiday, we have no objection to it

21   being an exhibit for that purpose.

22             MR. SOLOWAY:  I think it is number one.

23             THE COURT:  This will be marked as Defendant's

24   Exhibit 1 without objection on the representation that

25   this is the menu for the upcoming Passover holiday.

```
1              THE COURT:  Yes.  If you can bring that up to be
2       marked, then I can see it please.  Is there anything
3       further that the government wishes to offer?
4              MR. SOLOWAY:  After I bring it up, I would like
5       the opportunity to speak with counsel, your Honor.
6       (Handing.) For the record, your Honor, it is also a
7       document that was attached to the pleading that the
8       government filed on Sunday.
9              THE COURT:  Thank you.  Defendant's Exhibit 1
10      has been marked as a full exhibit.  Is there anything
11      further?
12             MR. SOLOWAY:  No, Your Honor.
13             MR. KOFFSKY:  Nothing from the defendant.
14             THE COURT:  I have only one question right now
15      anyways for you, Attorney Koffsky.  The petitioner's
16      petition when filed pro se was brought on a 2241 form as
17      a habeas petition.  Would you and I will ask the
18      government agree, it was pro se that I should construe it
19      not as a habeas petition but as a -- it isn't a 1983
20      either.  But comparable statute for state actions 5
21      U.S.C. 70 which is basically a 1983 action against a
22      federal person in their official capacity.
23             MR. KOFFSKY:  I would ask the court to consider
24      the petitioner's filing as broadly as possible.  She
25      drafted it as an inmate.  Drafted it without the benefit
```

1     of counsel.  If she misapplied the particular statute, I

2     would ask the court to apply the appropriate statutory

3     analysis.  I apologize.

4           THE COURT:  That's what I'm trying to do.

5           MR. KOFFSKY:  I understand that.  I would ask

6     the court do that.

7           THE COURT:  Am I correct, Attorney Soloway, it

8     should have been under that statute, not a 2241?

9           MR. SOLOWAY:  That's correct.  But counsel has

10    been in the case sometime.

11          THE COURT:  I could have scheduled a filing of

12    an amended complaint but I didn't so we didn't get one.

13    I don't want to construe it a certain way and have you

14    after the opinion comes out say you are wrong.  That's

15    not a cause of action under there.

16          MR. SOLOWAY:  I think the court is technically

17    correct.  However it is the government's position that

18    the petitioner has had the opportunity to correct the

19    deficiency of her initial proceeding.  For whatever

20    reason the petitioner has not done so.  Beyond that, I

21    don't need to be heard.

22          THE COURT:  Okay.  I'm not in a position this

23    moment to render a decision.  I expect I will be probably

24    by tomorrow morning.  It will likely be a written

25    decision.  Although I may do what I sometimes do in cases

1    where matters are of the essence and that's do a

2    telephone call and render an oral opinion on the record

3    which obviously see interest from the public in the

4    decision so I will strive to do a written decision so it

5    is available to everybody at the same time.  But we'll

6    see how difficult the legal issues are especially since I

7    haven't had the opportunity to read your memoranda.  I

8    don't know if you are taking me in a direction that we

9    haven't gone down in terms of the cases I have looked at,

10   whether there's new cases and whether they change my

11   thinking or not.  I can't say for certain.  My goal would

12   be to issue a written opinion sometime this morning.

13           MR. SOLOWAY:  If the court decides to issue a

14   opinion this afternoon, perhaps we can have numbers to be

15   reached.  I have a matter before Judge Bryant.

16           THE COURT:  I think it will be more likely

17   tomorrow morning written or oral.  Maybe if you can let

18   my law clerk know what your availability might be

19   tomorrow morning, but as I say, my goal is to have it be

20   a written opinion.  If it is going to take too long to

21   get it done right, I will have to do it orally.  I

22   realize if the claim by the plaintiff is successful,

23   obviously there are time issues that we are facing right

24   now.  My goal is to have it decided by tomorrow morning.

25           (Whereupon, the above proceeding adjourned at

1   12:07 p.m.)

2

3

4   COURT REPORTER'S TRANSCRIPT CERTIFICATE

5   I hereby certify that the within and foregoing is a true

6   and correct transcript taken from the proceedings in the

7   above-entitled matter.

8

9   /s/  Terri Fidanza

10  Terri Fidanza, RPR

11  Official Court Reporter

12

13  DATE_____

14

15

16

17

18

19

20

21

22

23

24

25

# INDEX

**EXAMINATION**

| Witness Name | Page |
|---|---|

Rabbi Jacob Hoenig

    Direct By Attorney Soloway ...................................... 185
    Cross By Attorney Koffsky ...................................... 196
    Re-Direct By Attorney Soloway .................................. 212